IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA
AT OMAHA, NEBRASKA

| | | |
|---|---|---|
| GUILLERMO HERRERA, III, | ) | Case No.: 8:15-cv-426-JMG-CRZ |
| | ) | |
| Plaintiff, | ) | |
| | ) | **BRIEF IN SUPPORT OF** |
| vs. | ) | **PLAINTIFF'S MOTION FOR** |
| | ) | **PARTIAL SUMMARY JUDGMENT** |
| UNION PACIFIC RAILROAD COMPANY, a | ) | **(SECOND CLAIM FOR RELIEF)** |
| Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW Plaintiff, Guillermo Herrera, III, by and through his attorney, James L. Cox, Jr., of BRENT COON & ASSOCIATES, PC, and submits his Brief in Support of Plaintiff's Motion for Partial Summary Judgment (Second Claim for Relief).

## INTRODUCTION

In Plaintiff's First Claim for Relief in the present action, he makes a claim under the provisions of the Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq.* ("FELA"). Plaintiff claims that on July 26, 2015, as a result of Defendant's breach of its duty to provide him a reasonably safe place to work, he sustained heat-related injuries, including heat exhaustion, heat stroke, and cerebellar stroke, which have resulted in significant permanent injuries.

In Plaintiff's Second Claim for Relief, Plaintiff claims Defendant violated the direct worker safety provision mandate in the first sentence of the Federal Railroad Safety Act, 49 U.S.C. § 20109(c)(1) ("FRSA").[1] Plaintiff claims that on July 26, 2015, Defendant violated the FRSA by denying, delaying, and interfering with his medical treatment that was necessary

---

[1] "(c) Prompt medical attention –
    (1)  Prohibition.: -- A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment."

because of his on-the-job heat-related injuries.[2]

Plaintiff brings this Motion for Partial Summary Judgment that Defendant violated the prohibition in the first sentence of 20109(c)(1) because there exists no genuine dispute that on July 26, 2015, Defendant, through Plaintiff's supervisor, Carlos Diaz, delayed, denied, and interfered with Plaintiff's need to obtain medical treatment for the heat-related injury from which he was suffering.

On July 26, 2015, at about 1:30 p.m., the decision was made by Plaintiff's supervisors that Plaintiff needed to be removed from the job site because he was suffering from significant heat-related problems.  He was assisted into a foreman's van (Robert Herrera) (no relation to Plaintiff), and transported a short distance to meet the gang supervisor (Carlos Diaz).  He was assisted into Mr. Diaz's company-issued pickup truck at about 2:00.  Plaintiff was in and out of consciousness during the period of time that he was in the supervisor's truck, but not taken to the nearest hospital's emergency room until 4:30 p.m.  At the time of the admission Plaintiff was extremely weak, dizzy, unable to walk, and unable to orient to purpose, place or time.  He was admitted to the emergency room emergently and diagnosed with heat exhaustion.

Defendant's own instructions to its supervisor require that if the signs and symptoms of heat exhaustion do not improve in 15-20 minutes, "seek medical attention."

The distance from where Plaintiff was removed from the job site by Foreman Herrera to where he met Supervisor Diaz is 4.8 miles on paved road.  The distance from where Plaintiff was put in Supervisor Diaz's truck to the hospital is 18 miles on paved roads.  The total estimated

---

[2] This Motion relates only to Plaintiff's claim that Defendant, through Supervisor Carlos Diaz, violated the first sentence of  20109(c)(1).  Although Plaintiff will argue at trial that Defendant also violated the second sentence of 20109(c)(1), he concedes that because of the difference in the testimony of Plaintiff and Robert Herrera and Carlos Diaz on when Plaintiff requested that he be taken to the hospital, a factual dispute remains on this issue for a jury's determination.

travel time is 30 minutes.  Neither Supervisor Diaz nor the defendant has offered any explanation for the 2½ - 3 hour delay in getting Plaintiff from where he was removed from the job site to the hospital.

As a result, a determination as a matter of law that Defendant violated the first sentence of FRSA 49 U.S.C. § 20109(c)(1) is appropriate.

## I.    49 U.S.C. § 20109(c)(1) IS A "DIRECT WORKER SAFETY PROVISION," NOT AN ANTI-RETALIATION PROVISION (AS IS SUBSECTION (c)(2)).

In *Santiago v. Metro-North Commuter Railroad Company, Inc.*, ALJ Case No. 2009-FRS-011, the U.S. Department of Labor Administrative Review Board, in the first case to address 49 U.S.C. § 20109(c)(1), stated:

> "In sum, to prove the railroad carrier violated subsection 20109(c)(1), an employee needs to prove that (1) the carrier inserted itself into the medical treatment and (2) such act caused a denial, delay, or interference with medical treatment."

The Third Circuit Court of Appeals, in *Port Auth. Tran-Hudson Corp. v. Sec'y, United States Department of Labor*, 776 F.3d 157 (3rd Cir. 2015), the Court, in reviewing the history of 49 U.S.C. § 20109(c)(1), stated:

> "Before the FRSA was amended by the Rail Safety Improvement Act of 2008 ('RSIA'), 49 U.S.C. § 20109 was exclusively an anti-retaliation provision. Subsections (a) and (b) of § 20109 provided (and still provide) protections to employees who assist in investigations into railroad safety, refuse to violate laws pertaining to railroad safety, notify a railroad or the Secretary of Transportation about 'work-related' injuries or illnesses, and report and/or refuse to work in hazardous conditions. The RSIA inserted a new subsection (c), containing both an anti-retaliation provision, subsection (c)(2), and a more direct worker safety provision, subsection (c)(1)…" (The Court then goes on to quote (c)(1) and (c)(2)).[3]

The Court went on to state that "Subsection (c)(1), entitled 'Prohibition,' is a 'substantive

---

[3] The Third Circuit Court of Appeals was the first Federal Appeals Court to consider a case involving 20109(c)(1).

provision'; while subsection (c)(2), entitled 'Discipline,' is an 'antiretaliation provision,'" at 163.

## II.   49 U.S.C. § 20109(c)(1) CONTAINS TWO DISTINCT MANDATES WHEN AN EMPLOYEE IS INJURED DURING THE COURSE OF HIS EMPLOYMENT.

In September of 2015, the United States District Court for the Northern District of Illinois Eastern Division, in *Armstrong v. BNSF Railway Co.,* 128 F.Supp.3d 1079 (2015), distinguished Armstrong's retaliation claim that the BNSF terminated him for filing an injury report, from Armstrong's claim for interference with medical treatment.  The Court stated:

> "Section 20109(c)(1) of the FRSA imposes two requirements on railroad carriers when an employee is injured during the course of employment. First, the railroad carrier 'may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment.' 49 U.S.C. § 20109(c)(1). Second, if 'transportation to a hospital is requested by an employee who is injured during the course of employment,' the railroad carrier must promptly arrange the transportation of that employee to the 'nearest hospital where the employee can receive safe and appropriate medical care.'"

