IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA
AT OMAHA, NEBRASKA

| | |
|---|---|
| GUILLERMO HERRERA, III | ) 8:15-CV-426-JMG-CRZ |
| | ) |
| | ) VIDEOTAPED |
| PLAINTIFF, | ) DEPOSITION OF |
| | ) CHARLES TURNER |
| VS. | ) |
| | ) |
| UNION PACIFIC RAILROAD COMPANY, A DELAWARE CORPORATION, | ) |
| | ) |
| DEFENDANT. | ) |

- - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF CHARLES TURNER, taken before Morgan M. Rath, RPR, CSR(IA), General Notary Public within and for the State of Nebraska, beginning at 9:57 a.m., on November 16, 2016, at Lamson Dugan & Murray, LLP, 10306 Regency Parkway Drive, Omaha, Nebraska.

EXHIBIT NO. 6

A P P E A R A N C E S

FOR THE PLAINTIFF:
MR. JAMES L. COX, JR.
BRENT COON & ASSOCIATES, PC
3801 East Florida Avenue, Suite 905
Denver, Colorado 80210-2500
(303) 756-3243 (Phone)
(303) 756-3595 (Fax)
jim.cox@bcoonlaw.com

FOR THE DEFENDANT:
MR. DAVID J. SCHMITT
LAMSON, DUGAN & MURRAY, LLP
10306 Regency Parkway Drive
Omaha, Nebraska 68114
(402) 397-7300 (Phone)
(402) 397-7824 (Fax)
dschmitt@ldmlaw.com
and
MR. TORRY N. GARLAND
UNION PACIFIC RAILROAD COMPANY
1400 West 52nd Avenue
Denver, Colorado 80221
(303) 405-5402 (Phone)
(303) 405-5413 (Fax)
tngarlan@up.com

A L S O P R E S E N T

Mr. Justin Dietrich
Ms. Cathy Price
Ms. Lisa Olsen, Videographer

I N D E X

CASE CAPTION .......................... Page 1
APPEARANCES ........................... Page 2
INDEX ................................. Page 3
TESTIMONY ............................. Page 4
REPORTER CERTIFICATE .................. Page 34
DIRECT EXAMINATION:
By Mr. Cox ....................... Page 4

E X H I B I T S

| EXHIBIT NO. | MARKED |
| --- | --- |
| 4. (PREVIOUSLY MARKED) | |

(Whereupon, the following proceedings were had, to-wit:)

VIDEOGRAPHER: Today is November 16th, 2016. The time is 9:53 a.m. This is the deposition of Charles Turner.

Counsel, we were on the record -- oh, after the court reporter swears in the witness.

CHARLES TURNER,
having been first duly sworn,
was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COX:

Q. Mr. Turner, good morning, sir.
A. Good morning.
Q. I introduced myself earlier. I'm Jim Cox. I'm Guillermo Herrera's lawyer. Thanks for being here today.
Give us your full name, please, sir.
A. Charles Lee Turner.
Q. Where do you live?
A. Schertz, Texas.
Q. And who do you work for now?
A. I work for Union Pacific Railroad, specifically 9002. And that's the curb gang/steel gang.

Q. And how long have you worked for the UP?
A. Since I joined May 5th, 2003.
Q. And what is your job with the UP now?
A. Assistant foreman.
Q. On Gang 9002?
A. That's correct.
Q. How does Gang 9002 compare to Gang 8501, the gang that was -- you were on and Mr. Herrera was on in July of '15? How -- how do those two gangs compare?
A. Well, you have different components. We're a steel gang. We put the steel on the tracks. Same as 8501. We install the steel. The rails -- the rails.
Q. All right. And are -- do -- are the gangs comparable in size? Number of machines? Number of employees?
A. Different machines. The 8501 they use more towards the concrete -- concrete machines as far as the -- the 8-man and other -- other contracted machines.
Q. Okay. Is -- is 9002 -- are you all working on wood or concrete ties?
A. Wood.
Q. Okay.



