IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

AT OMAHA, NEBRASKA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GUILLERMO HERRERA, III,


Plaintiff,

v.                        Case No. 8:15-CV-426-JMG-CRZ

UNION PACIFIC RAILROAD
COMPANY, a Delaware corporation,


Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEO DEPOSITION OF

SCOTT NICHOLSON



Milwaukee, Wisconsin

August 10, 2016

8:02 a.m. to 10:37 a.m.




Kim M. Peterson

Registered Professional Reporter



EXHIBIT NO. 7

Page 2

1        A P P E A R A N C E S
2           BRENT COON & ASSOCIATES, PC, 3801 East
3    Florida Avenue, Suite 905, Denver, Colorado, 80210, by
4    MR. JAMES L. COX, JR., jim.cox@bcoonlaw.com, appeared on
5    behalf of the Plaintiff.
6           LAMSON, DUGAN & MURRAY, LLP, 10306
7    Regency Parkway Drive, Omaha, Nebraska, 68114, by MR.
8    DAVID J. SCHMITT, dschmitt@ldmlaw.com, appeared on behalf
9    of the Defendant.
10          UNION PACIFIC RAILROAD, 1400 W. 52nd
11   Avenue, Denver, Colorado, 80221, by MR. TORRY N. GARLAND,
12   tngarlan@up.com, appeared on behalf of the Defendant.
13
14         I N D E X
15   WITNESS       EXAMINATION       PAGE
16   SCOTT NICHOLSON      By Mr. Cox        4
17
18
19         E X H I B I T S
20           None
21
22
23
24    (The original transcript was sent to Mr. Cox.)
25

Page 3

1        P R O C E E D I N G S
2          VIDEOGRAPHER:  We are now on the
3    record.  This begins DVD number one in the
4    deposition of Scott Nicholson in the matter of
5    Guillermo Herrera, III, v. Union Pacific Railroad
6    Company, in the United States District Court for
7    the District of Nebraska at Omaha, Nebraska, Case
8    Number 8:15-cv-426-JMG-CRZ.
9          Today is Wednesday, August 10, 2016.
10   The time is 8:02 a.m.  This deposition is being
11   taken at 207 East Michigan Street, Milwaukee,
12   Wisconsin, at the request of Brent Coon and
13   Associates.
14         The videographer is Jeff Wilhite,
15   Magna Legal Services.  The court reporter is Kim
16   Peterson, Magna Legal Services.  Will counsel and
17   the parties present state their appearances and
18   whom you represent.
19         MR. COX:  I'm Jim Cox.  I'm Guillermo
20   Herrera's lawyer.
21         MR. SCHMITT:  Dave Schmitt for Union
22   Pacific Railroad.
23         MR. GARLAND:  Torry Garland for the
24   Defendant Union Pacific Railroad.
25         VIDEOGRAPHER:  Will the court reporter

Page 4

1    please swear in the witness.
2          SCOTT NICHOLSON, called as a witness
3    herein by the Plaintiff, after having
4    been first duly sworn, was examined and testified
5    as follows:
6          EXAMINATION
7    BY MR. COX:
8    Q    Mr. Nicholson, good morning, sir.
9    A    Good morning.
10   Q    Would you give me your full name, please.
11   A    Scott William Nicholson.
12   Q    And where do you live now?
13   A    Right now I'm living in Milwaukee.
14   Q    And at what address?
15   A    I don't have an address.  I just stay at motels.
16   Q    Are you employed?
17   A    I am.
18   Q    For whom do you work now?
19   A    Union Pacific.
20   Q    Do you have a permanent address?
21   A    No, nothing that's my own.
22   Q    What is your job with the Union Pacific now?
23   A    Trackman.
24   Q    And are you on a system gang, or what -- what is
25        your job with the UP now?  I mean, for whom are

Page 5

1    you a trackman?  Is it a section, a system?
2    A    Yes, it is -- it is a section job here in
3         Milwaukee.  They cover grounds from Sheboygan down
4         to Illinois.
5    Q    And how long have you been working as a trackman
6         for the UP?
7    A    Well, initially when I came to the Track
8         Department I was a trackman for at least two or
9         three months.  And then after having other various
10        positions, I've been a trackman now since I came
11        back from furlough about three or four months.  It
12        was -- Let's see.  April?  April I want to say
13        came over here, yeah.
14   Q    So when did you first work for the UP?
15   A    I initially started working for the UP Railroad
16        2010, December 7.
17   Q    All right.  And have you been furloughed or laid
18        off as a result of force reduction during that
19        time since 2010?
20   A    That is correct.
21   Q    So when you talk about coming back from a furlough
22        in April of 2016, you were furloughed at some
23        period of time, reduction in force, and then
24        recalled or able to rebid a job in April of 2016?
25   A    That is correct, sir.



Page 6

1  Q   All right. I'm going to get a little more into
2      that in a minute. First I want to talk with you
3      about what you've done to prepare for this
4      deposition. Has anyone on the Union Pacific
5      Railroad advised you of Guillermo Herrera's
6      medical condition?
7  A   Yes.
8  Q   Who?
9  A   My attorney -- Well, Union Pacific's attorney told
10     me that he may have some heart complications or
11     something of that nature.
12 Q   All right. What else -- Tell me what you've done
13     to prepare for the deposition. Have you been
14     advised in any other way of any other medical
15     complications that Guillermo Herrera has as a
16     result of the heat injury on July 26, 2015?
17 A   Well, going back to July 26, 2015, I inquired
18     about how he was doing in the months following the
19     incident, and they just said he was still at home.
20     And at one point they said they were just running
21     tests, and that's all -- that's the only answer I
22     ever got.
23 Q   And of whom did you make that inquiry?
24 A   Some of his -- his peers, people he roomed with.
25     That was it.

Page 7

1  Q   All right. Have you ever spoken to Mr. Herrera
2      since July 26?
3  A   No, sir, I have not.
4  Q   With whom have you spoken prior to this deposition
5      about this deposition? I understand possibly
6      Mr. Schmitt and Mr. Garland. Anyone else? Did
7      you ever speak with a claim agent?
8  A   A claim agent?
9  Q   A risk management person. For example, Bill
10     Herring, or someone like that, who's from the
11     Claims Department, a manager of claims?
12 A   When you say risk management, I did speak with a
13     Doug Dietrich.
14 Q   Was it Doug Dietrich or Justin Dietrich?
15 A   Justin. It is Justin. My apologies.
16 Q   No problem. When did you speak with Mr. Dietrich?
17 A   Following the incident and correspondence -- well,
18     not correspondence, but via voice mails just
19     setting up this deposition process.
20 Q   Okay. Did Mr. Dietrich in any fashion advise you
21     of anything that would affect your testimony here
22     today?
23 A   He did not. We stayed on the surface. It was
24     just always about when and where.
25 Q   Did you give Mr. Dietrich, or anyone else from the

Page 8

1      Claims Department, an oral or written statement
2      about what had occurred on July 26, 2015?
3  A   I believe it was Mr. Dietrich that came out to the
4      gang following the incident maybe -- possibly a
5      day or two after. I don't recall exactly when,
6      but it was after the incident on the 26th, and I
7      gave an oral statement to him.
8  Q   And has the Union Pacific Railroad provided you a
9      copy of that statement to review?
10 A   They have not.
11 Q   Would a copy of that statement serve to refresh
12     your memory of events that occurred on July 26,
13     2015?
14         MR. SCHMITT: Object to the form.
15 Foundation. Go ahead.
16         THE WITNESS: No. I have a pretty
17 good memory. I don't -- I don't need it.
18 BY MR. COX:
19 Q   Okay. Did you ever request of them an opportunity
20     to review your statement to refresh your memory?
21         MR. SCHMITT: So I think the
22 question -- There's a question pending. He's just
23 asking --
24         THE WITNESS: I'm thinking back.
25         MR. SCHMITT: -- did you ever ask

Page 9

1      Justin to send it to you, is all he's asking.
2          MR. COX: No, that's not what I asked.
3          MR. SCHMITT: Oh.
4  BY MR. COX:
5  Q   I asked if you've ever asked of anyone in the UP
6      an opportunity to review your statement?
7  A   I really can't remember ever asking. That's why
8      it was taking me so long to answer.
9  Q   All right. What is your age, sir?
10 A   Thirty-two.
11 Q   And can you tell me a little bit about where you
12     were born and raised?
13 A   I was born in Omaha, Nebraska. I was raised in
14     Westgate.
15 Q   Did you attend high school in Omaha?
16 A   I did.
17 Q   Did you graduate from high school?
18 A   I did.
19 Q   And did you have any education after high school?
20 A   I tried to take some college courses, but between
21     being a parent and working for the railroad it
22     just -- it wasn't -- it wasn't in the cards. I
23     tried, but I wanted to make sure that my focus was
24     on my job first and that I wasn't giving them --
25     to make sure that I was giving them the attention



Page 10

| | | |
|---|---|---|
| 1 | | the job deserved. |
| 2 | Q | Tell me about your employment before going to work |
| 3 | | for the Union Pacific in 2010.  What jobs did you |
| 4 | | have? |
| 5 | A | I actually worked for -- Before 2010.  I worked |
| 6 | | for Terry Hughes Tree Service. |
| 7 | Q | What did you do for Terry Hughes Tree Service? |
| 8 | A | Trimmed and removed trees. |
| 9 | Q | Any other jobs you can think of? |
| 10 | A | Well, before that I was in Texas.  I lived there. |
| 11 | | Family owned a piece of property in the hill |
| 12 | | country, and trimmed trees there as well, but -- |
| 13 | Q | Sort of for your family on their property? |
| 14 | A | No, sir.  No, sir.  It was kind of like a mom/pop |
| 15 | | operation.  Me and this fella around there just |
| 16 | | did it locally. |
| 17 | Q | Any other employment that you can think of before |
| 18 | | going to work for the UP in 2010? |
| 19 | A | Yeah.  I mean, I can -- Cornerstone Christian |
| 20 | | Retreat Center.  That's in Tarpley, Texas. |
| 21 | Q | What did you do there? |
| 22 | A | Grounds maintenance on 200 acres for a retreat |
| 23 | | center.  I also worked at Lowes.  I made the |
| 24 | | transition from Omaha to Texas as I transferred as |
| 25 | | an associate out in the lawn and garden.  I worked |

Page 11

| | | |
|---|---|---|
| 1 | | my way up to team lead in Omaha, and then when I |
| 2 | | transferred down to Texas I was just a regular |
| 3 | | associate outside. |
| 4 | Q | And by an associate at Lowes you mean a -- if I |
| 5 | | were to go in to Lowes and I would run into a |
| 6 | | salesperson on the floor, is that -- was that what |
| 7 | | a person like you would do? |
| 8 | A | Sales associate, yes, sir.  Customer service.  Not |
| 9 | | in the customer service area, but out in the lawn |
| 10 | | and garden. |
| 11 | Q | All right.  In any of those jobs had you received |
| 12 | | any formal training regarding heat injury |
| 13 | | prevention, recognition or treatment? |
| 14 | A | Can you repeat the question, please? |
| 15 | Q | Sure.  In any of the jobs that you've told us |
| 16 | | about, did you ever receive any formal training |
| 17 | | from any of those companies for which you worked |
| 18 | | regarding heat injury prevention, recognition or |
| 19 | | treatment? |
| 20 | A | I don't remember.  I know some stuff, but I don't |
| 21 | | remember if I had the formal training or whatnot, |
| 22 | | but we had systems in place to deal with |
| 23 | | heat-related stress. |
| 24 | Q | At what company? |
| 25 | A | Terry Hughes.  I'm literally dragging trees to a |

Page 12

| | | |
|---|---|---|
| 1 | | chipper all day in extreme heat.  Unless it gets |
| 2 | | over, I think it's 104, we continue to work. |
| 3 | Q | Is that 104 degrees, or 104 heat index? |
| 4 | A | Just the degrees.  Yeah, I think it was 106 is -- |
| 5 | | If my memory serves me right, it was like 106 was |
| 6 | | the only time we ever called a day early, but we |
| 7 | | still worked in the morning. |
| 8 | Q | Tell me again when you began to work for the Union |
| 9 | | Pacific Railroad. |
| 10 | A | 2010, December 7 was my hire date. |
| 11 | Q | Where did you go to work for the UP? |
| 12 | A | Utah. |
| 13 | Q | And at what position? |
| 14 | A | Signal helper. |
| 15 | Q | And did you remain in the Signal Department? |
| 16 | A | I did not. |
| 17 | Q | Why not? |
| 18 | A | Because it's a temporary position.  It was a |
| 19 | | five-year agreement. |
| 20 | Q | I'm not sure I understand what I heard you say. |
| 21 | A | They needed help for a -- a -- a national project |
| 22 | | called PTC.  Basically, the ability to track |
| 23 | | trains by satellite to prevent collisions. |
| 24 | Q | Right. |
| 25 | A | And they needed extra help.  Some railroads |