In October of 2015, the United States District Court for the Eastern District of Louisiana in *Jones v. Illinois Central Railroad Company*, Civil Action No. 15-635, the Court, after reviewing again the regulatory purpose of Subsection (c)(1), cited *PATH v. DOL*, *supra*, and differentiated between Subsections (c)(1) and (c)(2).   It stated:

> "Subsection (c)(2) – like subsections (a) and (b) – is a 'anti-retaliation provision' aimed at deterring rail carriers from disciplining employees for, among other things, 'following orders or a treatment plan of treating physician.' 49 U.S.C. § 20109(c)(2).   Subsection (c)(1), however, is a 'substantive provision' whose 'primary objective is to ensure that railroad employees are able to obtain medical attention for injuries sustained on-duty," citing *PATH v. DOL*, 776 F.3d 16.

The Court confirms that the primary purpose of Subsection (c)(1) is remedial in nature.

It is important to note that in Plaintiff's Amended Complaint and Request for Jury Trial (Doc. #39), Plaintiff's Second Claim for Relief claims a violation of 49 U.S.C. § 20109(c)(1), "denial, delay or interference with medical or first aid treatment," and cites in ¶ 49 only the first

4

sentence of 20109(c)(1).  The first sentence in 20109(c)(1) is not an anti-retaliation provision like Subsection (c)(2), but is a direct worker safety provision, a "substantive provision" whose primary objective is to ensure that railroad employees are able to obtain medical attention for injuries sustained on duty, and whose primary purpose is remedial in nature.  The railroad employer cannot wait until the employee requests to be taken to the hospital before the substantive provision of the first sentence of (c)(1) is invoked.  The prohibition in the first sentence of (c)(1) becomes mandatory when the employee in injured on the job, not when he requests to be taken to the hospital.  This case is an example of why this interpretation is correct: Plaintiff was in need of removal from the job site; in and out of consciousness while in Supervisor Diaz's truck; disoriented when he was finally admitted to the hospital; where he was diagnosed with heat exhaustion.[4]

Can Defendant, Union Pacific Railroad, claim that its obligation to not deny, delay or interfere with Plaintiff's medical or first aid treatment does not arise until Plaintiff requests to be taken to the hospital?  The substantive worker safety provision of the first sentence clearly instructs that the answer is no.

Plaintiff was not retaliated against or disciplined for his injury or seeking or obtaining medical treatment.

Plaintiff has not made, and cannot make, a claim that Defendant retaliated against him in violation of 20109(a) or (b) or (c)(2).  As seen by the facts enumerated hereinafter, and reference to Plaintiff's Amended Complaint, his claim is that Defendant interfered, denied, or delayed medical or first aid treatment in violation of the distinct mandate in the first sentence of

---

[4] Plaintiff claims that he did request to be taken to the hospital.  This claim is disputed by Mr. Herrera and Mr. Diaz, creating a credibility question that precludes Plaintiff from filing a Motion for Summary Judgment on the claim that Defendant violated the second mandate in 20109(c)(1).

20109(c)(1).  The plaintiff's burdens of proof and the defendant's burden of proof enumerated in *Kuduk v. BNSF Railway Company*, 768 F.3d 786 (8th Cir. 2014), do not apply to Plaintiff's claim, nor govern Plaintiff's claim.[5]

## III.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   <u>Union Pacific Railroad Steel Gang 8501</u>

1.      Plaintiff was working on Union Pacific Railroad Steel Gang 8501 on July 24, 25, and 26, 2015, on Cook Siding, 22.8 miles from Onaga, Kansas.  (**Exhibit 4** to Plaintiff Depo., Job Briefing 8501 Work Group.)

2.      Joe Linford was a supervisor of Rail Northwest for Defendant, including UPRR Steel Gang 8501.  (**Exhibit 1**, Linford Depo., 7:20-25.)  He is the on-the-job, on-site supervisor of the gang.  (*Id.*, 14:21-22.)

3.      The chain of command on UPRR Steel Gang 8501 on July 26, 2016 was:  Louis Martinez was the Director; Michael Rolow was the manager; Carlos Diaz and Joseph Linford were the ARSA supervisors.  (*Id.*, 15:15-25.)  The surfacing gang foreman was Robert "Bobby" Herrera.  (*Id.*, 16:11-15.)  Scott Nicholson was the assistant foreman with supervisor authority over the clean-up/quality control gang, to which Plaintiff was assigned.  (*Id.*, 17:9-16.)

4.      UPRR Steel Gang 8501 is considered a steel gang, so one of its main jobs is going around replacing steel track throughout the railroad.  It also does pad replacement…on concrete ties.  (*Id.*, Linford Depo., 8:6-10.)

5.      UPRR Steel Gang 8501 is called a system gang.  So anywhere within the rail northwest, it can travel and do different work locations.  So a variety of states that it works in.

---

[5] Two recent 8th Circuit Court of Appeals decisions, *Heim v. BNSF Railway Co.,* No. 15-3532, and *Blackorby v. BNSF Railway Co.,* No. 15-3192, are claims under 49 U.S.C. § 20109(a)(4).  Neither Mr. Kuduk, Mr. Heim, nor Mr. Blackorby made a claim under the first sentence of 20109(c)(1).

(*Id.*, 8:19-22.)

6.      Union Pacific Railroad Steel Gang 8501 worked the first eight days of a month, followed by seven rest days, then the second eight days of the month, followed by seven rest days.  During each of these "halves," the gang will work 10-hour days or 11-hour days, straight time.  Like all construction work, there is some overtime involved.  (*Id.*, 10:5-11:9)

7.      Union Pacific Railroad Steel Gang 8501 had been working in California but, following a seven-day rest half, had begun to work in Onaga, Kansas on July 24, 2015. (*Id.*, 9:19-10:4.)

8.      July 24, 2015 was a travel day (a day that permitted members of the gang to drive from their homes to Onaga, Kansa, to begin work with the gang at the end of their rest days).  Approximately 10 to 12 employees were brought in on July 24 to unload the track machines that make up the steel gang from railroad cars on which they had been transported from California to Onaga, Kansas. (*Id.*, 9:19-10:4.)

9.      Steel Gang 8501 is akin to a big assembly line with anywhere from 24 to 27 pieces of equipment.  The first machines straighten out any slewed ties.  The next machines will curb ballast away.  Next are machines that grab a tie to make sure that it is straight.  Then a mini surfacing gang, comprised of a tamper, regulator, establishes a foundation for the ties and the ballast and for the new rails that are going to be placed on the ties. (*Id.*, 18:2-19:1.)

10.     Next in the process is a "declipping process," which removes the fasteners that are holding the rail onto the ties.  This gang is working on concrete ties rather than wood ties,  the primary difference being rail is held onto wood ties by spikes and tie plates; rail is held onto the concrete ties by metal clips that are added to clips already on the concrete ties to attach the base of the rail to the concrete tie. (*Id.*, 19:7-12.)

7

11.     Next, a large machine picks up the old rail and lays in place the new rail.  (*Id.*, 19:12-16.)

12.     Next is the clipping process.  This is accomplished by a large Harsco machine that puts the rail back into a neutral temperature state, applies insulators and clips, clipping the rail back into place.  (*Id.*, 19:21-25.)