A. Wood ties.
Q. So that's a fundamental difference there. 8501 they are laying rail on concrete ties; 9002 they are laying rail on wooden ties?
A. That's correct.
Q. Okay. You are assistant foreman of what part of the gang on 9002?
A. I'm part of the front group. We prep the rail and -- as far as taking the rail out and stuff like that.
Q. Okay.
A. We prepare the site.
Q. Okay. Let's -- well, tell me what jobs you've worked on the UP since 2003.
A. Okay. I've been a laborer. I've been a switch -- switch maintainer. I've done assistant foreman, different groups. I've been an assistant welder or a welder helper, as we call it. Welding machines.
Q. Okay. That -- that gives --
A. That's about it. That's about -- and track machine operator. Also worked for a -- counting ties and stuff like that.
Q. Okay. Do you have a foreman's date, an A-date?

A. Only on division.
Q. And do you know what I mean by an A -- a foreman's date? A -- a date on which you have been qualified as a foreman. Is that the way -- am I using that term right?
A. Yes, sir.
Q. Okay. And what is -- do you have an assistant foreman date on system?
A. Yes, sir.
Q. What is that date?
A. January 1st, 2011, I believe. Or 2012.
Q. Okay. When did you leave 8501, or why did you leave 8501?
A. About two years ago we were -- the gang was cut off. It was abolished.
Q. And did you -- were you able to bid onto another gang?
A. I bid onto -- well, I bumped in -- on a switch gang, I believe it was, at the time.
Q. Okay. When was 8501 abolished? Do you remember?
A. Not exactly to date. It --
Q. Generally it would be in the winter sometime?
A. Yes, sir. End of the -- probably either

in November or December. I'm thinking November.
Q. Of '15?
A. Yes, sir.
Q. And we don't want to confuse the jury. That's, generally speaking, weather-related, isn't it? Don't they abolish these system gangs, particularly up north when it gets too cold to work, or am I misunderstanding that?
A. Yes, sir. When it gets too cold, they'll -- they'll abolish. Or at the end of the year we tend to get a lot of people going on vacation. So that's going to cut down on the amount of people.
Q. Around --
A. So the gang gets abolished at the end of the year and is re-established the start of the next year.
Q. Okay.
A. January, February, March. Somewhere in there.
Q. Okay. And did you work on 8501 up until it was abolished?
A. Yes, sir.
Q. How long had you been working on 8501?
A. Off and on about two years, I believe.

Q. And what jobs had you held on 8501?
A. I was an assistant foreman. I also was track machine operator, TMO position. I worked on what -- what is called the 8-man.
Q. All right. Now, let's -- what track machines did you operate?
A. At that time I didn't operate any track machines. I was part of the 8-man. I worked on the 8-man.
Q. All right. Tell us -- we've had some understanding through the depositions of what an 8-man machine is. Explain to us what the 8-man does on 8501.
A. It's a clipping machine. Basically on the concrete ties we have these clips that clip the rail that secure the rail-- to the -- to the concrete ties.
Q. And is that a big machine, an 8-man machine?
A. Yes, sir.
Q. Can it work on several ties at once, or does it just do one tie at a time? How does that work?
A. It's several ties. You have a -- a group up front, four people. You have four people setting

up front. One lays the -- what is called the biscuit. It's the -- I guess they are -- they are for shock absorbency. And then the clip -- the second guy behind him in that car puts the clips on. He puts the clips there, and there is a paddle that squeezes the clips onto the -- onto the rail.
Q. I see. Does it work on both rails at once or one at a time?
A. Both rails.
Q. Okay. So if I understand it right, on this machine there will be a man on each rail that's placing a biscuit in place, behind him a man on each rail that's placing a clip in place, and then the machine does the work mechanically of attaching the clip to the base of the rail to hold the rail in place?
A. That's correct.
Q. Okay. What's the second half of the machine? That's four people -- four men.
A. Yes, sir.
Q. Is there -- what -- what does the rest of the machine do?
A. That's the same operation behind it.
Q. I got it.
A. You got two groups.