Page 13

| | | |
|---|---|---|
| 1 | | contracted it and some hired some on directly, and |
| 2 | | was I one of the people hired on directly |
| 3 | | under the -- under the understanding that it's a |
| 4 | | five-year contract, that it's temporary work.  If |
| 5 | | you look at my status, when I was hired it was |
| 6 | | temporary. |
| 7 | Q | I see.  All right.  And how long did you do that? |
| 8 | A | Rounding the base to four years, I want to say.  I |
| 9 | | don't know if that's exactly accurate, but at |
| 10 | | least three years. |
| 11 | Q | Then what job -- Did you remain a signal helper |
| 12 | | during that period of time? |
| 13 | A | I did.  I did, Mr. Cox. |
| 14 | Q | And that's essentially physical labor, right? |
| 15 | A | It is. |
| 16 | Q | What other jobs have you had for the Union Pacific |
| 17 | | since 2010? |
| 18 | A | So I was a signal helper.  Then I was a trackman |
| 19 | | when I transferred over to the Maintenance |
| 20 | | Department.  Within that couple months of doing |
| 21 | | section work I also retained a qualification for a |
| 22 | | grapple truck. |
| 23 | Q | For a what? |
| 24 | A | A grapple truck.  It's like a -- Some people call |
| 25 | | it a boom truck.  A grapple truck would probably |



Page 14

```
 1      describe it better.  It's just a -- basically, an
 2      automated arm.  Pick up stuff, ties, rail, put
 3      ties in in a section setting.
 4              So going forward, after I got those
 5      rights I went back to a trackman, but out on the
 6      system gangs because it's a -- a different
 7      division, different deal.  So -- So trackman, got
 8      my trackman rights.  And then from there I bid a
 9      assistant foreman position.
10   Q   When did you first bid an assistant foreman
11      position?
12   A   I would say that that was August of 2014.  Almost
13      a year prior, if not a whole year prior to the
14      26th of July.  It might have been a year or over a
15      year.
16   Q   When did you first hold a position as an assistant
17      foreman?
18   A   That's when.
19   Q   August of 2014.  Now, explain to us what it means
20      to bid for an assistant foreman position.
21   A   You go to the bid line and you make sure that you
22      have all the necessary qualifications, the
23      training, in order to even bid it.  Otherwise, it
24      will not be accepted.  And provided you do have
25      that, then you just go to UP's website and you put
```

Page 15

```
 1      a bid in for the job and -- yeah.
 2   Q   So what qualification or training was required in
 3      2014 for one to bid on an assistant foreman's job?
 4   A   Well, it's -- it's kind of a two-part question
 5      there because it's -- you have to qualify within
 6      45 days of getting the job, you know.  You have
 7      to -- You have to demonstrate safe behavior and
 8      critical thinking.  You can't just walk into it
 9      and do whatever you want.  You definitely are
10      being observed.
11              It's called like 2.13, I believe,
12      and -- and really -- it's very close, and I can
13      get that for you, but I wouldn't be able to say
14      you can quote me on it, but like 2.13 is the
15      foreman's training.  It's like -- I think it's
16      like a two-hour, two-to-four-hour slide show
17      presentation going through that you have to take
18      and answer the questions correctly in order to be
19      qualified.
20              Now, some guys have been able to bid a
21      position and still not have that yet, but then
22      they have to take it.  Otherwise, you cannot
23      retain that position with UP.
24   Q   And how is that two-hour slide show taken?  Is it
25      something you take online?
```

Page 16

```
 1   A   Yes, sir.  Usually at work, yeah.
 2   Q   When you got the bid in August of 2014 for
 3      assistant foreman, had you taken the two-hour
 4      slide show, or did you take it within 45 days of
 5      having had your bid accepted?
 6   A   I don't remember.
 7   Q   All right.  What other training have you received
 8      regarding how to be a assistant foreman?
 9   A   In regards to an assistant foreman, you have the
10      computer-based training and then at our what they
11      call startups or our annual meetings, we all take
12      tests and they are -- they're instructor led and
13      there -- there is no -- you know, you -- you need
14      to -- it's individual to you.  You need to pass
15      it, but we have in each category of, I guess,
16      critical red zone areas, we have tests that we
17      take to see if you can be qualified, and EIC is
18      one of them.
19              To be the employee in charge you have
20      to pass a series of tests in each category of
21      railroading, if I can word it like that.  You
22      know, lookout protection, on-track safety,
23      flagging protection in the event there's an
24      emergency and a train -- you know, how to flag
25      them down properly.  So you have that training.
```

Page 17

```
 1              And then -- I'm not -- It's above my
 2      pay grade to say what the standard is for a
 3      manager or an RSA, but I did have a lot of
 4      constructive criticism, what they call coaching
 5      out there, but not in the terms of punishment, nor
 6      did I exhibit unsafe behavior.
 7              It's just that they are constantly
 8      checking in with you and -- and asking okay, how
 9      are you doing, what are you doing, is there -- And
10      what I really like about the coaching is they ask
11      for my input, what can we do differently, you
12      know.  And so it's a very open conversation
13      that -- that really actually is, to me, even more
14      valuable than any of the -- the -- I guess the
15      book training, if you would.
16   Q   All right.  The CBT training you talked about, the
17      computer-based training, is that the two-hour
18      slide show that you talked about?
19   A   It's a part of it.  It's a part of it.
20   Q   And what training at the startups?  Is that a
21      conversation or a safety briefing or -- When you
22      say that you received some training at startups,
23      I'm not clear what that means.
24   A   Okay.  Like I said, it's an annual meeting, and
25      it's where they bring together guys in our
```



Page 18

1     department, say a couple gangs, in like a hotel in
2     the conference room.  And one day will be, you
3     know, what -- what our -- what our mission as a
4     company is, we'll talk about that.  That will be
5     our opening day.
6             And then depending upon what group you
7     are, and kind of what -- tailor made to what you
8     need is how your day's going to go the next three
9     days.  Like I said, like, for instance, foreman's
10    training, it's not -- it's not training for
11    someone who's not a foreman, right.  So you'll get
12    different computer-based training if you're not a
13    foreman.
14            So during those startups they have
15    stuff that is mandatory for everybody, and that's
16    like going into polluting waterways, asbestos,
17    random stuff like that that is not only law, it's
18    ethical.  You know, it's kind of ethics training,
19    you know, as far as what's good business practice
20    out there on the tracks.
21  Q   The employee in charge training, that's for
22    everyone, isn't it, on the gang in case they are
23    designated as the employee in charge when a
24    foreman or assistant foreman is leading the gang?
25  A   I'm sorry.  Say that again.

Page 19

1   Q   Who receives the employee in charge training?
2   A   When we're in our startups everybody takes it, but
3     not everybody passes.
4   Q   Okay.
5   A   Because it's just good to have that -- that
6     reinforcement.  It's good to come in contact with
7     that information, you know.
8   Q   When did you first -- How often have you worked in
9     the position of assistant foreman since August of
10    2010?  I'm sorry.  August of 2014 I think you told
11    me.  What was your assistant foreman date?
12  A   My assistant foreman date was August of 2014, and
13    I held that position without incident until --
14    it's going to be approximate, but pretty accurate,
15    September of 2015.
16  Q   And you said you held that position without
17    incident until September of 2015.  Was that on
18    Gang 8501?
19  A   No, sir.
20  Q   When did you leave -- When did you join -- You
21    know what I mean by Gang 8501?  That's the gang --
22  A   I do, sir.  I'm on the same page as you.
23  Q   When did you join Gang 8501?
24  A   Sometime in July.
25  Q   July --

Page 20

1   A   I don't remember the exact date.
2   Q   July of '15?
3   A   Yes, sir.
4   Q   All right.  And obviously, it was before July 26,
5     2015.  You just don't remember what day in July
6     you joined 8501?
7   A   Yeah, I don't remember the exact date.  I mean, I
8     was only there that week and the week of the
9     incident, and I was fairly new to the gang.  Not
10    fairly.  I was new to the gang, yes.
11  Q   So I'm clear, you had been on 8501.  Give me an
12    estimate of how many days before July 26.  When
13    you say week of, that kind of confuses me.  I need
14    to know you best estimate, best memory.
15  A   I was only there for two days because I combed
16    through the events that happened, and that
17    happened over two days, so.  The 26th was the
18    incident?
19  Q   That's the day that Guillermo was put in Bobby
20    Herrera's van.
21  A   Okay.  Then the -- Yeah, the day prior would have
22    been my first day, the 25th, yeah.
23  Q   And your first day on 8501 you -- what job were
24    you assigned?
25  A   Assistant foreman.

Page 21

1   Q   And is that the assistant foreman of the quality
2     control or Cleanup Gang, as it's called?
3   A   Yes, sir.
4   Q   Mr. Nicholson, I'm handing you the originals of
5     the exhibits that we've taken so far, and I'm
6     going to ask you to look at -- Do you see how
7     they're tabbed?  If you could open that up.
8             If you could look at Exhibit 4.  And
9     do you recognize this as a job briefing 8501 work
10    group form?  Are you familiar with this form?
11  A   I am familiar with this form, sir.
12  Q   If you go to the middle, you see that it
13    designates the various foremen; Hugo Calvillo,
14    Adam Taylor, Sugar, Charles Turner.  You see where
15    I am?
16  A   I do.  I do.
17  Q   And then on Number 5 it's got John Vegas, and John
18    Vegas' name is scratched out and the word Scott
19    written in under quality.
20  A   Um-hum.
21  Q   So that's the Quality Control Gang?
22  A   Yes, sir.
23  Q   And can you explain, or do you -- if you know, why
24    were you substituted for John Vegas on the Quality
25    Control Gang?



Page 22

```
 1   A   I don't know.
 2   Q   Was John Vegas there?
 3   A   He was.
 4   Q   Was he no longer the foreman, or was he the
 5       foreman and you're the assistant foreman?
 6   A   He's -- He's -- He's always an assistant foreman.
 7   Q   All right.  Was he an assistant foreman on the
 8       Quality or -- and Control Gang, the Cleanup Gang
 9       that day --
10   A   No.
11   Q   -- or were you?
12   A   No, I was.
13   Q   Is this the first day, July 25th, is that the
14       first day you had worked on Gang 8501?  I know for
15       this -- I'm asking is it possible sometime in '14
16       or '15 that you had worked on 8501?
17   A   No, sir.
18   Q   First time on 8501.
19   A   Yeah.  I came from a -- a Curve Gang.
20   Q   Okay.  Now, let's -- let's talk a little bit
21       about -- 8501, the gang you were working on on
22       July 26, is a Steel Gang.
23   A   Um-hum.
24   Q   Is that the correct term?
25   A   Yes, sir.
```

Page 23

```
 1            MR. GARLAND:  Mr. Nicholson, let me
 2       just advise you don't um-hum or ugh-ugh.  Answer
 3       audibly yes, no.
 4            THE WITNESS:  Okay.
 5   BY MR. COX:
 6   Q   And just to abbreviate this because the jury will
 7       have a lot of sense of this, a Steel Gang is a
 8       gang that lays rail.
 9   A   Yes.
10   Q   All right.  A Curve Gang does what?
11   A   It lays rail on curves.
12   Q   And on the work on the Curve Gang had you worked
13       on wood ties?
14   A   Yes.
15   Q   Had you worked on concrete ties before going to
16       work on Gang 8501 on July 25th?
17   A   No.
18   Q   So the first time -- So I'm clear, the first time
19       you had ever worked on a Steel Gang working on
20       concrete ties was on July 25th, 2015.
21   A   Yes, you would be correct, Mr. Cox.
22   Q   All right.  Let's talk a little bit about what
23       education or training you've received from the
24       Union Pacific Railroad regarding prevention of
25       heat-related illness.  Can you describe that for
```

Page 24

```
 1       me?  And I want to know before -- Well, that's a
 2       good point.  Let me lay a little more foundation
 3       here.
 4            You told me that you had worked -- or
 5       that you held the position of assistant foreman
 6       without incident until September of 2015.  Was
 7       that on 8501?
 8   A   I want to make a correction there.  I guess,
 9       Guillermo's deal would have been an incident, but
10       what I meant by that was is that I didn't have
11       anything else, as far as anybody in my group for
12       that year with any issues.  That's kind of -- I
13       guess I worded that wrong now that you repeat it.
14   Q   Okay.  Clarify that for me.
15   A   Yes.  Without incident means I did not have any
16       injuries or anything within my work group for that
17       year that I retained an assistant foreman
18       position.
19            Guillermo would have been the first.
20       I used the wrong word when I say incident.  There
21       was nothing formally on my record of having any
22       issues with my performance.
23   Q   Okay.  You had received that coaching that you
24       described earlier.
25   A   Everybody does.
```

Page 25

```
 1   Q   Now, from -- am I correct that you worked on the
 2       Steel Gang 8501 from July 25, 2015 until sometime
 3       in September of 2015?  Because I had asked you how
 4       long did you work on 8501 as assistant foreman,
 5       and you said you held that position without
 6       incident until September of '15.
 7   A   No, I did not.  What I said to you was is that I
 8       was an assistant foreman from August of 2014 to
 9       about September of 2015 aside from, and this is
10       the correction I made just a moment ago.  Aside
11       from the incident, and I used the wrong word when
12       I said incident, aside from the incident with
13       Guillermo, now that I'm rectifying it, I didn't
14       have any complications with anyone.
15   Q   Okay.
16   A   As far as any injuries within my work group.
17   Q   Forgive me.  I may not have been clear.  I just
18       want to know for what period of time you worked on
19       8501 as a -- as an assistant foreman.
20   A   Okay, yeah.  So that -- that would be what you
21       initially said.  And that is that I was there from
22       July 25th, I think we narrowed it down, yeah, to
23       September, and I don't have an actual day that I
24       left the gang.  I do not remember.
25            I just -- I remember -- I have a vague
```


MAGNA
LEGAL SERVICES

Page 26

1   thought I was like October or -- I don't know if
2   I'll be here in October or not, and I know I was
3   gone long before then.  Just something stuck out
4   in my mind, you know, there was like an event I
5   wanted to go to in the area or something.  So I
6   know I was gone before then.  It's literally been
7   over a year since then.
8   Q   All right.  And why did you leave the assistant
9       foreman position on 8501 in September of '15?
10  A   I would say curiosity.  I wanted to learn more
11      crafts within the craft I'm in.
12          You know, you get to observe as an
13      assistant foreman.  You know, your job is to keep
14      everybody safe and to provide OTS and radio
15      communication, but you don't get the hands-on in
16      some aspects.  And so I wanted to -- I wanted to
17      do some welding, but it just didn't work out
18      because I bid a welder helper position and
19      somebody else had an interruption in their
20      service, so I was bumped before I could even get
21      the position.
22  Q   All right.  To what job -- Strike that.  Did you
23      move in September of '15 to another job on the UP?
24  A   No.
25  Q   Why not?