13.     Next is the quality control, or clean-up crew.  The clean-up crew is responsible for everything being 100% when the gang's tasks are accomplished.  (*Id.*, 20:1-9.)

14.     Assigned to the clean-up gang is a P-car, a machine that will be up in front that clips the clips and declips the metal clips from the base of the rail.

15.     It is the P-car that clips and declips the clips that are attached to the concrete tie to hold a rail in place on the concrete tie.  (*Id.*, 23:16-24.)

16.     If the P-car is working properly, Mr. Linford expects it to be used, absolutely.  (*Id.*, 61:15-17.)

**B.     The Charles Turner Incident**

17.     On July 24, 2015, Assistant Foreman Charles Turner, who was assisting in offloading the machines in Onaga, suffered a heat-related problem.  He started feeling a little dizzy, dropped down to his knees, set on his back.  A coworker radioed that he was laying down; that he was in distress.  They picked him up in a speed swing to carry him to the head of the gang.  He was loaded into the speed swing by several coworkers grabbing parts of his body, lifting him down from where he was laying, and assisting him getting into the cab of the speed swing.  Instead of being taken to the hospital, he was taken to the job briefing area in Onaga, Kansas.  He remained in the job briefing trailer at the job briefing site in Onaga for the remainder of the day, four to five hours.  With him in the job briefing trailer were Dave Birt and Charlie

8

(Carlos) Diaz.  (**Exhibit 6**, Turner Depo., 12:11-14:2, 15:2-6, 16:5-24, 18:11, 19:2-12.)

18.     It is no further than 20 minutes drive time from the job site at Cook Siding, where the gang was working, to the job briefing site in Onaga.  (*Id.*, 24:9-12.)

### C.     Assistant Foreman Scott Nicholson

19.     Scott Nicholson was the Assistant Foreman in charge of the clean-up crew[6] working near the end of the steel gang assembly line, of which Plaintiff was a member.

20.     Mr. Nicholson was new to the gang. (**Exhibit 7**, Nicholson Depo., 20:10.)

21.     The first time Mr. Nicholson had ever worked on a steel gang working on concrete ties was on July 25, 2015. (*Id.*, 23:15-21.)

22.     Plaintiff was supposed to be operating the P-car but Assistant Foreman Scott Nicholson did not want Plaintiff using the P-car, so he would drive it up so far and we (Plaintiff and his coworker) would stay behind and do everything with the sledgehammers and a manual declipper.  (**Exhibit 8**, Plaintiff Depo., 65:2-14.)

### D.     The Work of the Clean-up Crew on July 26, 2015

23.     The main production part of Steel Gang 8501 moved ahead of the clean-up crew. Because the quality of the track was poor due to low ties and crooked ties, the clean-up crew was having to do a lot of clean-up work in the back to make the track 100%.  (**Exhibit 9,** Dickison Depo., 23:15-20.)

24.     Due to the poor quality that the main production part of the gang was producing, (the clean-up crew) (was) having to redo a lot of what they had done. The clean-up crew had to make sure the biscuits and clips are all in to make the track safe for travel.  (*Id.*, 24:10-14.)

25.     The Clean-up crew was undermanned needing more laborers.  (**Exhibit 58** to

---

[6] Also referred to as the "quality control crew."

Dickison Depo., Statement of Dennis Dickison.)  It consisted of Plaintiff, Assistant Foreman

Scott Nicholson, and Camp Car operator Dennis Dickison.  (**Exhibit 10**, Newman Depo., 26:18-

22.)  Dennis Dickison was on light duty and not able to do all of the physical labor required of

the clean-up crew.  (*Id.*, 27:9-20.)

26.     Under normal conditions, the P-car assigned to the clean-up crew (a track-

mounted machine) is used to apply or remove the clips to clip or de-clip the base of the rail to the

concrete tie.  (**Exhibit 5** to Plaintiff Depo., photo of Union Pacific Railroad PCAR 1401.)

27.     Plaintiff was assigned as the P-car operator.  (**Exhibit 8**, Plaintiff Depo., 65:5-14)

28.     However, Scott Nicholson decided it would be better for Plaintiff to not use the P-

car and just come back and pull the clips by hand. (**Exhibit 9,** Dickison Depo., 31:4-7.)

29.     Because there were so many clips being pulled, by not using the machine it

created a lot of extra physical, manual labor.   (*Id.*, 31:19-21.)  Before 9:00 a.m. on July 26,

2015, Plaintiff had been performing all of the physical labor duties on the clean-up gang.

(**Exhibit 10**, Newman Depo., 27:22-25.)

30.     When Plaintiff asked Assistant Foreman Nicholson to use the P-car to clip or de-

clip the rail, he was informed by Assistant Foreman Nicholson to do the clean-up work by hand.

(*Id.*, 36:12-37:3.)  When Mr. Marsing and Plaintiff talked with Assistant Foreman Scott

Nicholson about using the P-car on 07/25/15, they were informed to shut down the P-car and do

the cleanup by hand. (**Exhibit 11**, Marsing Depo., 30:6-25.)

31.     P-cars, if they are fully operational, should be utilized to the fullest extent that

they can be.  (**Exhibit 12,** Rolow Depo., 40:24-41:2.)

32.     When the P-car is not used, it definitely makes the physical work of the laborers

harder.  (**Exhibit 10**, Newman Depo., 36:23-25.)

10

33.     The clean-up gang was falling behind the rest of the gang because they were having to clip and de-clip the ties by hand and didn't have the manpower to keep up with the gang.  (*Id.*, 37: 6-8.)

34.     On the siding in Onaga where Steel Gang 8501 was working, there were a lot crooked, skewed ties and low ties, where they were actually lower than the rail.  To attach the biscuits and clips on them, you have to dig them out of the ballast and move them with a jack.  (**Exhibit 9**, Dickison Depo., 10:9-11:14.)

35.     Quite a bit of work is involved to do this.  The most strenuous part of the work is digging out the ballast to where the tie is movable.  (*Id.*, 12:11-13.)

36.     These were standard 8-foot concrete ties.  Each tie weighs 650 lbs.  (**Exhibit 14**, Defendant's Answers to Plaintiff's Fifth Set of Interrogatories, No. 29.)

37.     Mr. Herrera and Mr. Newman, the only members of the clean-up crew present and performing this heavy physical work (after Mr. Newman arrived about 9:00 a.m.), had to use a lining bar to lift the concrete tie, once it was loosened from the ballast, to where its top can be positioned at the bottom, or base, of the rail so that the metal clip can be hammered on to attach the rail to the tie.  It is strenuous physical work.  (**Exhibit 9**, Dickison Depo., 13:4-15:3.) (*See* **Exhibit 71** to Gavalla Depo., photo of ballast, tie, clips, and rail.)  Mr. Dickison, the Camp Car operator, was working on light duty because of a medical procedure, and could not assist in this heavy work.  (**Exhibit 9,** Dickison Depo., 20:19-22:4.)