Q. What machine aligns the ties, the concrete ties, so that they can be clipped?
A. Normally we'll have a tie straightener that's up towards the front of the gang, and they check to see which ties are misaligned, and they will try and align those ties.
Q. And is that done mechanically also?
A. Yes, sir. It's a machine.
Q. All right. All right. Let's move to 8501 in July of 2015. And I'm just going to give you a little bit of basics of our understanding, and you tell me if -- if I'm right. It sounds like the gang had moved from California to Onaga, Kansas, on an off half and that the gang arrived in Onaga, Kansas -- my understanding is on July 24th, 2015. Does that jibe with your memory?
A. As far as the actual dates, I couldn't recall that. But time frame, yes.
Q. All right.
When did you arrive -- and if it will help rather than do a date, we could work off July 26. That's the date Guillermo Herrera fell out from the heat injury.
A. Okay.
Q. And if you want to move back to the 25 or

24 -- and our understanding is on the 24th is when the gang had arrived in Onaga.
A. Yes, sir.
Q. All right. When did you arrive with the gang?
A. I was there that morning, the first morning.
Q. Of the 24th?
A. Yes, sir.
Q. All right. And to what job were you assigned on that gang on the morning of the 24th?
A. I was the assistant foreman, and the -- I'm -- we were part of the offloading gang, offloading group. We were offloading the machines that had showed up there on the train.
Q. Okay. Now, we have heard that you were seen being taken off a speed swing or some track machine for -- or -- and you know how the gangs are. There is a lot of talk, a lot of overhearing things on the radio.
Did you have any heat-related problem on July 24th, that first day?
A. Yes, sir.
Q. Tell me about it. Tell me about it.
A. I was helping to offload the machines,

untying all the equipment, and I started feeling a little dizzy; so I dropped down to my knees, and I set there. Then I set on my back. And at that time somebody radioed in that -- you know, that I was laying down, that I was in distress.
Q. Okay. So you were dizzy, you dropped to your knees, and then I thought you said you laid on your back. Did I understand that part?
A. I laid down a little bit, yes, sir. I just kind of laid on the car itself.
Q. And laid on -- I'm not -- I'm not clear on what. Laid on the?
A. The train car.
Q. Oh, one of the flat cars?
A. The flat cars. One of the flat cars. Yes, sir.
Q. Okay. Do you know who radioed?
A. I can't remember offhand, no, sir.
Q. All right.
A. Not the person -- the particular person.
Q. Tell me what happened. You laid down. Do you remain conscious? Are you aware of what's going on?
A. I'm aware of what's going on. At that point they radioed for the -- the foreman to come



Page 14

down there, and they brought the speed swing down there also.
Q. All right. Who was the foreman that they radioed?
A. Steve Gallop.
Q. And let's see. Gallop -- what was Mr. -- he was foreman of what, Mr. Gallop?
A. He's the -- he is the foreman of the gang. The gang foreman.
Q. All right. Did Mr. Gallop come down to you?
A. Yes, sir.
Q. And that -- you said they brought the speed swing down. The speed swing, is it -- does it run on tires? A track? Or does it run on the railroad track?
A. It -- it has tires. It can run by itself without being on the track, but it also has wheels where it sets on the rails and it rolls up and down the rails.
Q. Had it been offloaded? I gather it had been from the --
A. Yes, sir.
Q. -- from the flat car?
Was it still on the ground?

Page 15

A. Yes, sir.
Q. Okay. And the -- they bring the speed swing down for what purpose?
A. To -- to put me in the speed swing and move me back towards the head of the gang -- head of the train.
Q. Okay. Is the cab of the speed swing air conditioned?
A. Yes, sir.
Q. All right. Who was operating the speed swing that day?
A. Jeremy Marsing.
Q. Now, we have heard that the air conditioner on the speed swing was needing repair. Do you have a memory as to whether the air conditioner in the cab of this speed swing was working on the 24th or not?
MR. SCHMITT: Object to the form. Which speed swing?
Go ahead.
MR. COX: The one Marsing was operating.
THE WITNESS: I can't really recall that.