Page 27

1   A   Because somebody else had already bumped me from
2       the position that I was supposed to retain.  And
3       so what I did was is once that happened, of course
4       I want to work and -- and I'm comfortable as an
5       assistant foreman.  So I stayed there as an
6       assistant foreman for like -- well, once I was
7       bumped, I left.  That's -- That's what I did.
8           But I still, you know what I mean,
9       like I got bumped what would have been my first
10      day to show up at that welder helper job.  And so
11      in -- the standard is when you are in this Union
12      agreement is that you have 14 days to place
13      yourself after you are bumped.
14          That being said, I can catch a bid, I
15      could do that, within the next couple weeks to
16      come, hopefully, but if I don't, I have 14 days to
17      go to my bump list, review my bump list, and then
18      go ahead and bump in.
19          I ended up catching a bid.  Yeah, I
20      didn't even have to bump in, which no one likes to
21      bump in because essentially you're removing
22      somebody from, you know, from their position.  And
23      so I caught a bid, and it was in Wisconsin, very
24      nearby.  I'm going to -- I always mispronounce it
25      because it's French, but Eau Claire or Eau Claire

Page 28

1   or something to that nature, but that -- I bid
2   a -- a regulator.
3           And that draws into we -- we got on a
4   tangent, and that was my last rights that I hold.
5   You asked what, you know, what else have I done
6   here for the railroad.  That was the last one,
7   just to sum up that section of the deposition we
8   were talking about.  That's all.
9           So -- So going back through that,
10  that's going to be a trackman, that's going to be
11  a -- well, a signal helper, a trackman, a grapple
12  truck driver, assistant foreman, and that they
13  reference that machine, the regulator, a TMO date,
14  a machine operator.
15          That -- And that's when it all, like
16  you had said about the furloughs, that's when they
17  shut down, they had a reduction, and that gang was
18  abolished, and that's when I went into furlough.
19  Q   Okay.  Thank you for all of that explanation, but
20      what I'm interested in is when you left 8501 in
21      September of 2015 were you bumped?
22  A   When I left the 8501?  Yeah, I absolutely was.
23  Q   Okay.  You told me you left because of curiosity,
24      but what happened was someone bumped you.
25  A   You know, I guess I dug a little deeper than I

Page 29

1   needed to into your question.  I thought you were
2   asking me why I would bid another job.  The reason
3   why -- but what you're asking me, Mr. Cox, is why
4   I left the 8501?
5   Q   Yes, sir.
6   A   Okay.  Yeah, because -- because I was bumped.
7   Q   Okay.  Now, I'm going to summarize that a little
8       bit, in the interest of time, because I think by
9       now the jury will understand it, but based on the
10      seniority roster in the Union Pacific Railroad,
11      when a person gets a date on that seniority roster
12      he can bump a person with less seniority out of a
13      position, and that person that is bumped then has
14      14 days within which to bump into a new position
15      if his seniority permits.  Is that a fair summary
16      of it?
17  A   There was something in the beginning of that
18      statement I'm going to need you to repeat.
19  Q   Okay.  Well, why don't you explain it to us then,
20      how bumping and bidding works on the UP.
21  A   I need to know the question.
22  Q   Sure.  How does bumping and bidding work on the
23      UP?  You said you were bumped out of the assistant
24      foreman job on 8501 in September of '15.  You had
25      14 days within which to place yourself, bid on



Page 30

```
 1        another job.  Explain that to the jury.
 2   A    Okay.  Okay.  I did already summarize it, but I
 3        just want to make sure that I'm addressing your
 4        question.
 5              Now that it's vague you're going to
 6        open it up so that I can explain it the way that
 7        you just asked the question.  That is, how does
 8        bumping and bidding work.  Before you had asked me
 9        a series of questions leading up to what I was
10        going to answer, and that's why I asked you to
11        repeat it because the first question was a lot
12        different.
13              How bumping and bidding works is Union
14        Pacific has a bid line that we have to sign in to,
15        and we can review what jobs, provided we hold
16        the -- the -- even the -- the rights to work in
17        that area, because we have different agreements.
18        Like where I'm at right now, that's what they call
19        the old C&W agreement.  And I'm sorry to go on a
20        tangent, but you asked for an explanation of
21        bumping and bidding.
22   Q    Yeah.  Let -- I don't mean to interrupt you.  I
23        think the jury will have an understand of the
24        bidding and bumping.
25              I just wanted to -- Let me just
```

Page 31

```
 1        summarize so I'm clear I understand.  In September
 2        of 2015 a person with more seniority as an
 3        assistant foreman bumped you off the assistant
 4        foreman position on 8501.
 5   A    No.
 6   Q    No.  How is it that you were bumped off of the
 7        8501?
 8   A    I'm not sure how to tell you differently.  I've
 9        already told you.  The -- The -- I -- Like I said,
10        I had a curiosity about welding.  So I actually
11        bid a welder helper position on the same gang, on
12        the 8501.  Do you understand?
13   Q    I do now.
14   A    Okay.  When I was supposed to relinquish my job as
15        an assistant foreman to be a welder helper, there
16        was already another welder within the gang that
17        had -- either his job had either been abolished, I
18        don't know the story, or that he got bumped
19        himself.
20              So he bumped me.  His 14-day window
21        was open, so he bumped me the first day I even
22        supposed to step into my role as a welder helper,
23        opening my 14-day window.
24   Q    Okay.
25   A    Is that clear?
```

Page 32

```
 1   Q    It is now, but I'm not sure why you relinquished
 2        your right as an assistant foreman.  I understand
 3        it was to bump in as a -- attempt to bump in as a
 4        welder helper.  If you couldn't bump in as a
 5        welder helper, have you already relinquished your
 6        assistant foreman job and not able to go back to
 7        that job?
 8   A    If you've already relinquished your rights as an
 9        assistant foreman --
10   Q    Right.
11   A    -- you cannot go back to an assistant foreman?
12   Q    That's what I'm asking.  Here's my question.  Let
13        me make it a little more simple.
14              When you learned that the welder
15        helper job had been taken by someone with more
16        seniority, did you go back or attempt to go back
17        and as assistant foreman?
18   A    No.  No.  I -- I had that 14-day window to
19        exercise my seniority elsewhere, which never
20        happened.  I ended up catching a bid on a -- on a
21        regulator.
22   Q    Okay.
23   A    Um-hum.  Sorry about that.
24   Q    As a result of the injury to Guillermo Herrera on
25        August 20 -- on July 26, 2015, did you --
```

Page 33

```
 1        anyone in management or a supervisory role talk
 2        with you about what had happened in the day or
 3        days following?
 4   A    About the in particular incident?  No.  I --
 5              MR. SCHMITT:  You've answered the
 6        question, yeah.
 7              MR. COX:  No, but let's -- I guess
 8        he'll decide when he's through with his answer.
 9              MR. SCHMITT:  Well, I mean, for
10        purposes of the deposition, I mean, you just need
11        to answer the questions that are there.
12              THE WITNESS:  No, they didn't.
13              MR. SCHMITT:  If he wants further
14        explanation, then he'll ask.
15   BY MR. COX:
16   Q    We know you talked with Justin Dietrich and give
17        him a --
18   A    That's where I was going with it.
19   Q    Okay.  Did your ever talk with Mr. Rolow,
20        Mr. Diaz, any other foreman about what had
21        happened, or why it had happened, or what could be
22        done to prevent it from happening again?  Did
23        anyone, any supervisor ever talk with you about
24        that?
25   A    No.
```



Page 34

1  Q    Were you given any coaching or any discipline or
2       any -- anything as a result of the injury to
3       Guillermo Herrera?
4  A    No, I wasn't.
5  Q    Other than Justin Dietrich, did any of those
6       supervisors on that gang or directors of that gang
7       ever ask you what had happened --
8  A    No.
9  Q    -- that day?
10 A    No, they did not, which I didn't think that was --
11      Okay.
12 Q    Tell me what education or training regarding the
13      prevention of heat-related illness you received
14      from the Union Pacific Railroad before July 26,
15      2015.
16          You understand that I can obtain from
17      the UP your training history.  I haven't done that
18      yet, but I'm just interested in your training
19      history on the UP before July 26, 2015.  What
20      education or training did you receive from the UP
21      regarding the prevention of heat-related illness?
22 A    Going back to 2010, every summer, and with the
23      Signal Department it's even more intimate, we have
24      a safety meeting all day long for each day of the
25      month.  You know -- or not each day of the month.

Page 35

1       That's completely worded wrong.
2           For one day out of the month we put
3       aside for safety.  We meet in a hotel room and we
4       would have, you know, safety -- you know, we would
5       actually read what's going on within the company
6       and we have an actual safety briefing sent out to
7       us from -- probably our directors or above, and --
8       but that drawing -- that draws into your question.
9           The QS7, the heat stress awareness,
10      they call it the summer spike.  They're looking
11      out for these heat-related injuries to prevent
12      them.  And I have -- I have taken and signed off
13      on that training ever since 2010.  It's a
14      requirement.  They would come find me out on the
15      tracks and I would not even be allowed to be out
16      there, let alone in an assistant foreman position.
17          So that QS7 was taken annually since
18      2010, and if you can obtain those records, you
19      know, then -- yeah, it's there.  I've taken that
20      every year.
21          And as you indicated, I was a signal
22      helper doing manual labor, so it was even more
23      important that I pay attention because I literally
24      was digging trenches all day knee-deep in extreme
25      temperatures.

Page 36

1           So I was making sure that I was still
2       sweating, taking my water breaks accordingly, make
3       sure that I've got the, you know, you know, one an
4       hour, and depending upon the index how much time I
5       take and stuff like that.
6           And for me, a big hitter for me is I
7       make sure my electrolytes are up.  That's huge.
8       But no, I've -- I've sweated so much it's not even
9       funny, but I'm totally on a tangent here.
10          The question at hand is my training.
11      So I've had that summer spike, stand down, signed
12      off on, since 2010.  And then as far as
13      heat-related injuries, we're just always talking
14      about it, like always talking about the heat, what
15      we're going to do, buddy systems.  Knowing your
16      own limitations is a huge one.  That's --
17      That's -- I mean, at the end of the day that's --
18      that's -- that's the one that I wish -- I wish
19      there was some way around that, you know, that we
20      could know better, but there's not, you know.  I
21      mean, you got to know your own limitations, you
22      know.
23          Someone can appear just fine on the
24      outside and not be, you know, so.  And I think
25      there's a lot of different factors that come into

Page 37

1       that, you know.  I mean, how good of shape you're
2       in, if you're sleeping enough, what you're eating,
3       if you're drinking the night before.  We talk a
4       lot about hydration.  Hydration doesn't start in
5       the morning when you get to the job.  It's a part
6       of it, but it starts the night before.
7           So your whole -- your whole job is
8       important on and off the railroad to prevent
9       injuries.  You have to be very well hydrated to be
10      out there, and especially in those extremes.  And
11      I think the railroad's done a good job of
12      educating not only me, but everyone else on that.
13 Q    All right.  Now, a couple of things that you said
14      were interesting to me.  You said a big hitter for
15      you is to keep your electrolytes up.  What do you
16      mean by that?
17 A    Drink Gatorade.  It has electrolytes.
18 Q    Okay.  And you referenced a buddy system.  What is
19      a buddy system?
20 A    Is to be hyperaware of your surroundings.
21      Mitigate the risk of unsafe behavior.  Make it
22      less severe.
23          And so, you know, if you come there
24      and you're only thinking about what your job is
25      and you're not -- you're not looking over there



Page 38

1    and seeing that, you know, John Doe isn't sweating
2    and he looks tired and he looks like -- lethargic,
3    to go and engage him and make sure that he's okay,
4    and really make sure. Not just, you know, hey,
5    man, you going to make it. You need to keep going
6    like really -- really sit there and have a
7    one-on-one with him, you know what I mean.
8            It's almost like if someone had a
9    concussion, you want to ask them their name, how
10   many fingers am I holding up, check back in with
11   them. Make sure that their memory's working
12   properly. Make sure that -- that there's some
13   cognition there, you know.
14           And so that's -- the buddy system is
15   to go above -- not even above and beyond, because
16   that's our standard, but to -- out in the world,
17   you know, you don't walk down the street asking
18   people if the heat's getting to them, you know.
19   Out on the tracks we do. That's the buddy system
20   in a nutshell.
21   Q    You referenced sweating. What's the significance
22        to you, based on that training, whether one is
23        sweating or not?
24   A    It's an indication that you're still hydrated,
25        that you're not losing all your fluids.