**E.     The Weather on July 26, 2015**

38.     Plaintiff and Logan Newman were drinking plenty of water.  They tried to take breaks and hydrate themselves as much as they could.  (**Exhibit 10**, Newman Depo., 39:17-25.)

39.     The heat was "devastating."  (*Id.*, 42:23-43:8.)

11

40.     It was hot, humid and sunny.  It was a very muggy kind of day. (*Id.*, 38:23-39:2.)

41.     The humidity to Dennis Dickison was miserable and hard to deal with.  (**Exhibit 9**, Dickison Depo., 55:1-16.)

42.     "On a sunny day, the rail temperature will be approximately 30 degrees Fahrenheit higher than the ambient temperature.  An ambient temperature of 80 degrees Fahrenheit on a sunny day generally correlates to a rail temperature of approximately 110 degrees Fahrenheit."  (**Exhibit 18** to Steely Depo., Relationship between Ambient Temperature and Rail Temperature, Rule 7.3.3, Union Pacific Railroad Engineering Track Maintenance Field Manual, revised October 1, 2007.)

43.     When using the Heat Index, combine the temperature with the relative humidity to obtain the "feel like" temperature (Heat Index).  "Add up to 15° if in the direct sun."  (**Exhibit 20** to Steely Depo., Heat Index.)

44.     At a Heat Index of 103 or higher, "Heatstroke/sunstroke highly likely with continued exposure."  (*Id.*)

45.     When factoring in the rail temperature and the fact that at 10:52 a.m. and thereafter the skies were clear (sunny), the Heat Index at 10:52 a.m. was 129° F; at 11:52 a.m. it was 135° F; at 12:52 p.m. it was 135° F; and at 1:52 p.m. it was 136° F.  (*See* **Exhibit 123** and **Exhibit 15**, Verification of Sullivan P. Brown, Weather or Not.)

### F.     Plaintiff's Injury

46.     At about 10:30 a.m., Plaintiff started feeling faint.  Plaintiff sat in a mechanic's truck to cool off for about half an hour or so.  (**Exhibit 8**, Plaintiff Depo., 61:1-19; 69:22-25.)

47.     Plaintiff informed Assistant Foreman Scott Nicholson that he wasn't feeling good and needed a break.  Assistant Foreman Scott Nicholson advised Gang Safety Captain Bobby

Steely of this.  (**Exhibit 16**, Steely Depo., 36:2-23.)

48.     Mr. Nicholson was aware of the fact that Plaintiff was feeling dizzy, weak, and having trouble breathing, and that he was in the mechanic's truck for about half an hour or so to cool down. (**Exhibit 7**, Nicholson Depo., 44:4-10.)

49.     Around 11:00 a.m., while Plaintiff was sitting in the mechanic's truck, Assistant Foreman Scott Nicholson told him, "If you plan on being in the truck all day, you won't get paid."  (**Exhibit 8**, Plaintiff Depo., 70:1-11.)

50.     Braden Bradley, the mechanic in whose truck Plaintiff was sitting, recalls Assistant Foreman Scott Nicholson saying to Plaintiff that if he did not get back to work, he would not get paid that day.  (**Exhibit 17**, Bradley Depo., 12:11-21.)

51.     Plaintiff got out of the truck because he felt like Assistant Foreman Scott Nicholson was forcing him to get out.  (**Exhibit 8**, Plaintiff Depo., 70:7-9.)

52.     After this conversation, Plaintiff returned to work. (**Exhibit 10**, Newman Depo., 45:4-24.)

53.     About 11:30 to 12:00 noon, Plaintiff sat in another truck, this time a fuel truck, to cool down.  (**Exhibit 8**, Plaintiff Depo., 71:5-25.)

54.     Plaintiff and Dennis Dickison sat in the fuel truck for about 15 minutes.  (**Exhibit 9**, Dickison Depo., 44:19-45:13.)

55.     Assistant Foreman Scott Nicholson told Plaintiff and Dennis Dickison to get out of the truck.  Plaintiff got out of the truck and continued working.  (**Exhibit 8**, Plaintiff Depo., 72:8-10.)

56.     At approximately 1:00 p.m., Plaintiff told coworker Logan Newman that he didn't feel good; he couldn't walk anymore because his vision was looking real blurry; that he didn't

13

feel good, and had to stop and sit down.  (**Exhibit 8**, Plaintiff Depo., 72:16-22.) (**Exhibit 3** to

Plaintiff Depo., handwritten statement of Plaintiff.)

57.    Plaintiff then went and sat on a track machine on the gang.   (**Exhibit 8**, Plaintiff

Depo., 72:16-22.)

58.    Plaintiff told Dennis Dickison that he had diarrhea and felt like he was going to

throw up.  (**Exhibit 58** to Dickison Depo., Dickison Statement.)

59.    When Mr. Dickison and Mr. Logan offered to help him, Plaintiff said that he

could not walk.  (**Exhibit 9**, Dickison Depo., 45:14-47:11.)  Plaintiff actually fell and Logan

(Newman) caught him. (**Exhibit 8**, Plaintiff Depo., 72:24-25.)

60.    Mr. Dickison radioed Assistant Foreman Scott Nicholson to tell him that

Guillermo (Plaintiff) was sick, that he needed to call someone because Plaintiff needed help.

(**Exhibit 9**, Dickison Depo., 47:1-19.)

61.    Logan Newman observed Plaintiff's physical and mental condition.  Mr. Newman

said, "He seemed a little out of it.  You know, when he told me that he couldn't get up, I knew

that it was serious."  "And when he told me he couldn't get up I knew it was a big deal."  "I

called Scott as soon as he (Plaintiff) told me he couldn't get up."  (**Exhibit 10**, Newman Depo.,

48:3-15.)

62.    Assistant Foreman Scott Nicholson called Surfacing Gang Foreman Robert

"Bobby" Herrera on the radio, asking him to come and pick up Plaintiff in his vehicle.  Mr.

Herrera arrived within a couple of minutes of my transmission on the radio.  (**Exhibit 7**,

Nicholson Depo., 58:23-25.)

63.    Scott Nicholson and Logan Newman assisted Plaintiff to Bobby Herrera's van

because he could not walk by himself.  His legs kind of shuffled but he could not support

14

himself.  Mr. Newman stayed with Plaintiff the entire time until he left with Bobby Herrera.

Because of Plaintiff's condition, Mr. Newman assumed that Bobby Herrera was taking him to

the hospital at that time because he was not coherent and needed medical help.  (**Exhibit 10**,

Newman Depo., 49:5-50:1.)

66. Surfacing Gang Foreman Bobby Herrera left with Plaintiff in his van; his concern

was to get Plaintiff to the job (briefing) site, maybe to the doctor's office.  Whatever.  (**Exhibit

19**, R. Herrera Depo., 27:19-22.)

65. Dennis Dickison assumed that Bobby Herrera would be taking Plaintiff to the

hospital.  (**Exhibit 9**, Dickison Depo., 49:12-23.)  (**Exhibit 58** to Dickison Depo., Statement of

Dennis Dickison dated February 1, 2016.)