Page 16

BY MR. COX:
Q. Okay. Okay. Mr. Gallop shows up. They -- how do you get from the flat car into the cab of the speed swing?
A. There were, like, two or three people around me. They pretty much manhandled me. Set me -- I was in a setting position on the side of the car. They each grabbed a part of my body. They lift me down, and then they assisted me getting inside the cab of the speed swing.
Q. Okay. What -- what do you recall happening next?
A. I kind of stumbled back a little bit, and I'm in the speed swing, and we're -- by that time we're moving down the track. And Jeremy, he's right there speaking with me, and I'm talking back to him as we're going back.
Q. All right. What happens next?
A. We get to the point where the -- there is a vehicle. The mechanical supervisor, he is in the vehicle. They help me out of the speed swing. I get into the vehicle with him, and he's got the air conditioning on. And he takes me back to our staging area, job briefing area.
Q. And who was the mechanical supervisor?

Page 17

A. I believe his name is Dave Birt.
Q. Okay. And Mr. Birt does what with you? What do you -- what do you -- what do you all do?
A. Dave Birt -- oh, I --
Q. I'm sorry.
What does -- what do you and Mr. Birt do? Once you get in the -- do they have to help you from the -- from the speed swing into Dave Birt's car or truck?
A. Well, you have somebody there with me walking me there to his truck, yes.
Q. All right. And what do you say to Dave Birt, and what does he say to you?
A. He asked me if I'm okay.
I said I'm -- I'm feeling okay.
He asked me if I wanted to go to the hospital.
I said no. I'm -- I'm feeling fine. I'm okay. Just a little warm.
Q. Okay. And what -- what did he do, then?
A. He gave me -- I had water and I -- he had the air conditioning on pretty much full blast in the truck.
Q. Okay. And then what happened?
A. Then we go back to the job briefing area.



Page 18

I get out of the truck on my own. We -- I go up into the trailer. We have an air conditioned trailer there, a job briefing trailer, and he has me sit there. He also gives me more water. Brings me more bottles of water. So he said just relax here, stay here. He asked me again, "Are you okay?"
I said, "Yeah. I'm feeling fine."
And that was pretty much it. He checks back in and -- on me periodically.
Q. Okay. And how long do you remain in -- is the job briefing site, is that in Onaga?
A. Yes, sir.
Q. Okay. And we've heard that described as a -- like, a -- kind of a container deal. What -- what does -- what does that look -- what does it look like?
A. Like a mobile trailer --
Q. Okay.
A. -- on wheels.
Q. Okay.
A. It's air conditioned. It's a -- you can hook it up to a -- to a power source. It provides electricity and everything for the trailer.
Q. Okay. How long are you in that trailer?
A. The remainder of the day.

Page 19

Q. About what time of day did this happen? Give me some sense of that. When you first fell out, when was that approximately?
A. I'm not sure. Approximately sometime around midday.
Q. Okay. Does someone remain in the trailer with you?
A. The person -- there is a couple of people that come in and go out every few minutes.
Q. And who are they, if you can recall? Or who do you recall doing that?
A. Dave Birt, Charlie Diaz. I can't recall the other names.
Q. Okay. And you're in the trailer for the rest of the day?
A. Yes, sir.
Q. How do you feel through the rest of the day?
A. I'm feeling -- I'm feeling okay. Still a little warm. I'm still drinking water. I'm drinking lots of water. Periodically I get up, walk outside. You go to the bathroom. That's about it. Come back inside the trailer.
Q. Okay. And you're in there for -- till when?