Page 39

1    Q    Is it an indication at all as to whether or not a
2         person is suffering or could be suffering a
3         heat-related injury?
4    A    That's a medical question. I mean, that's not --
5    Q    Okay. If you could open up the exhibit book again
6         to Exhibit 13. You referenced it as QS7, the
7         training program. It's actually, I think, QS97.
8         Do you see that there?
9    A    Yeah, there's a 9 in there. My apologies.
10   Q    And this document says this information is
11        provided to assist supervisors in refocusing our
12        safety efforts. Do you see that?
13   A    Yes, sir.
14   Q    And the contents are the Leader's Guide. Now,
15        have you ever seen this document, this Leader's
16        Guide. Take a look at it, flip through it if you
17        need to.
18   A    I would say yes, but I would also say if it's
19        slightly altered at all I wouldn't know it being
20        there's so much criteria here.
21   Q    All right. Then you said something about -- Well,
22        strike that. Let's talk a little bit about that.
23        You see on the second page in the middle --
24   A    I'm sorry. I jumped all over. Hold on. I'm
25        sorry. Okay. Is it highlighted?

Page 40

1    Q    Yeah. It says in the past five years 30
2         engineering employees have suffered heat-related
3         incidents. Sixteen of these were serious enough
4         to be reportable, and 11 resulted in lost time.
5            Do you have any knowledge, other than
6         Guillermo Herrera, of anyone else suffering a
7         heat-related injury on Gang 8501 while you were
8         there?
9    A    I've had -- I've heard hearsay that -- that people
10        were dealing with the heat in different ways, but
11        I wasn't on the gang. Like you said, it was only
12        two days. So I don't really -- I don't know.
13        Like I said, all I've heard is hearsay. So I'm
14        not really sure what did or didn't happen, sir.
15   Q    Did you ever hear that Charles Turner had had a
16        problem, assistant foreman or foreman, I'm not
17        sure what his job was, Charles Turner had had a --
18        a problem with the heat a day or two before
19        Guillermo Herrera?
20   A    I heard guys talking about it, but it didn't come
21        from any official source, nor was of it like
22        briefed with me that it was something that
23        happened. I heard about it through the gang, but
24        that's about it.
25   Q    Okay. So that was -- If we look at Exhibit 4, the

Page 41

1         job briefing workweek, we identified Charles
2         Turner as a foreman of the Eight Man.
3            When -- If and when Mr. Turner went
4         down as a result of a heat injury, or left the job
5         because of a heat injury, do you know if that was
6         the subject of a safety standdown the day it
7         happened or the next day? Was it mentioned at the
8         job briefing the next day, do you know?
9    A    I was not there, no, and I didn't hear anything
10        about what you just asked me, the -- was it the
11        subject of a standdown or was it -- I was not
12        there. Like I said, I heard hearsay. I don't
13        even know when it happened, to be honest with you.
14        I just heard hearsay of it when I was -- when I
15        was there for that couple months.
16   Q    Now, I want to look at page 6.
17   A    Okay. Just a second.
18           MR. GARLAND: It's still in that
19        exhibit.
20           THE WITNESS: He said he wanted to
21        look at page 6.
22   BY MR. COX:
23   Q    Page 6 of that exhibit. Sorry.
24   A    Okay. Yeah, sorry. Got tabs going here that are
25        pretty extensive. Okay.

MAGNA
LEGAL SERVICES

Page 42

1  Q    You see under work procedures, the second
2       paragraph.  Also, remember that in hot weather
3       even normal tasks can cause an individual to
4       become overheated.  Be sure to know and be on the
5       lookout for the signs and symptoms of heat stress
6       from our annual training and, if possible,
7       implement a buddy system during the hot weather.
8       This means having two employees each responsible
9       for watching the other for signs of heat stress,
10      reminding each other to drink water, suggesting a
11      task rotation or taking a break.
12           Is that your understanding of the
13      buddy system that the UP attempts to implement?
14  A    Yes.
15  Q    I want to go to page 8 in that exhibit.  Were you
16      ever advised of what injury, what heat-related
17      injury or illness Guillermo Herrera was diagnosed
18      with at the hospital on July 26?
19  A    Yeah.  I just -- I -- Like I said, through the
20      guys in the gang I asked how's he's doing, and
21      they just said he had heat exhaustion.  That's it.
22  Q    Okay.  On page 8 in Exhibit 13, emergency
23      response.  You see that chapter title?
24  A    I do.
25  Q    It says as mentioned before, it is important that

Page 43

1       everyone knows the signs and symptoms of heat
2       stress and knows what to do should a coworker
3       experience those signs or symptoms.
4  A    Um-hum.
5  Q    If we recognize the early signs of heat strokes in
6       ourselves or one of our coworkers, the remedy may
7       be as simple as taking a break in the shade, if
8       any, or an air-conditioned vehicle, and drinking
9       water to allow our bodies to cool.  If the heat
10      stress appears to be more severe, don't hesitate
11      in seeking immediate medical attention.
12           Did I read that right?
13  A    You did, sir, yes.
14  Q    And then it describes the symptoms and signs of
15      heat exhaustion.
16           On July 26, 2015, and we'll get into
17      this in detail in a minute, what symptoms did you
18      observe in Guillermo Herrera any time that day
19      before calling Bobby Herrera in Guillermo Herrera?
20      What symptoms or observations did you make of him?
21  A    You know, honestly, he was okay because he
22      wouldn't have been on the tracks if he wasn't.
23  Q    What do you mean by that?
24  A    Well, what I mean is when I was observing him he
25      appeared to be okay.

Page 44

1  Q    Okay.  What about when he took the break in the
2       truck -- Hang on a second.
3           Let me go over with you a few things
4       here.  Sometime that morning, I believe it's about
5       10:30, Mr. Herrera sat in a truck for 30 to 45
6       minutes, and he described himself as feeling
7       dizzy, weak, and having trouble breathing.  And he
8       was in the mechanic's truck for about a half an
9       hour or so.  Were you aware of that?
10  A   Oh, yeah.
11  Q   And what -- did -- did you ever doubt
12      Mr. Herrera's stated need to sit in the truck to
13      cool down?
14  A   No.
15  Q   Did you make any observations of him as to why he
16      would need to do that?
17  A   Can you please -- I don't like the way that's
18      worded.
19  Q   Did you have any reason to believe that he did not
20      need to be in a truck to cool down?
21  A   Did I have any reason to believe he did not have a
22      reason to be in the truck.  No.  It was at his
23      own -- That's what he wanted to do.
24           What I have to do with it is nothing.
25      It's totally -- He wanted to be in the truck, he's

Page 45

1       in the truck.  I mean, that's -- you know yourself
2       better than anybody.
3  Q    Okay.  And did you permit him to go into the
4       truck?
5  A    Absolutely.
6  Q    Did you tell Bobby Seely that Mr. Herrera wasn't
7       feeling good and needed a break?
8  A    I did, but what I did was is -- Okay.  Bobby Seely
9       came through, and I just wanted to say -- you
10      know, I said he tells me he's fine, he's
11      absolutely fine, he looks fine, but he did need a
12      break.  I just -- just so that this isn't just
13      solely -- I wouldn't say on me because it isn't
14      about blame.  It's about really -- being
15      compassionate and making sure he's okay.
16           I said, you know, you being the safety
17      captain, you having the extra PPE, I think it's
18      wise you go have a briefing with him, and they
19      did.  And he did take PPE from him.  Also,
20      reinforcing, I mean, he's -- that's showing that,
21      you know, he's not so dizzy that he can't
22      function, that he can't make decisions.  I mean,
23      he had a briefing with him, you know.
24           I mean, I don't know -- like I said
25      I'm not -- I'm not -- I'm -- I'm not the judge of

MAGNA
LEGAL SERVICES

Page 46

1    that. I just listen to what -- what it is Herr --
2    what Guillermo is telling me, you know, so -- I
3    think I've answered the question.
4  Q  All right. My question was did you tell Bobby
5    Seely that Mr. Herrera wasn't feeling good and
6    needed a break?
7  A  No. What I told Bobby Seely was is that he was
8    not -- he said he was lightheaded earlier and then
9    he took a break, and then he came back on his own
10   will and he's telling me he's okay. And he's been
11   telling me he's okay ever since it happened. And
12   that is what I told Bobby because I do not want
13   anybody out there who's going to get hurt. It's
14   just not worth it.
15 Q  In any of the training that you've ever received
16   from the Union Pacific Railroad, have you ever
17   been told that the last person to ask how they're
18   doing is a person that is in the throws of a heat
19   illness?
20 A  Excuse me?
21 Q  Have you ever been told by anybody on the Union
22   Pacific in any of this training that if a person
23   is complaining of heat problems; dizziness, I need
24   to take a break, that you cannot rely on what they
25   tell you if they are in the throws of a heat

Page 47

1    illness? You cannot -- They cannot -- Because
2    they've become confused and lose mental function,
3    they cannot be relied upon to describe to another
4    person how they're doing. Have you ever received
5    any training like that?
6  A  I know what you mean, but it's a little bit more
7    complex than that. The training I received said
8    they have to be exhibiting the signs.
9         He clearly was not exhibiting the
10   signs. He was taking all the precautionary
11   measures to stay hydrated. He was drinking lots
12   of water, lots of Gatorade. He was able to
13   have -- hold a conversation just fine, joking with
14   the guys.
15        It wasn't -- There was no indication
16   that he didn't have awareness that he was
17   suffering from some kind of heat dementia or
18   something or -- I don't know what -- where you're
19   going with that, but that's -- that's what --
20   that's how I'm going to leave that answer,
21   Mr. Cox.
22 Q  And that's your perception at the time about 10:30
23   or so when he was in the mechanic's truck; is that
24   right, that point?
25 A  Okay. The timeline, I don't know if that's

Page 48

1    exactly right. So that's like when were talking
2    about the questions here and you asked me, you
3    know, and now I've just said it was 10:30, which I
4    haven't even gone through my head what exact time
5    it was. I don't know that it was 10:30. It might
6    have been a little bit later in the day, but he
7    was in there for a couple hours, not 30 to 45
8    minutes. That's not -- No. And he came back on
9    his own will.
10 Q  All right. So how would you describe the
11   condition of a person, if your memory is accurate
12   that he was in the truck for two hours, how would
13   you describe the condition of a person that needed
14   to be in an air-conditioned mechanic's truck for
15   two hours?
16        In other words, why would one have to
17   be in an air-conditioned truck for two hours,
18   assuming your memory of two hours is correct?
19 A  Because that is -- It's -- It's right here, I just
20   read it and -- Let's see. I mean, the -- the
21   deal, what it says is let -- let someone have
22   access to a truck and the air conditioner, you
23   know what I mean, and -- So why would he need to
24   be in there two hours? Maybe he felt fine. Maybe
25   it took him that long to drink that much water and

Page 49

1    Gatorade where he felt he could come back.
2         I personally got in the truck with him
3    once me and the couple guys I was working with
4    worked up close to where he was at and, I mean, I
5    gave him my personal radio and he had access to a
6    working radio to make sure that -- that, you know,
7    he can say something if he had a problem, but I
8    got in the truck with him and we had a
9    conversation, so yeah.
10 Q  In that conversation -- By the way, was the
11   mechanic Brad present when you were having any
12   conversation with Mr. Herrera?
13 A  He was not.
14 Q  Do you know Brad is the mechanic in whose truck
15   Guillermo Herrera was sitting about 10:30 or 11 in
16   the morning?
17 A  I do.
18 Q  Did you say to Mr. Herrera while he was sitting in
19   the mechanic's truck if you plan on being in the
20   truck all day, you won't get paid?
21 A  Absolutely not. Absolutely not. No. I did not.
22   And where I want to go with that, as far as how I
23   look at that, that has definitely been a
24   miscommunication.
25        I was saying why -- you know, all I



```
 1    said was is it's not -- if you are feeling sick at
 2    all, it's better that you recover from it, you
 3    know, if you have to go back for a day to the
 4    hotel room, instead of missing a whole week's
 5    worth of work, but at no point did I say -- hence,
 6    he was there the whole day getting paid for any
 7    breaks that he needed that we did take officially.
 8         So to answer your question, no, but I
 9    can see why -- how that got turned around, but no,
10    it's -- I never -- I never said anything -- I'm
11    not the railroad. I'm an employee of the
12    railroad.
13  Q  But you were his assistant foreman.
14  A  Yes, but that's -- again, that's above my pay
15    grade. I don't make those calls. I make the
16    calls to mitigate the risk of unsafe behavior,
17    provide on-track protection, and just make sure
18    that I'm the voice for my guys.
19  Q  Did Mr. Herrera return to work after he had been
20    in the mechanic's truck?
21  A  Yes, sir.
22  Q  And what work did he return to?
23  A  Trading off with the bus driver just placing
24    biscuits. Biscuits are plastic insulators that go
25    between what they call the tower of the tie, the
```

```
 1    concrete tie, and the rail. And they help hug the
 2    rail. You know, sometimes we put a little water
 3    on them.
 4  Q  Okay. We're going to understand all of that. I'm
 5    just asking you what was he doing.
 6  A  Well, earlier you were asking me if I had any
 7    experience on concrete, so I felt like I'd kind of
 8    elaborate on it in the process, but he was -- he
 9    was -- he was putting those insulators in and
10    putting those clips in place so that the machine
11    could actually do the work.
12         So he wasn't swinging a hammer. He
13    was just basically setting out material for the
14    machine to do the actual labor.
15  Q  Do you remember after he had returned to work
16    Mr. Guillermo telling you that he was feeling real
17    dizzy?
18  A  No. I do not remember that. There was one time
19    in the morning, and that was what led to his
20    break. Well, first he went to his machine, to get
21    it right, he went to his machine. And then he
22    sent word to me via the radio that he was going to
23    go to the mechanic's truck. So he was already on
24    break a little bit before the couple hours in the
25    truck in a shade machine. There's shade on that
```

```
 1    machine.
 2         And at one point I do remember, and I
 3    don't have a timeline, that he was standing in the
 4    shade on the tracks, too, off the track, but when
 5    he came back, I did not hear him complain about
 6    dizziness because I was -- I was hyperaware and I
 7    did not want to see him the way he is now.
 8  Q  Who called Surfacing foreman Gang Robert or Bobby
 9    Herrera? I'm probably going to refer to him as
10    Bobby Herrera. Who called Bobby Herrera that day?
11  A  I did.
12  Q  Why?
13  A  To get Guillermo transportation because around
14    3:30 in the afternoon he said that he wanted to
15    leave, he didn't feel good.
16  Q  And how do you get the time 3:30?
17  A  That's my timeline in my head. It was around that
18    time.
19  Q  All right. It's an estimate. We can agree on
20    that?
21  A  Pretty accurate one, yes.
22  Q  All right. I mean, how do you document that, or
23    how are you -- how are you able to say that's
24    pretty accurate? I'm not trying to --
25  A  Just my memory, yeah.
```

```
 1  Q  Mr. Herrera thinks it's about 1 or 1:30.
 2  A  No.
 3  Q  Do you have any way to dispute that?
 4  A  No, there's no way it was 1:30. I could actually,
 5    if you give some time to do some research, it
 6    wasn't 1 or 1:30 that he left. No way.
 7         There was a -- a fuel truck that came
 8    through around 2 something. It's my job to
 9    document what goes on during the day. That's how
10    I remember. And the -- the fuel truck came
11    through between 2 and 3, and he sat in that truck,
12    too, for about 15, 20 minutes, maybe longer. 1 or
13    1:30, that's just not going to add up at all.
14  Q  What would you look at to document that?
15  A  Witness sworn testimonies, lots of them. There
16    was -- You know, you got -- you got more
17    depositions I'm sure. I don't know. If you don't
18    already know, the people who were there.
19  Q  What would you look at? You said you were
20    responsible for keeping time of events, things
21    like that. Did you keep a log or a diary, or did
22    you make any notes about what happened that day?
23  A  That day I'm sure -- I'm sure I did. And, I mean,
24    like I said, I'd have to go back through my
25    records, I doubt I have it, but I do remember
```