66. Plaintiff is under the impression that Bobby Herrera is taking him to the hospital.

(**Exhibit 8**, Plaintiff Depo., 74:5-8.)

## G.   The Denial, Delay, and Interference with Plaintiff's Medical Treatment

67. In the Job Briefing form for UPRR Steel Gang 8501 ("Job Briefing 8501 Work

Group") (*see* **Exhibit 4,** referenced in Turner Depo.), in the Emergency Response Plan

("E.R.P.") is designated the nearest hospital and directions to that hospital.  In Exhibit 4, it is

designated:  "Hospital:" with directions to the Onaga Community Hospital[7], 120 W. 8th St.,

Onaga, Kansas, 66521.  The hospital and location is included on the Job Briefing form (Exhibit

4): "In case of emergencies.  In case of emergencies, everyone knows the location of the nearest

hospital."  (**Exhibit 6**, Turner Depo., 23:6-21.)

68. Robert Herrera called Mr. Diaz "[a]bout 1:45, maybe 1:30."  (**Exhibit 19**, R.

Herrera Depo., 31:25-32:2.)

---

[7] "Onaga Community Hospital"  and "Community HealthCare System" are used interchangeably throughout.

69.     Charlie (Carlos) Diaz told Robert Herrera to meet him at a gas station in Emmett, Kansas.  (*Id.*, 32:21-32:22.)

70.     Surfacing Gang Foreman Robert Herrera drove to the gas station/store in Emmett, which was about three and a half miles from the siding where the gang was working.  (*Id.*, 29:14-15.)

71.     Robert Herrera and Plaintiff waited at the gas station/store in Emmett until Mr. Diaz arrived in his truck.  They waited about five minutes.  (*Id.*, 32:23-24.)

72.     When Mr. Diaz arrived in his truck, Robert Herrera and Carlos Diaz had to assist Plaintiff to Carlos Diaz's truck, put him in the front seat, and help him with the seat belt.  (*Id.*, 35:2-10.)

73.     While Plaintiff was in Mr. Diaz's truck, he was in and out of consciousness.  (**Exhibit 8**, Plaintiff Depo., 74:12-14.)

74.     While Plaintiff was in Mr. Diaz's truck, Mr. Diaz was not listening to Plaintiff when he was telling him to take him to the hospital.  (*Id.*, 53:11-23.)

75.     Eventually, Mr. Diaz drove Plaintiff in his truck to the Union Pacific job briefing site in Onaga, Kansas, not the hospital.  (*Id.*, 74:20-21.)

76.     Plaintiff was at the job briefing site with Carlos Diaz and Bobby Steely "[n]o more than 20 minutes."  (**Exhibit 16**, Steely Depo., 49:10-14.)

77.     Plaintiff told Bobby Steely, "I think I need to go to the hospital."  Bobby Steely said, "Alright.  Charley (a/k/a Carlos), let's go."  (*Id.*, 48:12-20.)

78.     Mr. Steely jumped in the back seat and we drove straight to the Onaga emergency room (*Id.,* 48:19-20), which is only about one minute away from the job briefing site in Onaga.  (*Id.,*, 49:25-50:02.)

79.     Bobby Steely helped Plaintiff into a wheelchair, and the emergency room personnel took Plaintiff right back in, took Plaintiff back to a room and got him on a table at Community HealthCare System.   (*Id.*, 51:8-21.)

80.     Plaintiff arrived at the emergency room at Community HealthCare System, Onaga, Kansas, at 4:28 p.m.  His chief complaint was heat exhaustion, dizzy, weak, confused. His neurological assessment revealed:  "Level of consciousness: cooperative and lethargic. Orientation:  Oriented to person. Not oriented to place.  Not oriented to time.  Unable to orient purpose.  Speech is slow.  Patient is lethargic."  "Patient is confused.  Patient obeys commands. Tingling noted.  Patient reports headache, and vertigo."  Cardiovascular assessment reveals sinus tachycardia.  The assessment in the emergency room is (1) heat exhaustion, (2) hypokalemia secondary to above, (3) weakness secondary to above.  (**Exhibit 92** to Dr. Diaz Depo., Community HealthCare System records.)

81.     Plaintiff was discharged from the emergency room at Community HealthCare System, Onaga, Kansas, at 9:52 p.m.  His condition on discharge was "fair." (*Id.*, Page 3 of 37.)

### H.     The Distance from Where Plaintiff was Injured to the Hospital in Onaga, KS

82.     Union Pacific Railroad Steel Gang 8501 was working in Cook Siding, Kansas, at Mile Post 92.  (**Exhibit 2** to Plaintiff Depo., Report of Personal Injury.)

83.     It is 4.8 miles on paved, county roads from the road crossing at Cook Siding to the gas station/store in Emmett, Kansas, where Robert Herrera drove Plaintiff to meet Carlos Diaz. It is a 9-minute drive.  (**Exhibit 153**, screen shot of travel from UPRR Structure in Emmett, Kansas, to gas station in Onaga, Kansas)

84.     It is 18 miles on Kansas Highway 63 and Highway 16 from the gas station/store in Emmett, Kansas to Community HealthCare System in Onaga, Kansas.  It is a 21-minute drive.

(**Exhibit 154**, screen shot of travel from gas station in Emmett, Kansas to Community HealthCare System in Onaga, Kansas.)

85.     Robert Herrera called Carlos Diaz at 1:30-1:45 p.m.  It takes 9 minutes to drive from the crossing to the gas station/store in Emmett.  Mr. Herrera would have arrived with Plaintiff in his van at 1:54.  Robert Herrera and Plaintiff waited at the gas station/store for about 5 minutes until Mr. Diaz came in his truck, until 1:59 p.m.  Robert Herrera estimates that it was probably about 30 minutes from when he picked up Plaintiff at the job site to when he got him help to Mr. Diaz (1:30-1:45 to 2:00-2:15 p.m.).  (**Exhibit 19**, R. Herrera Depo., 34:5-16.)

86.     Plaintiff was assisted into Mr. Diaz's company-issued pickup truck between 2:00 p.m. and 2:15 p.m., in Emmett, Kansas (*Id.*, 35:2-10.)

87.     Plaintiff was not admitted to the emergency room at Community HealthCare System in Onaga, Kansas until 4:28 p.m.  (**Exhibit 92** to Dr. Diaz Depo., Community HealthCare System records.)

88.     Neither Mr. Diaz nor the Union Pacific Railroad has come forward with any explanation as to why it took Mr. Diaz over two hours to get Plaintiff to a hospital that was only 22.8 miles away.

     **I.**    **Expert Testimony**

     **i.)**    **John Wyker**

89.     John J. Wyker is an expert retained by the Union Pacific Railroad to "testify regarding the Rail Safety Act."  (**Exhibit 21**, Defendant's Third Supplemental Expert Witness Disclosure.)  (**Exhibit 132**, Appendix A, curriculum vitae of John J. Wyker.)

90.     Mr. Wyker agrees that Mr. Robert Herrera called Mr. Carlos Diaz somewhere between 1:30 and 1:45. (**Exhibit 22**, Wyker Depo., 49:12-18.)