Page 20

A. I would say four to five hours, maybe. Basically when the rest of the gang comes in and it's quitting time.
Q. Do you have your personal vehicle there, or are you brought there by the bus?
A. I have -- at the job briefing site, my personal vehicle is there.
Q. All right. And you're staying in a hotel somewhere in Onaga?
A. Actually, it was about 20 miles outside of Onaga.
Q. I understand Onaga is a small town. It may not have enough hotels for all of you.
A. Exactly.
Q. Okay. And how do you get from the job site to your motel?
A. I drive myself.
Q. Is there anyone with you?
A. No, sir.
Q. Okay. And who is it that releases you to drive yourself home, or who -- does anybody make a decision that, "Charles, you're okay to drive home?" Or is that a decision you made on your own?
A. All we had -- like I said, supervisors come in, ask me, "Are you okay? How are you

Page 21

feeling?"
I say, "I'm feeling great. I'm doing all right."
And at that point, you know, when they release everyone, I get in my car and I drive home. I -- basically I guess I made that decision.
Q. Okay. Do you have a roommate? Or did you at that time?
A. Yes. I -- yes, I believe I did.
Q. What -- what was his name?
A. I think at that time it -- the person that was there was Scott.
Q. Is it Scott Nicholson?
A. Nicholson.
Q. Okay.
A. Yes, sir.
Q. Okay. So do you tell Scott Nicholson what has happened to you?
A. He already knew.
Q. Okay. What happens that evening?
A. I go out. I get some dinner. Go back to the room. Just relax. Take a shower. End of the day.
Q. Did you ever go to a doctor --
A. No, sir.

MAGNA
LEGAL SERVICES

Q. -- because of this heat injury?
A. No, sir.
Q. What did you do the next day?
A. I went back to work.
Q. Okay. And how did you feel that day?
A. I felt fine.
Q. Okay. And how would you describe the heat on July 25th, the next day?
A. I would say it's about the same.
Q. As on the 24th?
A. As on the 24th.
Q. I mean, it was hot and humid in Onaga; right? Am I --
A. Yes, sir.
Q. Okay. Now, forgive my ignorance, but Schertz, Texas, is where? What part of Texas?
A. San Antonio. Suburb of San Antonio, Texas.
Q. Is it hot? Humid? Dry? How would you characterize the weather in Schertz, Texas?
A. For the most part hot and humid.
Q. Okay. Do you have any knowledge of Guillermo Herrera's heat exhaustion injury or heat injury on July 26th?
A. Only what I had heard.

Q. Okay.
A. Just -- no firsthand knowledge, no, sir.
Q. All right. You were working in a different part of the gang?
A. Yes, sir.
Q. All right. Let me ask you to look at Exhibit 4. This a job briefing 8501. Work --
MR. COX: Oh, thank you, Dave.
BY MR. COX:
Q. Do you see about a third of the way down it's got -- the copy is not very good but it's hospital from job site, go north on Victory. It's basically instructions how to get to the hospital in Onaga hospital -- how to get to the Onaga Community Hospital?
A. Yes, sir.
Q. All right. Why is that put on a job briefing form like this?
A. In case of emergencies. In case of emergencies, everyone knows the location of the nearest hospital.
Q. Do you have a memory from either your experience driving to and from that job site how far it is from the -- you all were working on a siding called Cook Siding. Does that -- does that jibe

with your memory?
A. I can't recall the actual name.
Q. Too many -- too many -- too many mileposts? Too many sidings?
A. Yes, sir.
Q. Okay. Do you have a memory of how far it was from the job site to the cooling station in -- or the job briefing site in -- strike that.
Do you have a memory of how far it was from the job site to the job briefing site with the trailer that you were in?
A. No further than 20 minutes.
Q. All right.
A. Approximately.
Q. And in route -- when you got into Dave Birt's truck, did he make any stops between there and the job briefing trailer?
A. No, sir.
Q. Now, let's go down to the middle of the form. And I'm still on Exhibit 4. It says PPOS, predetermined place of safety. Do you know what that means?
A. Yes, sir.
Q. What's that mean?
A. That means, if a train is called through