Page 54

1    everything. I did go over this a little bit in my
2    mind. Yeah, you know, once he didn't return I was
3    thinking well, what -- I don't understand, you
4    know.
5         So I just -- I've played back that day
6    in my head hundreds of times, you know, thinking
7    what could I have done differently. And I can't
8    see what I could have done differently for
9    Mr. Herrera.
10   Q    When I was asking you about what you had done to
11   prepare for your deposition, have you reviewed any
12   documents?
13   A    No, I have not.
14   Q    No statements, no logs, no time rolls, nothing.
15   A    No. No. Through and through I have not, sir. I
16   have not. Like I said, when you said how do you
17   know, from my memory. I remember.
18   Q    Did the UP furnish you anything to review to
19   assist you in making accurate your testimony here
20   today? Did they provide you any documents?
21   A    No. No. They made it -- They made it clear
22   what -- what the guidelines are.
23   Q    So I'm back to the question of why you called
24   Robert Herrera, Bobby Herrera. Why did you call
25   him?

Page 55

1    A    Because Guillermo wished to leave.
2    Q    And how did you call Mr. Herrera?
3    A    On the radio.
4    Q    And what about -- what did Guillermo Herrera say
5    to you?
6    A    He just said, you know, I'm not feeling good, my
7    body feels weird. That's what he told me.
8    Q    What else?
9    A    That's it. I don't feel good, my body feels
10   weird, I don't know what's going on. Okay.
11   That's -- That's the -- the key there to what we
12   were talking about earlier. That's not what I
13   needed to hear. If I even thought that he was
14   trying to -- you know, I need to stay out here
15   because I'm worried about something else, like he
16   said pay or something, and I'm like no, you need
17   to go to home and I'll call somebody, but that
18   right there was -- he's like I'm feeling weird.
19   And I was like okay, we'll -- I'll -- we'll -- as
20   fast as I can I'll get somebody here to get you.
21   Q    All right. And did you make any observations of
22   Guillermo Herrera at that time?
23   A    At that time? He was still sweating and he was
24   just leaned up against the machine. And when I
25   say leaned up, he was half sitting on it, half

Page 56

1    standing, and his shoulders were slumped forward
2    just a little bit, slightly. I still have a still
3    frame.
4    Q    And did you form any impressions of his condition
5    at that time?
6    A    Just that he did look exhausted at that time.
7    When I finally -- When it -- When -- When I seen
8    him he looked exhausted, you know. That's -- So,
9    you know, so we handled it accordingly.
10        That's when he -- That's when -- I
11   wouldn't even -- If I viewed him like that before
12   he said he wanted to leave, I would have -- I
13   would have had him out. Like I said, I have a
14   still frame in my mind, in my memory of him
15   exactly where he was at. He was on the -- He was
16   on the side of the track, you know. He wasn't on
17   the field side. The field side is what we
18   reference the right-of-way where vehicles drive up
19   and down. He was actually over on the other side
20   and he was leaning up against that camp car, as we
21   call it, which is also another word for clipper,
22   and -- clipper car, you know, and we also have
23   a -- a bin that we haul our tools behind that, but
24   he was in the front.
25        He was in the front of that machine,

Page 57

1    closest to the front of the machine, and he was
2    just -- he was just like half sitting, half
3    standing with his shoulders slumped forward, and
4    he looked like he was thinking, you know, like he
5    was evaluating his own condition. And of course
6    he was nervous. He said I feel weird. And I said
7    well, I'll get you out of here, you know. All
8    right.
9    Q    Now, what was your thought when you say I'll get
10   you out of here? What was your thought? What
11   does that mean, get you out of here?
12   A    To call somebody. You know, to call Robert, who
13   is -- who's the nearest available vehicle to get
14   him to where he needs to go, you know.
15   Q    And where did he need to go? Did you form any
16   opinion in that regard?
17   A    I -- Like I -- I didn't really form an opinion
18   except to say that I knew he wanted to leave. You
19   know, it's -- it really wasn't up to me where he
20   goes because, again, you know, I -- from what I
21   saw there, I just was concerned about getting him
22   a ride. Where he went, you know, I didn't even
23   really -- This happened so quickly, Mr. Cox, that
24   we didn't have like an in-depth conversation,
25   Mr. Herrera and I.

MAGNA
LEGAL SERVICES

1      He was sick.  He was gone.  I didn't
2  get the chance to get an evaluation, like check in
3  with him and be like, hey, you know, what do you
4  want to do.  Do you need -- You know, again,
5  looking for the signs of heat stress, you know.  I
6  didn't -- I didn't have much time at that point to
7  evaluate him, you know, is he still sweating, you
8  know.  Is he -- Is he -- Can he tell me what, I
9  don't know, his favorite lunch was back in fifth
10  grade.  Just -- Just make sure he's not -- his
11  cheese isn't off his cracker and that he's not
12  showing any physical signs of, you know, heat --
13  exhaustion, which is what -- what it would have
14  looked like at that point if I had more time with
15  him maybe.  I don't know.  I didn't have very much
16  time with him, but heat stroke, going a step
17  further, so -- which -- it's almost one in the
18  same.  You might as well go with the more
19  restrictive, but -- So anyways, I had him out of
20  there within a couple minutes from him telling me
21  he wanted to go and making that contact with
22  Mr. Herrera, Bobby Herrera, because we have two
23  Herreras here.  Bobby Herrera from the Servicing
24  Gang came within a couple minutes of my
25  transmission over the radio.

1  Q    And did --
2  A    He has a lot of experience.
3  Q    Did you and Mr. Newman have to assist
4  Mr. Guillermo Herrera to Bobby Herrera's van?
5  A    No.
6  Q    Did -- Is it your statement that he walked on his
7  own?
8  A    Yes.  He had people standing next to him, but they
9  were not assisting him.  They were there just in
10  the event he did not -- he was not able to perform
11  the task on his own.
12       Their hands, if they were touching
13  him, were on the exterior of his shoulders, not
14  underneath his shoulders.  Almost like support.
15  The buddy system, you know.  We're here, it's all
16  right.
17  Q    All right.  Let's go back to Exhibit 13.
18  A    Okay.  I'm in there.  I'm on page 8.
19  Q    Correct.  It says if the heat stress appears to
20  be -- Let me read the preceding paragraph.  And
21  this is, again, the UP training program.
22  A    Okay.
23  Q    If we recognize the early signs of heat stress in
24  ourselves or one of our coworkers, the remedy may
25  be as simple as taking a break in the shade, if

1  any, or an air-conditioned vehicle, and drinking
2  water to allow our bodies to cool.  If the heat
3  stress appears to be more severe, don't hesitate
4  in seeking immediate medical attention.
5       Did I read that right?
6  A    You did, sir, yes.
7  Q    And at the time that you find Guillermo Herrera
8  sitting on the machine, slumped over, and he had
9  already been in the truck, or a truck, once or
10  twice before, did it appear to you that the heat
11  stress had not cleared as a result of being in an
12  air-conditioned vehicle and drinking water?
13       MR. SCHMITT:  Object to the form.
14  BY MR. COX:
15  Q    Did he appear --
16  A    What does that even mean?
17  Q    Did he appear to be continuing to be suffering the
18  effects of the heat?
19  A    Well, Mr. Cox, this isn't -- this isn't me trying
20  to go around your words, and I understood the
21  question completely.  And we're all out there.
22  We're all taking breaks.  We all would have fit
23  the criteria for heat exhaustion not only in the
24  railroad, but out there on construction crews and
25  everywhere where this QS97 is implemented, or the

1  construction gangs, you know, the construction
2  OSHA standards, stuff like that, we're all taking
3  lots of breaks and would exhibit looking exhausted
4  because it's hot.  It's real hot out there, but
5  you have to know your own limitations.
6       So when you ask me a loaded question
7  like that, I don't really know how to respond
8  because then everybody -- there would be nobody on
9  the tracks.  There would be nobody in jobs
10  anywhere, you know.
11       So when you say should he have got
12  medical attention because he exhibited what he
13  exhibited towards me, I would say no.  This is
14  about the third time I've said that I've checked
15  in with him, and I told you the conversation and
16  what it was he was doing and what it was I was
17  doing in my observations to make sure of it that
18  we didn't have an emergency situation.
19       As far as what happened after
20  Guillermo left me, I can't -- that's not -- I
21  don't -- you know, I can tell you what I
22  witnessed.
23  Q    Okay.  What did Guillermo Herrera say to you when
24  he was sitting on that machine slumped over like
25  you described?  What did he say to you?

MAGNA
LEGAL SERVICES

Page 62

1  A   Yeah.  He said I feel weird, I want to leave.
2  Q   Now, Guillermo Herrera has been in an
3      air-conditioned truck for either 30 to 45 minutes
4      or, according to your testimony, two hours.  Then
5      he was back in an air-conditioned truck --
6  A   Twenty minutes.
7  Q   -- and then about this time he's sitting on a
8      machine, slumped over, saying he feels weird, and
9      you said he looked exhausted?
10 A   I got in the truck with him for a while.
11 Q   No, no.  No, no.
12 A   I got in that -- I got in the mechanic's truck,
13     too, at one point to get some air conditioner.  So
14     did another guy on my gang.  They were trading
15     out.
16 Q   Okay.  My --
17 A   This isn't limited to.
18 Q   Please listen to my question.
19 A   Yes, sir.
20 Q   I know you're --
21 A   Yes, sir.  I just take the personal statements
22     serious.
23 Q   When he was sitting on the machine just before you
24     called Bobby Herrera to come get him --
25 A   This is not a game.