91.     It is Mr. Wyker's understanding that Mr. Robert Herrera took Plaintiff right away over to Emmett, to Mr. Diaz, from Cook Siding, which was three or four miles from Emmett, and would have taken 10 or 15 minutes to get there.  He agrees that it would have been about 2:00 that Plaintiff would have been put into Carlos Diaz's UP pickup truck.  (*Id.*, 49:21-50:14.)

92.     The Community HealthCare System records document that Plaintiff was admitted at 16:36 (4:36 p.m. civilian time).  Mr. Wyker agrees (after lengthy debate) that if Plaintiff were admitted to the hospital at 4:30, there would be "some delay in there."  (*Id.*, 68:6-9.)

93.     Mr. Wyker clarifies that the first sentence in 20109(c)(1) prohibits the Union Pacific Railroad from denying, delaying, or interfering with medical treatment; that it makes that prohibition.  (*Id.*, 20:1-7.)

94.     Mr. Wyker agrees that the language in sentence one in Paragraph 1 of 20109(c) does not mean anything different than the straightforward statutory language contained in the sentence; *i.e.*, "I think the statute – the statute language speaks for itself."  (*Id.*,, 18:12-16.)

95.     Mr. Wyker agrees that the first sentence in 20109(c)(1) prohibits the Union Pacific Railroad from denying, delaying, or interfering with medical treatment.  He agrees that the second sentence imposes an affirmative duty on the Union Pacific Railroad that if transportation to a hospital is requested by an employee, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital.  He agrees that the first sentence is a prohibition, the second sentence imposes on the railroad an affirmative duty. (*Id.*, 20:2-19.)

96.     49 C.F.R. § 225.33 requires the Union Pacific Railroad to have an Internal Control Plan.  (*Id.*, 25:1-6.)

97.     49 C.F.R. § 225.33, Internal Control Plans, (a), states:

     "Each railroad shall adopt and comply with a written Internal Control

Plan that shall be maintained at the office where the railroad's reporting officer conducts his or her official business. … The Internal Control Plan shall be designed to maintain absolute accuracy and shall include, at a minimum, each of the following components: (1) A policy statement declaring the railroad's commitment to complete and accurate reporting of all …injuries, …arising from the operation of the railroad, to full compliance with the letter and spirit of FRA's accident reporting regulations, and to the principle, in absolute terms, that harassment or intimidation of any person that is <u>calculated to discourage or prevent such person from receiving proper medical treatment</u>…will result in some stated disciplinary action against any…supervisor,…committing such harassment or intimidation."

98.     49 C.F.R. § 225.33 is a regulation promulgated by the FRA for the protection of railroad employees.  (*Id.*, 29:4-13.)

99.     The Internal Control Plan published by the Union Pacific Railroad and last revised May 18, 2015, states that the UP will not tolerate harassment or intimidation of any person that is calculated to discourage or prevent such person from receiving proper medical treatment.  (*Id.*, 28:19-29:3.)

**ii.)     George Gavalla**

100.     George Gavalla is Plaintiff's retained expert regarding the Railroad Industry Standard of Care and the Union Pacific's own Safety Policies, Rules and Procedures regarding treatment of railroad workers who report or exhibit signs of injury or illness.  (*See* **Exhibit 58-1**[8] **at P. 18,** Gavalla CV, Appendix A to Safety Analysis Report.)  He was the Associate Administrator for Safety at the Federal Railroad Administration from 1997 to 2004.  He reviewed, among other things, the Union Pacific policy regarding heat stress, including instructions to its supervisors and managers on how to monitor heat stress, signs of heat stress, and precautions to be taken when an employee is suffering signs of heat stress; depositions of

---

[8] During depositions two exhibits were marked Exhibit 58; therefore, for clarification, this exhibit is referred to as Exhibit 58-1.

Plaintiff's coworkers; deposition of Assistant Foreman Scott Nicholson; deposition of Robert Herrera; deposition of Carlos Diaz; deposition of Plaintiff.

101.    It is Mr. Gavalla's opinion that the Union Pacific Railroad did not follow either the industry standards or UP's own standards of care regarding the treatment of Plaintiff. (**Exhibit 23**, Gavalla Depo., 58:5-13.)

102.    As it relates to the Union Pacific Railroad's own policy (**Exhibit 13**, Union Pacific Railroad Quality Safety Meeting Process, Heat Stress Prevention, Course Code – QS97), Mr. Gavalla's opinion is that at 1:30 in the afternoon on July 26, 2015, "it should have been clear to all the UP people on the scene and certainly was clear to the fellow employees that Mr. Herrera was suffering heat stress of some type and definitely should have been taken for medical examination by that time at 1:30."  (**Exhibit 23**, Gavalla Depo., 73:18-74:17.)

103.    Mr. Gavalla testified that a delay from the time Mr. Guillermo Herrera was removed from the job site to the time he actually showed up at the emergency room is an interference, delay, and, at least for a period of time, denial of such medical treatment when it should have been obvious that Plaintiff was exhibiting signs that he could not perform his work, that he asked to be removed, and that clearly his supervisors observed him in a condition where he was not fit, all in violation of the standard of care embodied in 20109(c)(1).  (*Id.*, 118:21-120:1.)

### iii.)    **James H. Diaz, M.D.**

104.    James H. Diaz, M.D., MPH, Ph.D., FCCP, FCCM, FACOEM, FACMT, was retained by the Union Pacific Railroad to perform a "review and analysis of the heat stress incident, July 26, 2015."

105.    Dr. Diaz is a department head in Environmental and Occupational Health

21

Sciences at the School of Public Health at LSU Health Sciences Center in New Orleans.  He has

appointments in the School of Medicine in the Departments of Anesthesiology and Internal

Medicine as an occupational medicine physician and anesthesiologist.  (**Exhibit 24**, Dr. Diaz

Depo., 5:1-22.)

106.    It is Dr. Diaz's understanding that the Union Pacific Railroad selected him to be

an expert in this case because he is a consultant to the Union Pacific Railroad.  (*Id.*, 7:14-18.)

107.    After a lengthy discussion of the removal of the plaintiff from the job site, the

time and distance from the job site to the hospital in Onaga, Dr. Diaz states, "It seems to me he

(Carlos Diaz) could have gotten him (Plaintiff) there (to the hospital) quicker."  (*Id.*, 125:17-

126:15.)

**J.    Union Pacific Railroad 30(b)(6) Witness, Brian Rowe**

(Brian Rowe is the Union Pacific Railroad's 30(b)(6) witness as it relates to 20109(c)(1) and

Defendant's related documents, including its Internal Control Plan (ICP).)  *See* Amended Notice

to Take F.R.C.P. 30(b)(6) Video Preservation Deposition **(Exhibit 46** to Rowe Depo.)

108.    **Exhibit 54**  is the Union Pacific Railroad's "OSHA Whistleblower Policy &

Policy Directive" identified by Brain Rowe in his deposition.  (*See also* **Exhibit 29** to Mr.

Rolow's deposition.)  (**Exhibit 25**, Rowe Depo., 56:9-23.)