while we we're out there working, we're already decided that we are going to be on the south side -- everyone is going to group up on the south side of the tracks or on the north side of the tracks, depending on where they wanted us then. Place of safety.
Q. All right. So if the gang is working on a track, obviously no train can go down that track. That would be -- a predetermined place of safety would be if there are two or more tracks and a train comes down the live track, you all would clear to a predetermined side or the other?
A. Yes, sir.
Q. All right. You don't want people -- some of them going north and some of them going south?
A. No, sir.
Q. You want everybody cleared of that live train --
A. Yes, sir.
Q. -- the live track?
A. Yes, sir.
Q. Got it.
Then we come to the -- some names. We've got Hugo Calvillo, prep; Adam Taylor/John V., P-cars/RRS; Sugar, tie movers; Charles Turner,



8-man; John Vegas scratched out; Scott, quality; and Bobby Herrera, surfacing?
A. Yes, sir.
Q. Are these numbered in the order in which they work in that gang? In other words, is the prep gang first, then P-cars, then tie movers, then the 8-man, then quality, then surfacing? Is that the order in which they work in the gang?
A. Yes, sir.
Q. So you were the foreman on the 8-man machine or the 8-man gang, and where is the 8-man gang -- the 8-man machine in relation to the cleanup crew or quality control gang?
A. We are basically right in front of them.
Q. Then, do you know John Vegas? Did -- did you know who he was at that time?
A. Johnny Vlahos, yes, sir.
Q. Do you know -- oh, is it -- is it -- what's his last name?
A. We called him Johnny Vegas. His name is John Vlahos.
Q. I see. Okay.
Like, a lot of people on the railroad, they end up with some kind of nickname?
A. Yes, sir.

Q. Okay. Okay. And I know that's a chuckle, but -- and we won't go into that.
But it looks like Johnny Vegas for some reason his name is scratched out and Scott is written in. And -- and we have learned that Scott was Scott Nicholson. Do you have a memory that Scott Nicholson was a foreman or assistant foreman of the quality gang on July 25th or 26th?
A. As far as the exact date, no, sir. I -- I can't recall whether or not he was actually there or -- but this is the layout of the gang. Yes, sir.
Q. Do you have any understanding as to why Johnny Vegas's name was scratched out and Scott was written in?
A. No, sir. I can't recall.
Q. All right. Now, we've heard that on the 25th and 26th a gap developed between the main body of the gang and the cleanup crew. Do you have that -- do you -- does that jibe with your memory?
A. Yes, sir.
Q. Where was the 8-man? Were you back with the cleanup and quality control, or had you moved ahead with the balance of the gang?
A. We were staying approximately with the balance of the gang.

Q. Okay. Do you have any knowledge of the work that was being done by the cleanup or quality control gang on either July 25th or July 26th from personal observation? Not what normally is or supposed to happen, but from your personal observation did you have any knowledge of what work was being done on July 25th or July 26th on that cleanup crew?
A. As far as straightening the clips, making sure the biscuits were properly aligned, that part, yes, sir. That's -- that's normal operation.
Q. I understand it's normal. But, I mean, did you ever observe them work on the 25th or 26th? Ever see what they were doing?
A. Yes, sir. I -- I looked back there from time to time, and I would see them back there.
Q. Okay. And what distance were they away from you when you were there -- when you were the closest to them?
A. When we were closest -- when we were closest, once we stop and if they -- if they are able to come up to the back of the machine, that's where we stop. That's where they -- but as far as throughout the day, that distance would vary.
Q. Okay. From what to what? What's --

what's the farthest you got ahead of them on the 25th or the 26th?
A. I can't recall that.
Q. Okay. Now, I want to look down here, Mr. Turner, on Exhibit 4 again. It's got team number, track, work description, today's goal, yesterday's actual. And here we've got PPOS. I see predetermined place of safety, south side of track. So we were talking about that earlier.
But on this part that says track, work description, today's goals, and yesterday's actual, work description tells you where the gang is working on the 26th. Am I right on that?
A. Yes, sir. Because this is the job briefing for the 26th. Yes, sir.
Q. So the work description -- that describes for the members of the gang where the gang is going to be working in terms of milepost?
A. Yes, sir.
Q. So on the main track, some of the gang is working relay rail milepost 92.22 to milepost 92.90 and some of the gang is working at relay rail milepost 99.42 to milepost 100; is that right?
A. Yes, sir. That's what I see.
Q. Now, would this indicate that some of the