Page 63

1  Q   -- he was slumped over, he said he was feeling
2      weird, and he had been in a truck earlier that day
3      for either a half an hour or two hours, and then
4      back in an air-conditioned truck, both
5      air-conditioned trucks, on two occasions.
6          Now, I know everybody was hot out
7      there.  Had everybody else been in a truck for two
8      hours or two-and-a-half hours?
9  A   It's a hundred-man plus gang.
10 Q   No, no.
11 A   There could have been.  Not everybody, but yes,
12     there could have been guys in trucks for a couple
13     hours easily.  And then there's other guys who
14     their job doesn't even require them to be in the
15     heat.
16 Q   To your knowledge, did anyone else sit in a truck
17     for two-and-a-half hours, an air-conditioned
18     truck, two-and-a-half hours that -- earlier in the
19     day?
20 A   To my knowledge, and on my part of the gang, no,
21     sir.
22 Q   All right.  Let's look on page 8 again under the
23     training that -- the Leader's Guide on the
24     training for the Union Pacific Railroad.  It says
25     symptoms and signs of heat exhaustion; headache,

Page 64

1      dizziness, weakness, flushing of the skin.
2      Actions to take if this occurs:  Get the person in
3      shade, start cooling, give fluids, seek medical
4      attention if symptoms do not improve in 15 to 20
5      minutes.
6          Did Mr. Herrera's symptoms, to your
7      observation, get better or worse during the
8      earlier part of the day?
9  A   Did his symptoms get better or worse during the
10     early part of the day?
11 Q   From earlier in the day.
12 A   From earlier?  Oh, from earlier in the day.  That
13     matters.  That matters.  They --
14         MR. SCHMITT:  Let me just object to
15     the form regarding symptoms earlier in the day.
16     Go ahead.  I mean, who's testifying?  But go
17     ahead.
18         MR. COX:  That's an interesting
19     objection.  Go ahead.
20         MR. SCHMITT:  Well, but, Jim, I mean,
21     he's already testified to what he observed earlier
22     in the day.
23         MR. COX:  David, stop.
24 Q   Go ahead.
25 A   Well, I mean, it's still -- there's -- there is --

Page 65

1      and this is how I honestly see it in my mind.
2          There's where we started out, you
3      know, he said he was lightheaded.  I was
4      lightheaded that day.  Even talking, you know,
5      like I -- I -- I was.  And so here's where we
6      started out.  I was lightheaded.  I recovered that
7      fine, not to -- not to -- I know my own
8      limitations.  That has nothing to do with
9      Mr. Guillermo Herrera because you're the judge of
10     your own body, but he said he's lightheaded.  He
11     went to a truck.
12         Now, I understand what you're driving
13     at here, that he was in a truck more than 15
14     minutes, you know, and you think that would be --
15     No.  He said he was lightheaded.  His -- His
16     condition only improved or stayed the same, from
17     what he was telling me, until it was too late.
18         There is no this was a downward slope
19     throughout the day and we didn't -- we didn't
20     properly take care of Mr. Guillermo Herrera.  No.
21     It was -- I was 100 percent, in my mind, focused
22     on my abilities to lead a group, as you keep
23     referencing this manual, to observe that.
24         And -- And it -- it hurts to see that
25     that -- that it could even be worded that way

MAGNA
LEGAL SERVICES

Page 66

1      because he was fine, and then he wasn't, but
2      through the course of the whole middle of the day,
3      all those events and stuff, every safety
4      precaution, every measure, every observation was
5      taken to ensure that we were giving him a safe
6      work environment to be in.
7            I don't know, you know -- and -- and
8      like Mr. Schmitt has said here already, you know,
9      I've said all these things.  I just keep repeating
10     myself now.
11  Q   My question is was he worse off when he was
12     sitting on the machine and you called Bobby
13     Herrera than he had been earlier in the day?
14  A   Well, yeah.  In a matter of a couple minutes.
15  Q   Look at page 9, if you would.
16  A   Hold on.  I almost -- These tabs, you know, I want
17     to go to your tabs instead of the pages.  Okay,
18     I'm on 9.  How much you got?  How many tabs are
19     these?  40 tabs?  Wow.  It's pretty extensive.
20  Q   Let's see what I wanted to ask you about here.
21  A   I don't have anything.
22  Q   Under environmental procedures, Paragraph 2, it
23     says take at least a five-minute break every hour.
24     In California breaks must include access to shade
25     or air-conditioned vehicles.

Page 67

1            The second bullet says use the buddy
2      system to watch out for each other.
3   A   Um-hum.
4   Q   Who was Guillermo's buddy that day, if you know?
5   A   Oh, I was his personal buddy.
6            MR. GARLAND:  Jim, while there's no
7      question pending, can we take a quick break?  I
8      have to use the restroom.
9            MR. COX:  Sure.
10           MR. GARLAND:  Thank you.
11           VIDEOGRAPHER:  Time is 9:29 a.m.
12     We're off the record.
13           (Recess taken.)
14           VIDEOGRAPHER:  This is the beginning
15     of DVD number two.  The time is 9:44 a.m.  We are
16     back on the record.
17  BY MR. COX:
18  Q   Mr. Nicholson, we just took a break for about 15
19     minutes or so.  Did you speak with either lawyer
20     during the break?
21  A   Yes.
22  Q   About what?
23           MR. GARLAND:  Objection.
24           THE WITNESS:  Just -- Just like how
25     much longer we think it's going to take, and why

Page 68

1      you were asking some of the questions you were
2      asking.  I didn't understand.  Just, basically,
3      the -- the stuff that I didn't understand that I
4      needed clarification on.  Some of the questions I
5      didn't know.
6            More about like how this is going.
7      Like am I talking too much, am I -- As far as
8      talking too much, when I say that I mean am I
9      talking too loud, can you hear me, like what he
10     just said with the yes, how I'm answering.
11           I've never been in a deposition, so
12     the setting is all new to me.  So I was just
13     asking them, you know, standard questions of that,
14     but not anything to what we were really talking
15     about.
16  BY MR. COX:
17  Q   Okay.  All right.  Let's move to July 25th, 2015.
18     I understand that was your first day as assistant
19     foreman on the gang?
20  A   Please say the date again.
21  Q   July 25th.
22  A   20 what?
23  Q   Fifth.  The day before Mr. Herrera's heat injury.
24  A   July 25th, 20 --
25  Q   '15.

Page 69

1   A   -- 15, yes.  I think you said '16.  On 2015 --
2      July 25th, 2015, yeah, that was my first day on
3      the gang, sir.
4   Q   Tell me -- Did you join the gang that morning?
5      Did you come sometime during the day?  Were you
6      there for the morning job briefing?
7   A   Yeah.  I had two -- two full days.
8   Q   So you were there for the job briefing on the
9      morning of July 25th.
10  A   Yes, that's correct.
11  Q   And what -- what work did the Cleanup Gang or
12     Quality Control Gang do under your authority on
13     July 25th?
14  A   We -- What -- We did quality control.
15  Q   And tell us what that -- your understanding of
16     what that was.  My question is how did you learn
17     what you were supposed to do on -- as assistant
18     foreman of the Quality Control Gang?
19  A   Well, from -- I mean, from the guys there.  Those
20     guys had been doing it for several months, if not
21     years, prior to me coming there.
22           The -- The assistant foremen, you
23     know, they don't -- they're there for the on-track
24     safety, and also for safety concerns, and also
25     making sure nobody is doing any unsafe behavior.

MAGNA
LEGAL SERVICES

Page 70

1        Those guys gave me a very clear idea of what was
2  supposed to take place and how it was supposed to
3  take place.  And if I saw anything that was
4  subject to unsafe behavior, then I would have said
5  something, but as far as like what we do, we make
6  the tracks safe so that trains can run on it after
7  the fact.
8        I mean, in anything you doing in
9  railroading, I mean, that's our goal as being in
10  the Engineering Maintenance Department.
11  Q   Okay.  Did --
12  A   You can tell when a track's unsafe.
13  Q   Can we -- Is it fair for me to say that you were
14  learning on the job, you had on-the-job training
15  that day?
16  A   Yes, sir.
17  Q   No supervisor had told you how to do the job or
18  how the job was to be performed or anything like
19  that.  You learned on the 25th and on the 26th?
20  A   Yeah.  Well, we have -- like you said, those
21  assistant foremen, we all meet up in a group in
22  the morning and we get our machine operators,
23  employees checked in with us.  That's just not
24  something that happens infrequently or
25  sporadically.  Every single morning that is part

Page 71

1  of our -- I have a briefing in the morning for a
2  foreman's meeting.  Then we have an actual
3  briefing with the whole group, and then we have
4  subgroup briefings which, if you want to make
5  reference to your own tab there on the job
6  briefing, that would be a subgroup on that job
7  briefing sheet.
8        So there was a lot of information
9  passed to me.  And me having the background I had
10  with concrete ties, I wouldn't say I was ignorant,
11  by any means, to what needed to take place.  Like
12  I said, we could take a step back a little bit
13  from the actual duties being performed, and look
14  and see that the track needs to be safe when we
15  leave for trains to run on it.  It depends on what
16  class of track it is, too, you know what I mean.
17  It's -- That's -- That's -- The standard goes, you
18  know, some tracks, you know, if they're not going
19  to have any heavy freight on it or commuter-type
20  things, then they don't have as many things that
21  need to be done, but I can see that, having the
22  background I have in concrete, you know, all the
23  clips need to be on, we need to have safe ties in
24  place, make sure that we're not going to put
25  anything that's going to jeopardize the safety of

Page 72

1  the track out there after we're gone.
2  Q   All right.  We all have to catch a plane.  So if I
3  interrupt you or feel like you're getting too
4  broad in your answers --
5  A   Yes.
6  Q   -- I might interrupt you.
7  A   Okay.
8  Q   We need to stay kind of focused here.  You
9  referenced your concrete tie experience.  I
10  thought I understood earlier that July 25th, 2015
11  was the first day worked on concrete ties.
12  A   For rail.  Big difference.
13  Q   Okay.  Had you worked on a Concrete Tie Gang
14  before?
15  A   Yeah.
16  Q   When did you do that?
17  A   Eight months prior.  About eight or nine months
18  prior to going to a Curve Gang and then over to --
19  It's like eight or nine -- Maybe eight to -- Let's
20  see here.  Let me tally it up real quick for you,
21  and if you want to interrupt me --
22  Q   Just an estimate.
23  A   Okay.  It's okay -- An estimate's okay?
24  Q   Yeah.
25  A   Okay.  An estimate would be eight -- eight months.

Page 73

1  Approximately eight months on a Concrete Tie Gang,
2  but not just in one area.  I went from the front
3  to the back of that gang.  It actually initially
4  started out as a TRT Gang, which replaces rail and
5  ties at walking speed, but that is contracted out
6  to Harsco, who runs the machines, so I was
7  observing that.
8        So I had a little bit of background
9  with rail and concrete ties.  I apologize for the
10  misconception.  I mean, in our world there's a big
11  difference between rail and -- I mean, between
12  wood, concrete, but also rail and ties.
13  Q   Okay.  So this is your first -- July 25th was the
14  first time you'd ever worked on a Steel Gang on
15  concrete ties.
16  A   July -- I'm sorry.
17  Q   July 25t, 2015, the first day you had worked on a
18  Steel Gang on concrete ties.
19  A   Steel Gang on concrete ties.  Steel Gang and --
20  Yes.  Yes, that is correct.
21  Q   All right.
22  A   Yeah.  And that's what I answered to earlier.
23  Q   Have you ever operated a P car?
24  A   Yeah.
25  Q   Are you qualified on a P car?

**MAGNA** ▶
LEGAL SERVICES

1  A   No.
2  Q   Have you ever worked it as an assigned job?
3  A   No. I've never done the production on it. I've
4      just moved one. When you said have I operated a
5      P car, I've had to move one down the tracks just
6      to get it out of the way.
7  Q   Okay. But you've never clipped or de-clipped
8      using a P car.
9  A   No, no, but there's really not much to it.
10 Q   Okay. Now, do you remember what time you started
11     on July 25th that morning?
12 A   5:30 was the foreman's meeting, and 6 o'clock was
13     the start time and the briefing was to commence
14     for the larger group.
15 Q   What time did you actually start working, if you
16     know? July 25th I'm talking about now.
17 A   Oh, okay. It's the same. It holds the same for
18     both days, as far as what I've given you so far,
19     but what time we actually started working at? I
20     would say probably between 7:30 and 9.
21 Q   All right. And do you know how -- do you remember
22     how long you worked on July 25th?
23 A   Go back on that. I'm sorry. I had to think about
24     that a lot. It's -- The -- That's a wrong answer
25     because we start at -- 6 is our meeting, and we

1      were really just right there. It might have taken
2      us 20 minutes to get out to the job. So it had to
3      be like 6:30 to -- like maybe 7 -- 7 to 8:30.
4      There's no way we started at 9. That would be way
5      too late. And it doesn't -- it doesn't match up
6      at all.
7  Q   How late did you work that day?
8  A   5-ish.
9  Q   All right. Let's go to July 26th. Do you
10     remember when you actually began to work on
11     July 26th?
12 A   That would be around the same -- the time in the
13     morning. The timeline would be --
14 Q   Would you have any reason to dispute the
15     timekeeper's records of when you all started to
16     work on July 26th?
17 A   We started work at 6.
18 Q   And when did you actually start working on the
19     track?
20 A   The timekeeper has that?
21 Q   Yes, but what is your estimate?
22 A   No, he doesn't.
23 Q   What is your memory?
24 A   Out there on the tracks it was -- All I can say is
25     before 8:30. Between 6 and 6:30, because our

1      briefing takes at least 30 minutes, and 8:30. We
2      were definitely at it. There was no reason not to
3      be out their working. There's nothing there in
4      between, but to give you an exact time, no, I do
5      not have that. Before 8:30.
6  Q   Was there -- What distance was there between the
7      Cleanup Gang and the balance of the gang on
8      July 26?
9  A   That's kind of tricky. They did a skip. They put
10     about a mile on us, a little less than a mile, and
11     then there's a skip. That first day they just ate
12     up that section of track. It wasn't very much. I
13     don't remember exact footage, you know, maybe a
14     half a mile or something, but then there was an
15     area that did not need any attention. And I don't
16     know how many miles they went up the way, but then
17     they were gone. I know that they got a lot done
18     after that, but -- yeah. So there's a skip there.
19     So they were at least a couple miles up the way.
20 Q   Was the Quality Control Gang falling behind?
21 A   Yeah.
22 Q   Why?
23 A   Why were we falling behind? Because there was a
24     lot of work there. The track needs a lot of
25     attention. It wasn't an easy job.

1  Q   Did anyone -- any supervisors ever tell you to
2      hurry up or catch up?
3  A   No, no, they knew I was new and -- yeah.
4  Q   All right. Let's talk about who was regularly
5      assigned to your gang on July 26, 2015. What was
6      Guillermo Herrera's job, his assigned job?
7  A   Okay. Through actual verbal conversation with him
8      I found out that he was assigned to the speed
9      swing.
10         On the 25th, Jeremy, another guy on
11     the gang, operated it the whole day right in front
12     of him, and he had nothing to say about that or
13     anything. When it came down to it, when Jeremy
14     was gone the next day, on the day of his actual
15     injury, that's when he told me he was assigned to
16     it. I had no idea. He had already been sitting
17     on that P car for the whole day of the 25th,
18     and --
19 Q   Sitting on the --
20 A   -- this is all relative -- What?
21 Q   Sitting on the P car?
22 A   Yeah, on the 25th. The P car. He was on the
23     P car on the 25th.
24 Q   Who?
25 A   Guillermo Herrera.

MAGNA
LEGAL SERVICES

Page 78

1  Q     Okay.  Now, was Guillermo Herrera assigned to the
2        P car on July 25th and 26th?
3  A     Finding out later, no, he was not.
4  Q     He was a speed swing operator, but Jeremy Marsing
5        was operating the speed swing.
6  A     The day prior, yeah, on the 25th.
7  Q     Do you know if Jeremy Marsing is qualified to
8        operate a speed swing?
9  A     I do not know.  I do not know.  That I do not
10       know.  Never even -- It's never been any -- That
11       has never been subject to any discussion.
12              All I know is that, you know, between
13       Guillermo and Jeremy, they were okay with both of
14       them doing what they were doing on the 25th.  Come
15       the 26th, Jeremy was gone.  That -- That changed
16       things a little bit.
17              It's at that time I found out that --
18       that Guillermo -- I inquired about using the
19       equipment to move some ties over that were under
20       some welds because that's a no-no, and I was told
21       from the foreman that he had seen Guillermo
22       operate the speed swing, and it wasn't done safely
23       so he was not to operate it.  I said okay.
24              Well, what's his face, Logan, Logan
25       was there, and I said can Logan operate it.  And

Page 79

1        he's been on that 8501 for a number of years, I
2        believe.  It's speculation.  I'm pretty sure.
3        He's gotten a lot of time there.  He said yeah, it's
4        okay if Logan operates it.  And that's because
5        Logan's esteemed.  He's not somebody that's new
6        within the last couple years or anything.  Logan's
7        been around, and he knows -- he knows how, you
8        know, how Logan works.  And so I -- I put Logan on
9        the machine, and Guillermo was upset about that.
10 Q     Put Logan on which machine?
11 A     On the speed swing, because I was given the
12       go-ahead, yeah.  It was parked off to the side,
13       and I said we need to be utilizing that to move
14       these ties.
15 Q     Okay.  And do you know if Logan Newman is a
16       qualified speed swing operator?
17 A     I do not.  I was just told he had the go-ahead,
18       so, I mean, on the assumption that he was, I mean,
19       you know, it's like questioning my, you know, my
20       superior's ability to, you know, to -- that's --
21       that wouldn't be something that I'm like well, is
22       he qualified.  I said could he run it, he told me,
23       and I said okay, that's good.  All right.  We'll
24       get Logan in there.
25 Q     All right.  So just tell me who was on the gang on

Page 80

1        July 26.
2  A     What?
3  Q     On July 26, who was on the gang?
4  A     There's --
5  Q     On your gang.
6  A     -- a lot of people on --
7  Q     On the Quality Control Gang under your authority
8        on July 26.
9  A     On July 26, the day of the incident, Dennis was on
10       the camp car.  I don't have a last name.
11 Q     We'll learn it's Dennis Dickison.
12 A     Dickison, thank you.  And then Logan.
13 Q     What was Logan Newman's job?
14 A     He was a laborer.
15 Q     He was normally the bus driver, wasn't he?
16 A     Correct.
17 Q     And then he -- because you were shorthanded, he
18       was assigned to work as a laborer on the gang; is
19       that right?
20 A     Yeah.  I do not believe he was assigned.  He came
21       there on his own.  I thought he was like the
22       clouds opened up.  I was so happy he came down
23       there because -- I wasn't asking for double the
24       work.  I was just doing what we could get done,
25       and --

Page 81

1  Q     So Dennis Dickison is the camp car operator.
2        Dennis Dickison was on light duty; is that right?
3        Do you recall that?
4  A     That is correct, yeah.
5  Q     All right.  And Logan Newman, the bus driver, came
6        to help out.  Who else was on the gang that day?
7  A     The -- On the 26th -- Between the 25th and the
8        26th, intermittently the Servicing Gang came to
9        help.  And on the 26th they did come to help
10       because -- yeah, they did come to help.  They were
11       helping move ties for the time that we had that
12       speed swing.
13              We did like one.  I don't even think
14       we did one.  We got the first one and everybody's
15       like ah, it's so hot I do not want to do that.  So
16       we got the speed swing like, you know, because I
17       was listening, like you said, me being new in OJT,
18       I was listening to what they had to say.  They
19       said we can use the speed swing, you know, we did
20       yesterday when Jeremy there was.  So I made sure
21       to flag down a foreman and got the okay.
22              And fortunately, not for Guillermo,
23       who had been already operating the P car, so I
24       thought they were at peace with that whole
25       situation, don't know the details, but had Logan,



Page 82

1    who I got the okay because I felt -- we
2    wouldn't -- you know, I don't know that we would
3    have been able to use it hadn't Logan been there.
4    And I don't know what Logan's qualifications are,
5    but it worked out pretty good, but --
6  Q   Okay. We know there's Dennis Dickison. We know
7    there's Logan Newman. We know there's Guillermo
8    Herrera, and we know there's you.
9  A   Yeah. There's three servicing guys, too.
10 Q   Really? What are their names?
11 A   One of them's name is Scott. I don't know his
12   last name. They call him Scotty. And another
13   one -- you know, there's two other guys there and
14   they're on the tamper. They're Bobby Herrera's
15   guys.
16 Q   What were they doing?
17 A   They would come up and help. Like I said,
18   intermittently they would come up and help out.
19 Q   Why?
20 A   Because they had already caught up behind us.
21   Their job is to surface everything behind us. And
22   because we were moving so slow they were at the
23   standstill. So they got out and gave us a hand.
24         They did have a lot of problems with
25   that tamper. So even times when they could help

Page 83

1    out they didn't because they were back there --
2    Well, they couldn't because they were working with
3    their machines that were constantly going down on
4    them. And that actually held pretty true for the
5    rest of my duration on the gang. Those machines
6    were going down quite a bit.
7  Q   Okay. Let's -- What is your recollection of
8    whether or not the P car was being used to clip or
9    de-clip the clips on the surface -- on the Quality
10   Control Gang on July 25th and 26th?
11 A   What is my recollection of the clipper car -- its
12   ability to clip and de-clip? One of them could
13   only -- Between the camp car and the clipper car
14   was -- they're essentially the same thing except
15   that the camp car has the ability to manipulate
16   the rail over so we can get those insulators in in
17   order to put the clip on.
18         The -- The -- The P car could only
19   clip. So anything that would fall behind that car
20   was for the camp car to get, but -- yeah. So
21   that's -- that's -- that's what it is.
22 Q   Let me ask the question again.
23 A   Yeah, go ahead.
24 Q   Were you permitting the use of the P car to clip
25   and de-clip the clips on the concrete ties on

Page 84

1    July 25th and 26th?
2  A   Half the time. 50/50. It got to the point where
3    Logan, who, like I said, he's esteemed, has a lot
4    of time on, said he's not -- he's leaving
5    everything for me. And I would come up there
6    and -- I came up there and talked with Guillermo
7    and -- and just said, you know, we're getting a
8    lot back here, and these guys from their
9    experience are telling me that, you know, there's
10   a lot of clips missing, I think it would be more
11   beneficial that we just swap out taking care of it
12   back that, being that machine he was on it doesn't
13   de-clip anyway. All it does is clip. So he's
14   going to leave stuff no matter what.
15 Q   Who?
16 A   The operator of the P car, which would have been
17   Guillermo at that time. Like I said, half the
18   time we were using it, and half the time we
19   weren't, but the only person who was ever on it
20   was -- was him, unless it was being moved. I
21   moved it, but I didn't operate it. I was in the
22   same boat.
23 Q   Why wouldn't you use the P car full time?
24 A   Well, like I said, it was busted, and he was
25   missing too many things, and he was missing far

Page 85

1    too much.
2  Q   The P car was busted?
3  A   Well, the -- it wasn't -- it didn't have -- it
4    wasn't busted. It just didn't have the ability to
5    de-clip, and the car behind it did. It was really
6    just a -- a -- nice to have there to have one more
7    functionality.
8          I mean, it was deemed as safe to
9    operate by a mechanic, but its capabilities
10   weren't able to catch all the flaws ahead, you
11   see. So I was already walking behind the camp car
12   checking our QC making sure that -- especially
13   since we're going as slow as we are, that we're
14   dishing out, you know, good quality.
15         So I brought everybody to the back,
16   and I was going back behind the gang, not very
17   far, maybe a hundred foot tops, and just making
18   sure that we're leaving good quality behind.
19         So the machine -- I guess busted is a
20   bad word. It wasn't operating at its full
21   capacity, but at the same time it still made our
22   jobs easier and it still had a purpose.
23         As far as the camp car goes, that
24   could actually take care of all the work on its
25   own. And Guillermo -- like I said, Logan had told



Page 86

1       me that Guillermo is not helping our cause to do
2       QC up there on that car.
3  Q   Who told you that?
4  A   Logan Newman.
5  Q   Okay.
6  A   And I was observing it, too.  He didn't just say I
7       know about Steel Gangs and this is what's going
8       on.  No.  I used critical thinking, I looked at
9       it, and I noticed he's missing things that he even
10      spray painted himself.
11           The whole object is to go ahead, walk
12      ahead, set out the clips you need, even get them
13      lined up so that you can clip.  Remember, you
14      can't de-clip.  So you just have to leave that
15      behind.  You can mark it for the guys back there.
16      You could mark the tie that's going to need
17      de-clipped and clipped again.  You're supposed to
18      do that because that's what they were doing,
19      that's their system they had in place, but what
20      Logan was telling me was he wasn't marking those
21      ties that needed de-clipped, and we were missing
22      things.
23  Q   Who wasn't?  Guillermo wasn't?
24  A   Yeah, Guillermo wasn't.  He had a can of spray
25      paint up there, and he would go out in front of

Page 87

1       that P car and mark what needed to be done, but he
2       was not -- he was not marking it, and -- and there
3       was no reason why.  I went up there and had a
4       couple job briefings with him, and I couldn't
5       understand why, you know.  And --
6  Q   Is this on July 26th or 25th?
7  A   The 25th.  The 25th.  Yeah.  The 25th was our --
8       was our kind of -- I don't know if he was happy
9       that I bumped in or what, but he kind of -- I kind
10      of felt a little bit -- some negative vibes coming
11      off of him.  I mean, he didn't -- he didn't really
12      seem like he wanted to work with me.
13           You know, I don't know -- it's kind of
14      like the whole theme that you started to go
15      across, you know, like -- like well, you don't
16      even know what you're doing, and I'm like I'm
17      learning and actually -- we're not going to do
18      anything unsafe and we're not going to do double
19      the work, he was -- because the next day in the
20      morning, the day of the incident, he apologized to
21      me for his behavior on the 25th.  That happened.
22      We had a conversation.  He's like I'm sorry about
23      yesterday.  And I said hey, I'm new.  I get it,
24      you know.  Things like this happen.  Let's just
25      have a clean slate.  Let's move forward.

Page 88

1  Q   So on July 26th was the P car being used to clip
2       or de-clip the clips?
3  A   Let me think.  No, because we didn't -- we
4       didn't -- with Guillermo saying that he needed a
5       break and then he needed to go to the mechanic's
6       car, there was nobody to run it.  I have to be out
7       there to take care of the on-track safety and be
8       there with the guys and also watch the cleanup.
9           So there was nobody to operate it on
10      the 26th starting, you know, around 9 or 10 when
11      he said he was lightheaded.
12  Q   So had the P car been used at any time to clip or
13      de-clip the clips on July 26th?
14  A   Maybe for -- you know, before he -- before he felt
15      lightheaded he might have done a little bit
16      that -- that one instance because him and Logan
17      were trading out sitting on it.
18  Q   Well, sitting on it is different than operating
19      it.
20  A   Well, they still were operating it, too.  And then
21      once Guillermo was down and out, I mean, that's
22      really in the morning it was done, so it was
23      operated.
24  Q   All right.  So --
25  A   You know, you're going to mark stuff, we're going

Page 89

1       to help each other out.
2  Q   I'm just asking about was the P car used to clip
3       or de-clip --
4  A   Yes, it was.
5  Q   -- on July 26th?
6  A   Yes, sir, it was used.
7  Q   Now, that's different than what you just told me
8       early.  Was it used, or not?
9  A   Yes.
10  Q   By whom?
11  A   Logan and Guillermo.  I didn't tell Guillermo he
12      couldn't operate it if he's on it.  I seen him
13      operating it.
14  Q   Do you have a memory of a conversation with the
15      members of the Cleanup Gang discussing with you
16      that the P car should be used rather than doing
17      the work manually?
18  A   I don't remember that.
19  Q   If they were to claim that --
20  A   There was lots of suggestions coming from every --
21      every direction, I mean, you know.
22  Q   Well, was one of those conversations or
23      suggestions that the P car be used rather than
24      attempting to clip and de-clip the clips by hand?
25  A   If that conversation was had it wasn't had with



1   me.
2   Q    Who would it have been had with?
3   A    I don't know.  You're asking me a question that
4        I -- that -- No.  The answer is no.
5   Q    If the members of that gang claim that they had
6        come to you and asked you to use the P car rather
7        than doing the job manually, would you dispute
8        that?
9   A    Yeah, because I just told you that Logan told me
10       that he was not maintaining what they had been
11       doing previously and that even Guillermo hadn't
12       been on there that long.  He was in a project in
13       California where he wasn't on it really all that
14       long, on the P car.  And that's a different
15       territory and a whole different track conditions.
16            So Logan is the one who said he's
17       missing a ton, because I was like well, wouldn't
18       it be easier with the clipper/de-clipper.  And
19       Logan, having as many years as he has on that gang
20       was like no, he's missing stuff.
21            And I've only just left him there, you know
22       what I mean, and I'm helping out, too, where I can
23       without making it a safety hazard because, like I
24       said, I have to have my head on a swivel for any
25       other unsafe conditions.  So no, nobody came to

1        me.  Actually, it was quite the opposite.
2   Q    Nobody came to you urging you to use the P car
3        rather than have the men do the work by hand, is
4        that what I'm understanding your testimony to be?
5   A    Yeah, I don't remember that.  I do not remember
6        somebody coming to me telling me that we need to
7        use that P car.
8            I had those guys trading out, but
9        Guillermo had displayed that in his only --
10       somebody else can run it.  If somebody else came
11       and said I'd like to run it and they did a good
12       job, I mean, that's -- that's hypothetical because
13       that didn't happen because we didn't have that
14       many people there, but I'm saying that he, you
15       know, he was not -- he was not contributing.  And
16       this is not when he was on break.  This is like --
17       It was like well, it doesn't seem like there's a
18       reason to have somebody just bumping that machine
19       up because that's the product we're getting.
20            We kept going -- I mean, I went in
21       front of him and I went behind him and seen that
22       what needed to be happening there wasn't
23       happening.  The ties were not marked.  And I
24       understand how it works and what needed to be
25       marked.  I got a good understanding before I just

1        jumped to conclusions.
2            And like I said, you know, I'm trying
3        to keep the moral of my gang that I have authority
4        over, my subgroup, and it was unanimous that he'd
5        have been better helping us back there.
6   Q    All right.  Now, my question was did anybody use
7        the P car on July 26th?
8   A    Yes.
9   Q    Who?
10  A    Guillermo and Logan.
11  Q    For what period of time?
12  A    Up until 9 or 10 when Guillermo went away.  There
13       was nobody else to even be on it.  Then we were
14       just bumping it up.
15  Q    And after Guillermo left was it used?
16  A    No.  No.  Going later in the day, no.
17  Q    Why not?
18  A    Because everything was moving a lot slower, and I
19       wanted to keep the group together.  We weren't
20       laboring very hard at all, but -- especially with
21       his conditions, we just all needed to stay
22       together.  I mean, I wasn't going to have him just
23       sitting way up there on the machine without radio
24       communication, so we all stayed together.  We all
25       went down the tracks together and we didn't -- we

1        did not -- you know, we didn't work at a grueling
2        pace, let alone -- We did more -- We did more
3        breaktime than we did working.
4   Q    Okay.
5   A    It was a really bloody hot day out there.
6   Q    How would you characterize the weather on
7        July 25th?  And then I'm going to ask you about
8        the 26th.
9   A    I mean, it was -- it was hot.  That's all I can
10       say.
11  Q    How about the 26th?
12  A    It was hot, and it was even a little bit more
13       humid.  It was pretty humid that day, from my
14       memory.
15  Q    Forgive me.  The -- The length of your answer
16       confuses me a little bit.  Tell me when and who --
17       when the P car was used and by whom on July 26th.
18  A    Guillermo Herrera and Logan Newman were using it
19       before -- before Guillermo said he was
20       lightheaded, but the thing is, though, it was take
21       as many breaks as you can.
22            So if they did something, it might
23       have been for a couple minutes, but I did see them
24       use it a little bit, just piddle around with it.
25       You know, I'm not -- I'm not going to micromanage

MAGNA
LEGAL SERVICES

Page 94

1  them. I mean, I appreciate any extra effort, but
2  I did witness both of them operating it and
3  marking ties.
4  Q    Were they using -- Is it your memory that they
5       were using the tie clipper and de-clip to clip and
6       de-clip ties or --
7  A    No.
8  Q    -- or clips? Is that what they were using it for?
9  A    They were using it to clip ties. It doesn't have
10      the ability to unclip. And that's why he was
11      supposed to be marking things that we were going
12      to take care of as we approached it with that camp
13      car, but it wasn't getting done.
14 Q    All right. Now, I asked you why you called Bobby
15      Herrera earlier when Mr. Herrera was having his
16      heat distress. Why did you not call an ambulance?
17 A    I -- I want to say, and -- and it's only because I
18      want to say it, I can't remember, but, you know,
19      in that couple minutes, you know, I'm sure I asked
20      him, but I don't remember, but the way I gauge the
21      situation is that, you know, he's leaning up
22      against the machine, he's holding his own weight,
23      he's still able to talk fine, he's sweating, he's
24      making eye contact, you know, he looks tired, and
25      that's it.

Page 95

1        I don't remember the exact words of
2  the conversation or, you know, he never -- I know
3  for sure he never said could you call an
4  ambulance, I know that, but I wasn't -- I
5  wasn't -- there definitely wasn't -- it didn't
6  appear to be something that he wished to happen,
7  but like I said, I can't put words in his mouth
8  and I can't say what I said to him being over a
9  year ago, but that happened the way it did for
10 that reason because it was custom to that
11 circumstance.
12 Q    It was accustom to that circumstance?
13 A    It was custom -- It was -- It was special to that
14      circumstance that he appeared like he was still
15      okay. He was not on the ground. He was not --
16      You know, his shoulders were down, but he wasn't
17      like passed out or anything. He wasn't like -- He
18      could still walk. He walked himself to the van.
19           It wasn't -- It wasn't a situation
20      where he alarmed everybody. He still was just
21      very -- He just looked tired. That's it, you
22      know. And so within two minutes he was gone.
23           I mean, it was -- so we're talking
24      about decision making within that two minutes, you
25      know what I mean. If he'd have been there just a

Page 96

1  little bit longer, I probably would have called an
2  ambulance.
3  Q    All right. Was your gang undermanned on July 25th
4  and 26th?
5  A    Yes.
6  Q    Do you know what a full complement of employees on
7  a Quality Control or Cleanup Gang is?
8  A    Is that Union Pacific terminology?
9  Q    What -- Yeah.
10 A    Whose terminology is that, a full complement?
11 Q    When a -- When a -- When everybody that's supposed
12      to be assigned to a gang, the Quality Control or
13      Cleanup Gang, how many people are on that gang and
14      what are their jobs?
15 A    It really depends on workload. If you got crystal
16      clear track, you go to where the work is. If you
17      got a lot of work, you get as many people as
18      possible back there. That's a full complement.
19 Q    When they -- Do you know what a -- the full
20      complement on a Quality Control Gang is supposed
21      to be when the jobs are placed on the bid roster
22      or with Crew Management Services?
23 A    That was my answer.
24 Q    What?
25 A    That it's according to the workload.

Page 97

1  Q    On a day-by-day basis, or within the day?
2  A    Yeah. On a day-by-day moment-by-moment. If we
3       run into a bomb, we're going to need more help.
4  Q    Do you know how the UP lists the gang as a full
5       complement of employees?
6  A    (Witness nods.)
7  Q    No, okay.
8  A    There was a lot of vacations.
9  Q    Lot of vacations?
10 A    Yeah, that's what it was. I don't necessarily
11      know that this full complement business is what --
12      what -- that they didn't have enough jobs there.
13      I just -- My understanding was that there was guys
14      on vacation.
15 Q    And that's why your gang was undermanned?
16 A    Yeah. Partially, I'm sure. When I say partially,
17      if there's any other reasons I wasn't aware of it.
18      I did know that. I remembered that because, I
19      mean, like I said, I know to know, you know. We
20      were behind, but we weren't working beyond our
21      means. I'm just like if you guys ever want to
22      catch up, you're going to have to send people back
23      here at the end of the day, or we're just going to
24      work at the pace we're going.
25 Q    Okay. Now, let's -- tell me what it is that



Page 98

```
 1          concerned you about Guillermo Herrera to call --
 2     cause you to call Bobby Herrera.
 3   A    That he told me he wanted to leave.  That's what
 4     concerned me.  That's -- You know, that's like --
 5     that was -- it was sad.  It was sad because he was
 6     fine up until that point.
 7          That's what concerned me is that out
 8     of nowhere, out of left field he's not okay.  He's
 9     saying he feels weird.  Physical, external
10     indications, I didn't have any except to say that
11     he looked tired.
12   Q    And where did you think Mr. Herrera was taking
13     Guillermo Herrera when you put him in the van?
14   A    I didn't know.
15   Q    You didn't give it a thought?
16   A    No, because like I said, he -- he looked tired.
17     He said he needed to leave.  He didn't say I need
18     to go to the hospital, get me out of here.  I
19     don't know what's going on.  I mean, he was
20     coherent and he said I just -- I want to leave,
21     you know.  And in two minutes, how much can you
22     really talk about.
23          I really didn't give it a thought
24     where he was going.  I was just happy that he was
25     on his way to wherever it is he thought he needed
```

Page 99

```
 1     to go.  Honestly.  He walked to that van.
 2   Q    If, indeed, the P car was used some during the
 3     morning of July 26th, did its use stop and
 4     Mr. Guillermo and Logan Newman have to de-clip by
 5     hand?
 6   A    We -- Yeah, we pulled some -- we pulled some clips
 7     off.
 8   Q    We?  Did you participate in the work?
 9   A    Only if it was safe to do so, but not -- I did a
10     little bit, yeah.
11   Q    Tell me what a little bit means.
12   A    Well, like digging those ties over when we were
13     using the speed swing, I was in there digging.
14     Guillermo got upset that we were in the five-foot
15     radius of the boom.  And I said well, you know,
16     policy is if we have an enhanced job briefing and
17     we all know what's going on, we can be in that
18     five feet.  And he was never even in it, but I had
19     had that briefing with Logan.
20          So then he stepped aside.  He didn't
21     even participate, he didn't feel it was safe, and
22     I didn't -- I wasn't going to argue with him, you
23     know.  I didn't -- I was fine with that.  And like
24     I said, we did more than breaktime than we did
25     working that day, so -- it was just an odd day.
```

Page 100

```
 1     So it was definitely nothing that I was going to
 2     push the envelope on, but I dug out some of those
 3     ties with one of the surfacing guys at the time
 4     that we had that speed swing there and then
 5     de-clipping a little bit.
 6          And then there was a couple things
 7     that the guys missed.  Even that camp car, like
 8     there was a piece of steel stuck under the rail,
 9     under the pad.  And so I actually just grabbed the
10     tools myself and went back there and did, you
11     know, because that's what I sign off on is the
12     quality control.
13          So there was a few things I did
14     instead of saying, you know -- One time I made
15     them go back because I needed an automated piece
16     of equipment.  I could not get it.  I tried.  I
17     had a jack and everything, but other than that, I
18     did the handwork myself back behind the gang, the
19     stuff that they did miss, but it was pretty good
20     quality, I will say that, that out of all falling
21     behind and, like you said, people on vacations and
22     whatnot, I -- I was able to keep the quality
23     pretty good.  Sorry that was a tangent.  I know
24     you're in a hurry here.
25   Q    Were you demoted to -- or transferred to another
```

Page 101

```
 1     gang after this incident?
 2   A    No.  Absolutely not.  No.  I still have my
 3     assistant foreman qualification.
 4   Q    No, I mean within 8501.  Did they transfer you to
 5     another gang?
 6   A    Oh, no.  Oh, no.  They didn't -- They didn't
 7     demote me.  I was still an assistant foreman.
 8          MR. COX:  Let's just go off the record
 9     a second.  Let me look at my notes here.
10          VIDEOGRAPHER:  Time is 10:29 a.m.
11     We're off the record.
12          (Recess taken.)
13          VIDEOGRAPHER:  Time is 10:37 a.m.
14     We're back on the record.
15          MR. COX:  Mr. Nicholson, I don't have
16     any other questions.
17          MR. SCHMITT:  I will wait with my
18     questions until the time of trial.  So we're done.
19          VIDEOGRAPHER:  This concludes the
20     deposition.  The time is 10:37 a.m.  We are off
21     the record.
22          (The attorneys have standing orders.)
23          (At 10:37 a.m. the deposition
24     concluded.)
25
```

MAGNA
LEGAL SERVICES

Page 102

```
 1    STATE OF WISCONSIN )
 2    MILWAUKEE COUNTY  ) SS:
 3            I, KIM M. PETERSON, CM, Registered
 4    Professional Reporter and Notary Public in and for the
 5    State of Wisconsin, do hereby certify that the deposition
 6    of SCOTT NICHOLSON, was taken before me at 207 East
 7    Michigan Street, Milwaukee, Wisconsin, on the 10th day of
 8    August, 2016, commencing at 8:02 a.m.
 9            I further certify that I am not a
10    relative or employee or attorney or counsel of any of the
11    parties, or a relative or employee of such attorney or
12    counsel, or financially interested directly or indirectly
13    in this action.
14            In witness whereof, I have hereunto
15    set my hand and affixed my seal of office on this
16    18th day of August, 2016.
17
18            _____
19                    Kim M. Peterson
20                    Notary Public in and for the
21                    State of Wisconsin
22
23    My commission expires March 17, 2018.
24
25
```