109.    **Exhibit 54** states under "Purpose":  "Union Pacific is strongly committed to

complying with the Rail Safety Act of 2008, 49 U.S.C. § 20109, also known as the

Whistleblower Statute."

110.    On Page 2 of the document, the Union Pacific Railroad sets forth its policy and

directive regarding an employee with a work-related injury:

"When an employee reports a work-related personal injury or illness, Union Pacific's expectations include, but are not limited to, the following:

"1.    Ensure the employee receives necessary medical attention, without delay.

        The document also states:

"Do not interfere in any way with an employee's medical treatment whether related to an on- or off-duty injury or illness."

111.    Mr. Rowe confirms that  "…if it's obvious that a person is – let's say they're injured, and it's obvious they have a very serious injury, for example a broken bone, you know, some kind of bad injury, call 911 and get them to the hospital.  I mean, there's no question, even if the employee can't tell you he needs to go to the hospital."  (**Exhibit 25,** Rowe Depo., 95:20-96:2.)

112.    Mr. Rowe confirms that the words "deny, delay, or interfere" speak for themselves.  (*Id.*, 86:18-25.)

113.    A Memo to All Operating Department Management Employees from Lance Fritz, dated February 28, 2013 (**Exhibit 52** to Rowe Depo.), states:

"The FRA reporting regulations and the FRA's interpretation and application of these regulations specify how managers must handle on-duty employee personal injury cases and medical treatment.  To ensure compliance I am providing some basic procedural guidelines below:

(1)    When an employee is injured, the first priority is to ensure that the employee receives the necessary medical attention, without delay.

**K.    Conduct of Carlos Diaz**

114.    Mr. Diaz had received training on the Leader's Guide to Preventing Illnesses Due to Heat Stress dated May 2014:  "This information is provided to assist supervisors in refocusing our safety efforts" (**Exhibit 13** to Linford Depo., Union Pacific Railroad Quality Safety Meeting Process, Heat Stress Prevention, Course Code – QS97), after which he should have been able to

recognize the different types of heat stress and their signs and symptoms, and "[i]f the heat stress appears to be more severe, don't hesitate in seeking medical attention" (*Id.,* at p. 8).

115.    He also should have been aware of the symptoms and signs of heat exhaustion, including headache, dizziness, weakness, and flushing of the skin, and the action to take if these symptoms occur, *i.e.*, get person in the shade, start cooling, give fluids; <u>seek medical attention if symptoms do not improve in 15 to 20 minutes</u>.

116.    He also should have been aware of the symptoms and signs of heat stroke, including confusion, decrease in consciousness, nausea, vomiting (*Id.,* at p. 8).

117.    He should have known the action to take if this (heat stroke) occurs; that it is a medical emergency, call 911, or immediately transport to an emergency room (*Id.,* at p. 8).

118.    Mr. Diaz received this training four months before July 26, 2015, the date of Plaintiff's injury.   (*See* **Exhibit 64**, Complete Training History for Carlos Diaz, at Bates UP Herrera 0602, 03/19/2015, marked at deposition of Louis Martinez).

119.    On July 26, 2015, from 14:21 (after Plaintiff was in his truck) to 16:28 (when Plaintiff was admitted to the emergency room), Mr. Diaz made 14 calls on his cell phone, and received 5 calls on his cell phone:

      a.    According to information provided by Defendant in discovery, Carlos Diaz's cell phone number is (480)      -5369.

      b.    He was on his cell phone a total of 74 minutes during this period of time.

      c.    One call was to his wife at 14:27 for 3 minutes.  (Mrs. Diaz's number is (480)      -2822.)

      d.    One of the calls was to Mr. Diaz's mother at 14:36, for 30 minutes.  (Mr. Diaz's mother's phone number is (520)      -2521.)

24

e.      One phone call was to Assistant Foreman Scott Nicholson at 15:18, for 3

minutes.  Two calls were from Assistant Foreman Scott Nicholson, 16:14

for 4 minutes, and 16:18 for 1 minute.  (*See* **Exhibit 26**, Defendant's

Supplemental Responses and Objections to Plaintiff's First Request for

Production of Documents, Supplemental Response to Request No. 3; and

"Carlos Diaz Cell Phone" documents provided therewith and Bates

stamped UP Herrera 00578-00582.)

(The phone numbers of Scott Nicholson, Mr. Diaz's wife, and Mr. Diaz's mother were furnished

by Defendant in Defendant's Answers and Objections to Plaintiff's Sixth Set of Interrogatories,

Interrogatory No. 30 (**Exhibit 27**.))

120.    Union Pacific Rules for its Maintenance of Way Department, effective November

17, 2008 with updates as of October 1, 2014, 40.2 Chapter 2 Supplements, 2.21 Electronic

Devices, states under "Cell Phones and Computers":

> "2.  Employees, while on-duty or on company property, must not use cell phones
> or computer while driving motor vehicles except as follows.  Exception: when
> initiating or receiving cellular phone calls, drivers of company vehicles must
> utilize hands-free equipment.  If hands-free equipment is not available, bring the
> vehicle safely to a stop until the call is completed."

(**Exhibit 28**.)

121.    Counsel for Plaintiff has not been provided information as to whether or not the

company vehicle that Mr. Diaz was driving was equipped with hands-free equipment.  If it did

not, Mr. Diaz was required to bring the vehicle to a stop until the call was completed.  In any

event, during the more-than-two-hour period of time that Plaintiff was in the condition he was in

and in Mr. Diaz's company truck, Mr. Diaz was on his phone 75 minutes.  (**Exhibit 27,**

Defendant's Answers and Objections to Plaintiff's Sixth Set of Interrogatories, Interrogatory No. 30.)

### L.   **The Parties**

122.   Plaintiff is a natural born citizen of the United States, residing in El Paso, Texas. He continues on the employment roster as an employee of Defendant, Union Pacific Railroad, but in the status of "on a long term MLOA."  (**Exhibit 30**, E-mail to counsel for Plaintiff from Justin Dietrich, 04/18/17.)

123.   Defendant admits it is a corporation duly organized and existing under the laws of the State of Delaware and operates as a railroad carrier in the State of Nebraska and other states. (*See* Answer to Plaintiff's Amended Complaint (Doc. #44).)

124.   Defendant does not contest jurisdiction or venue.  (*See* Rule 26(f) Report, Doc. #10.)

## ARGUMENT

## I.   **Summary Judgment Standards**

A motion for summary judgment shall be granted by the court when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).*  A material fact is one that might affect the outcome of a suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A genuine issue of material fact exists when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party. *Id.*  In considering a motion for summary judgment, the evidence is to be viewed in a light most favorable to the non-moving party, giving that party the benefit of all favorable inferences which may be reasonably drawn from that evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

If the moving party meets the initial burden of establishing the nonexistence of a genuine issue of material fact, then the burden shits to the nonmoving party to produce evidence of the existence of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," *Anderson*, 477 U.S. at 257, and "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," *Id*. at 256 (citing Federal Rule of Civil Procedure 56(e)).  The inquiry is to determine whether there is a need for trial on the issue. *Anderson*, 477 U.S. at 250.

## II.     The History and Purpose of the Federal Railroad Safety Act

The purpose of the FRSA is to promote safety in every aspect of railroad operations.  49 U.S.C. § 20101; *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152 (3rd Cir. 2013).

In *Jones v. Illinois Central Railroad Company*, the court cited to an Administrate Review Board decision, *Santiago v. Metro-North Commuter R.R. Co., Inc.*, ARB Case No. 10-147; 212 WL 3255136 (July 25, 2012).  The Administrative Review Board is the agency to which U.S. Secretary of Labor has delegated authority to review appeals of decisions by Administrative Law Judges under the FRSA.  The ARB in *Santiago* summarized the pertinent legislative history regarding § 20109(c):

> "A series of hearings in the 110th Congress signaled increasing public and Congressional concern with rail safety, including chronic under-reporting of rail injuries, widespread harassment of employees reporting work-related injuries, and interference with medical treatment of injured employees. In particular, . . . testimony before Congress identified numerous management policies that deterred employees from reporting on-the-job injuries including subjecting employees who report injuries to increased monitoring and scrutiny from supervisors, which could lead to discipline and termination, supervisors accompanying employees on their medical appointments and attempting to influence employee medical care,

27

sending employees to company physicians instead of physicians of their own choosing, and light-duty work programs, which have the injured employee report to work, but perform no work, to avoid having to report the injury as a lost work day to the Federal Railroad Administration."

The purpose of the first sentence in § 20109(c)(1) under "Prohibition" prohibits a railroad carrier from denying, delaying, or interfering with the medical or first aid treatment of an employee who is injured during the course of employment.

"Section 20109(c)(1) of the FRSA imposes two requirements on railroad carriers when an employee is injured during the course of employment. First, the railroad carrier 'may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment.' 49 U.S.C. § 20109(c)(1). Second, if 'transportation to a hospital is requested by an employee who is injured during the course of employment,' the railroad carrier must promptly arrange the transportation of that employee to the 'nearest hospital' where the employee can receive safe and appropriate medical care.'" *Ibid. Armstrong v. BNSF Railway,* Case No. 12 C 7962, United States District Court for the Northern District of Illinois, Eastern Division (Sept. 4, 2015).

Plaintiff's claim herein is that Defendant violated this requirement in the first sentence of 20109(c)(1).

Mr. Diaz delayed, denied, or interfered with Plaintiff's medical treatment for symptoms of a heat-related injury. Plaintiff's claim is not for "retaliatory action" against him, such as would be the case if Plaintiff were disciplined or discharged for reporting an injury, or reporting an unsafe condition. Here, Plaintiff's claim is for delay, denial, or interference with medical treatment under 20109(c)(1), not that Defendant in some fashion retaliated against Plaintiff. Because Plaintiff's claim is not a claim for retaliatory action, the burden-shifting provisions of AR-21 do not apply. To permit Defendant to argue that it would have taken the same action in the absence of protected activity, taking Plaintiff to the cooling station rather than taking him to the hospital, would undermine the purpose of 20109(c). It would create, contrary to the purpose of 20109(c)(1), the impression in Defendant's managers' minds that if they delay, interfere with,

28

or deny Plaintiff medical treatment, maybe his condition will resolve and he will not need medical attention, and therefore his injury will not be reportable to the FRA. This is clearly contrary to the purpose and history of Congress in passing 20109(c)(1). Were Defendant to be permitted to make this argument, it would circumvent, or contradict, the purpose of 20109(c).

### III.    Reasonable Minds Can Only Conclude Defendant Delayed, Denied, and Interfered with Plaintiff's Medical Treatment, and Summary Judgment is Therefore Appropriate.

The undisputed evidence in the case shows that Defendant clearly delayed, denied, and/or interfered with Plaintiff's medical treatment in violation of the requirement of the first sentence of 49 U.S.C. § 20109(c)(1). Plaintiff was assisted into Robert Herrera's van between 1:30 and 1:45 p.m. Plaintiff testified that he thought Mr. Robert Herrera was driving him to the hospital. Mr. Herrera received a phone call from Mr. Diaz. Mr. Diaz was the Supervisor of Gang 8501 for the Union Pacific Railroad at the time of Plaintiff's injury; a supervisor senior to Mr. Herrera.

As a result of this phone call, Plaintiff was brought by Mr. Robert Herrera to a gas station in Emmett, Kansas, a point between Cook Siding and Onaga, Kansas, where he was loaded into Mr. Diaz's truck at about 2:00 p.m. Mr. Diaz denied, delayed and/or interfered with Plaintiff's medical treatment. Mr. Diaz drove Plaintiff to the Union Pacific Railroad job briefing site in Onaga, Kansas, rather than the hospital that was within a few blocks of the job briefing site. At the job briefing site, the gang's Safety Officer, Robert Steely, who has heard "they are bringing Mr. Guillermo Herrera in," waits for Mr. Diaz and Plaintiff at the job briefing site. It is only then that observations of Plaintiff's condition, and Plaintiff's renewed request to be taken to the hospital, that Plaintiff is rushed to the hospital in Mr. Diaz's truck.

Surfacing Gang Foreman Robert Herrera had Guillermo Herrera loaded into his van

about 1:30 in the afternoon, and called Mr. Diaz at about that time.  Plaintiff was not admitted to the ER at Community HealthCare System in Onaga until 4:36 p.m.  Cook Siding is 22.8 miles, 30 minutes, from the hospital in Onaga.  Mr. Guillermo Herrera's emergency medical treatment for heat exhaustion was delayed for 2½ to 3 hours.

## CONCLUSION

For the reasons set forth above, summary judgment as to Plaintiff's Second Claim for Relief is properly granted.  Reasonable minds could not dispute that Defendant violated the direct worker safety provision in the first sentence of FRSA, 49 U.S.C. § 20109(c)(1), by denying, delaying and/or interfering with Plaintiff medical treatment.  Therefore, as a matter of law summary judgment as to Plaintiff's Claim that Defendant violated 49 U.S.C. § 20109(c)(1) is appropriate.

Signed at Denver, Colorado this 26th day of May, 2016.

 s/James L. Cox, Jr.
James L. Cox, Jr., Nebraska Bar #20223
Attorney for Plaintiff
BRENT COON & ASSOCIATES, PC
3801 E. Florida Ave., Suite 905
Denver, CO  80210-2500
Telephone: (303) 756-3243
Fax: (303) 756-3595
jim.cox@bcoonlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 26th day of May, 2017, the foregoing **BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT  (SECOND CLAIM FOR RELIEF)** was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

William M. Lamson, Jr., Esq.
David J. Schmitt, Esq.
LAMSON, DUGAN & MURRAY, LLP
10306 Regency Pkwy. Dr.
Omaha, NE  68114
wlamson@ldmlaw.com
dschmitt@ldmlaw.com

Torry N. Garland, Esq.
Union Pacific Railroad Company
1400 West 52nd Avenue
Denver, CO  80221
tngarlan@up.com

s/James L. Cox, Jr.

31