Page 30

gang was at milepost 92.22 to milepost 92.90 and some of the gang was at milepost 99.42 to milepost 100?
A. Yes, sir.
Q. This would evidence the gap that existed in the gang?
A. A gap. Yes, sir.
Q. A gap.
Then it's got today's goal 7,180 feet for 80- -- well, for the first group. And then for the second group -- well, you're going to have to explain to me: What does today's goal mean?
A. That's what we're trying to achieve.
Q. And then it's got yesterday's actual was 12,240. So if we looked at the job briefing group -- job briefing 8501 work group job briefing form for July 25th, 2015, that would give us that day's goal. Then we look at the 26th. We see what was actually accomplished?
A. Yes, sir. For yesterday.
Q. Okay.
A. Now, this could be the surface and lining because surface and lining, they might be a couple of miles behind us. Basically surface and lining is the tampers and the regulators. They -- they broom

Page 31

in the rock and stuff like that and smooth it out --
Q. That's --
A. -- and make sure the track --
Q. That's Bobby Herrera's gang?
A. Yes, sir.
Q. Okay. And Bobby Herrera has told us that he was close enough to the cleanup crew that he was able to talk with Guillermo Herrera and sometime during the day they caught up with the cleanup crew.
So would it be the cleanup crew and the surfacing gang that were at the 92 -- 99.42 -- no, I'm sorry -- the 92.22 to 92.90, or do you have any way of knowing?
A. I can't recall that, sir.
Q. Okay. Okay. Anything else that you can remember about your treatment, your injury, your heat injury? Anything like that that happened on the 24th that we haven't talked about?
A. No, sir, not that I can recall.
Q. All right. And I gather you don't have any personal knowledge, anything you observed or heard about Guillermo Herrera's injury?
A. No, sir.
MR. COX: Okay. Thanks, Mr. Turner. That's all the questions I have for you today.

Page 32

Thank you so much.
THE WITNESS: You're welcome.
MR. SCHMITT: I have no questions.
MR. COX: Oh, we can go off the record.
VIDEOGRAPHER: The time is 10:28 a.m. This is the end of the deposition. Counsel, we're off the record.
MR. COX: As usual, lawyers are perfect predictors of time.
MR. SCHMITT: Pretty dang close.
MR. COX: And you all know that better than anybody.
Charles, I got to do this. They can do it or I can do it. You have the right to read -- the court reporter would type it up question, answer, question, answer. You could read that for spellings, for words that were misunderstood, et cetera.
Or you can waive reading and signing. The choice is entirely yours. You can concede to Mr. Schmitt's advice. Whatever you want to do. Most people -- I will be honest with you. Most people waive.
THE WITNESS: And that's my plan, to

Page 33

waive.
MR. COX: Okay. Thanks.
(10:29 a.m. - Adjournment.)
** ** ** **

C E R T I F I C A T E

STATE OF NEBRASKA )
) ss.
COUNTY OF DOUGLAS )

I, Morgan Rath, RPR, CSR(IA), General Notary Public within and for the State of Nebraska, do hereby certify that the foregoing testimony of Charles Turner was taken by me in shorthand and thereafter reduced to typewriting by use of Computer-Aided Transcription, and the foregoing thirty-three (33) pages contain a full, true and correct transcription of all the testimony of said witness, to the best of my ability;

That I am not a kin or in any way associated with any of the parties to said cause of action, or their counsel, and that I am not interested in the event thereof.

IN WITNESS WHEREOF, I hereunto affix my signature and seal this 30th day of November, 2016.

______________________________
MORGAN RATH, RPR
GENERAL NOTARY PUBLIC

My Commission Expires:

