```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEBRASKA
                  AT OMAHA, NEBRASKA


GUILLERMO HERRERA, III,         )
                                )
      Plaintiff,                )
                                )
vs.                             )  No. 8:15-cv-426-
                                )      JMG-CRZ
UNION PACIFIC RAILROAD COMPANY, )
a Delaware corporation,         )
                                )
      Defendant.                )
_____)




          VIDEOTAPED DEPOSITION OF LOGAN NEWMAN

                   September 7, 2016

                    Tucson, Arizona




_____

        Reported by:  ANTHONY C. GARCIA, RDR, CR
             Certified Reporter No. 50218

           KATHY FINK & ASSOCIATES, INC.
               2819 East 22nd Street
               Tucson, Arizona  85713
          (520) 624-8644    Fax (520) 624-9336
```

```
                                                          Page 2
 1     APPEARANCES:
 2      FOR THE PLAINTIFF:
 3         BRENT COON & ASSOCIATES, P.C.
           BY:  JAMES L. COX, JR., ESQ.
 4         3801 East Florida Avenue, Suite 905
           Denver, Colorado 80210-2500
 5         jim.cox@bcoonlaw.com
 6      FOR THE DEFENDANT:
 7         LAMSON, DUGAN & MURRAY, LLP
           BY:  DAVID J. SCHMIDT, ESQ.
 8         10306 Regency Parkway Drive
           Omaha, Nebraska  68114
 9         dschmidt@ldmlaw.com
10         UNION PACIFIC RAILROAD COMPANY
           BY:  TORRY N. GARLAND, ESQ.
11         1400 West 52nd Avenue
           Denver, Colorado  80221
12         tngarlan@up.com
13
                  *   *   *   *
14
15         BE IT REMEMBERED that pursuant to Notice for
16  taking depositions in the above-styled cause, the
17  videotaped deposition of LOGAN NEWMAN was taken upon
18  oral examination at the offices of Kathy Fink &
19  Associates, Inc., 2819 East 22nd Street, in the City of
20  Tucson, State of Arizona, before ANTHONY C. GARCIA,
21  RDR, CR, Certified Reporter No. 50218, on the 7th day
22  of September 2016, commencing at the hour of 10:00
23  o'clock a.m. in a certain cause now pending before the
24  United States District Court, for the District of
25  Nebraska, at Omaha, Nebraska.
```

```
                                                          Page 3
 1                  I N D E X
 2
 3   EXAMINATION                            PAGE
 4     By Mr. Cox                           4
 5     By Mr. Schmidt                       53
 6
 7
 8
 9
10
11
12                  E X H I B I T S
13
14   NUMBER       DESCRIPTION            IDENTIFIED
15    32     Statement                       14
16
17
18
19
20
21
22
23
24
25
```

```
                                                          Page 4
 1         THE VIDEOGRAPHER:  My name is Frederick Van
 2  Normal, legal videographer, here today to take the
 3  deposition of Logan Newman.
 4         The date today is September the 7th, 2016.
 5         Will the court reporter please swear in the
 6  witness.
 7
 8                  LOGAN MEWMAN,
 9   after having been first duly sworn to tell the truth,
10    was examined and testified as follows:
11
12                  EXAMINATION
13  BY MR. COX:
14     Q.  Mr. Newman, good morning, sir.
15     A.  Morning.
16     Q.  I introduced myself when I arrived.  I'm Jim
17  Cox.  I'm Guillermo Herrera's lawyer in the claim that
18  Mr. Herrera has made against the Union Pacific Railroad
19  for injuries he received on July 26, 2015.  I
20  appreciate your coming down here today.  I do
21  appreciate that.
22         For the record, would you give us your full
23  name and spell it, so we're sure we have it right.
24     A.  It's Logan, L-O-G-A-N, John, J-O-H-N, Newman,
25  N-E-W-M-A-N.
```

```
                                                          Page 5
 1     Q.  Mr. Newman, where do you live now?  What's
 2  your current address?
 3     A.  I live here in Tucson.  My address is
 4                                                        .
 5  It's in Tucson, Arizona, 85741.
 6     Q.  And if you don't mind me asking, what's your
 7  age?
 8     A.  I am 32.
 9     Q.  And do you mind giving us a little bit about
10  your education background?
11     A.  I have an Associate Degree in Applied Science
12  of Information Technology and a Bachelor's degree in
13  Multimedia Game Design.
14     Q.  Are you married?  Do you have any kids?
15     A.  I have no kids.  I'm not married.  I have a
16  girlfriend.  We are talking about possibly getting
17  married one day, though.
18     Q.  Good.  Good.  I'm not trying to get too
19  personal here.  Just a little general background.
20  Thanks.
21         Tell me a little bit about -- when did you
22  graduate from high school and when did you get your
23  Associate and Bachelor's degrees?
24     A.  I graduated in 2002, was my actual graduation
25  date, and my Associate I got in 2009, and I want to say
```

Page 6

1  it was August of 2009. And then I got my Bachelor's
2  degree in 2011, and I believe that was November or
3  September of 2011.
4      Q. Now, have you attended school? Have you
5  done -- obtained a Bachelor's degree online? How did
6  that occur?
7      A. I went to school here in Tucson. I went to
8  the ITT here.
9      Q. Okay. Now, tell me a little bit about your
10  employment background. For whom have you worked since
11  graduating from, let's say, high school? I don't need
12  all of them, just a general sense of what you've done.
13  What I'm doing here is leading up to when you went to
14  work for the UP.
15      A. I've had a lot of different jobs. I was a
16  baker for little while there. I worked on the military
17  base in Fort Huachuca for a little bit there. I have
18  worked for Berg's and Mountain View Heating and Air. I
19  worked for movie theater for -- I was a night auditor
20  for a long period of time for a few different hotels
21  and resorts, and I worked at a Circle K.
22      Q. Okay. When did you go to work for the Union
23  Pacific Railroad?
24      A. In 2011. It was February 13th.
25      Q. And who do you work for now?

Page 7

1      A. For Union Pacific.
2      Q. All right.
3         Let's talk a little bit about what jobs
4  you've had on the Union Pacific Railroad. First, can
5  you tell us why you went to work for the Union Pacific
6  Railroad?
7      A. Well, at the time, I was getting close to
8  graduating from school with my Bachelor's degree, and
9  there's not a lot of job openings here in Tucson for
10  people for game design and stuff, and I ran into Larry
11  Collins, who was the hiring manager here in Tucson, who
12  persisted that I should apply for the railroad. And,
13  you know, I thought it was a great idea, but I didn't
14  know what my odds were getting hired, and I ended up
15  putting in for it and getting the job. I thought it
16  was a great career to get in to.
17      Q. Great. Tell me, what do you like about
18  working on the UP?
19      A. I like traveling, I like being able to move
20  around and go to different areas. I also liked the
21  fact that I get to go outdoors. I was behind a desk
22  for a long time, so it's nice to do something
23  different, change it up a little bit. I think that's
24  also one of the best things about the railroad, is that
25  if you don't like something you're doing, you can just

Page 8

1  go try something else.
2      Q. Bid on to another job?
3      A. Yeah, bid on to another job, go somewhere.
4  And it's great, because it never really wears you out
5  as far as, you know, you don't get bored with just one
6  job, because if you are doing just one thing for
7  30-plus years, you know, it can be a lot. But the
8  great thing is I could be a bus driver one month and
9  bid over and be a machine operator the next month, and,
10  you know it keeps things fresh and, you know, always
11  things going in your mind.
12      Q. How about the pay and fringe benefits?
13      A. Oh, it's amazing. I mean, the fact I have an
14  actual retirement to look forward to now is great. And
15  the fact that I have mental, dental and eye coverage
16  and everything, you know, it's -- if you would have
17  told me five years before I started working for the
18  railroad that I would be a railroader, I would have
19  thought you're crazy, you know. I wouldn't have
20  thought this is where I would end up, but I'm glad that
21  I'm here.
22      Q. Do you enjoy it?
23      A. I do.
24      Q. Good. Much of the time, I understand, you've
25  worked on System Gangs.

Page 9

1      A. I would say by now it's pretty much 50/50.
2  I've worked -- half the time when I started I was
3  working on District Gangs. I worked in Tucson, I
4  worked in Gila Bend, and then after that I went off the
5  system for a while, moved around different locations
6  with the 8501 System Gang, then I came back here and
7  I've worked in Willcox and I'm currently in Phoenix.
8      Q. Okay. A District Gang, is a Gang that will
9  work in a --
10      A. General location.
11      Q. General location. A System Gang can work
12  system wide on the Union Pacific?
13      A. Yeah. I've worked all the way from
14  California all the way over to Wisconsin.
15      Q. Now, when you work on the System Gang you get
16  per diem?
17      A. Correct.
18      Q. Explain to us what per diem is and what about
19  that appeals to you.
20      A. The good thing about per diem is, when you're
21  out and about and away from your family and stuff at
22  home, you get this additional money, which kind of
23  offsets your costs. They give you per diem, which
24  allows you to pay for your hotel and food for the day,
25  and makes it to where you can pretty much go anywhere

Page 10

1  and have, like, a supplemental income to offset the
2  cost.
3      Q.  Now, were you one of the employees that is
4  able to save some of the per diem or do you pretty much
5  have to use that up to support yourself while you're on
6  the road?
7      A.  We all try to save a little bit of it.  You
8  try to save as much as you can, because it definitely
9  helps with bills and stuff at home.  Like, for me, I
10 have student loans, so, you know, the additional amount
11 of money that I can save, it goes towards my student
12 loans.
13     Q.  In your experience, how will employees on,
14 for example, 8501, Gang 8501, how will they conduct
15 themselves to try to save some of that per diem?
16     A.  We'll do different things like carpooling
17 together, we will share hotel rooms, because the per
18 diem amount is a base amount that they give you, and
19 split cost of food.  Like, obviously, it's cheaper to
20 cook your own food than it is to go out to eat every
21 night, plus it's healthier.  So we'll have one person
22 cook per night, that's what we used to do with the guys
23 I roomed with, and we would all split the cost of food,
24 and it definitely helped out in the long run.
25     Q.  Great.  I want to talk a little bit about

Page 11

1  what you've done to prepare for the deposition.  I know
2  you've talked with my assistant, Donna Baker, to
3  coordinate this the deposition; is that right?  Did you
4  talk with Donna or did she send you an email or a
5  letter?
6      A.  I don't think I talked with Donna.  I think
7  there was a guy I talked with.
8          As far as coordinate the deposition, what do
9  you mean by that?
10     Q.  Well, for example, you and I talked some -- I
11 honestly don't remember, a couple of weeks ago.
12     A.  Yeah.
13     Q.  To let you know about the deposition --
14     A.  Correct.
15     Q.  -- where it would be.  And then we sent you a
16 copy of the statement that you had given to Sean
17 Dillon.
18     A.  Correct.
19     Q.  All right.
20     A.  That's the guy I talked with, Sean Dillon.
21     Q.  Okay.
22     A.  I haven't spoke with him, though, in weeks.
23     Q.  Okay.  And just to lay a little foundation
24 here, we understand that you were working with
25 Guillermo Herrera on Union Pacific Steel Gang 8501 on

Page 12

1  July 26, 2015.
2      A.  That's correct.
3      Q.  All right.
4          Have you reviewed the statement that you gave
5  to Sean Dillon?
6      A.  Yeah, I looked it over.
7      Q.  Can you explain to us the process of how you
8  provided that statement to Mr. Dillon?  How did that
9  work?
10     A.  He had done an over-the-phone kind of
11 statement thing where he -- yeah, he basically asked me
12 to give my recollection of what had happened, and then
13 he sent what I had said back to me, and I reviewed it
14 and made any changes, if needed, then I signed off on
15 it and sent it back to him.
16     Q.  And we'll talk about that more in a minute.
17         Did you -- when you reviewed the statement
18 that you gave to Sean Dillon, is it accurate or are
19 there any changes that you want to make to it or
20 anything like that?
21     A.  No; it was accurate.
22     Q.  In additional -- in addition to that, to
23 prepare for this deposition did you meet with the UP
24 lawyers Mr. Schmit, Mr. Garland?
25     A.  Yeah.  I met with them earlier today.  They

Page 13

1  kind of gave me a foundation of what I should expect
2  coming in here, because this is the first time I've
3  done one of these.
4      Q.  Kind of warned you about me a little bit, did
5  they?
6      A.  No.  No negative things.
7      Q.  Good.  Do you have a memory of giving a
8  recorded statement to any employee of the Union Pacific
9  Railroad in the few days after Mr. Herrera's injury?
10     A.  There was a person that came by, and I had to
11 talk with him in the vehicle with him.  I had to give
12 him a statement, and he recorded the statement.  I
13 don't recall his name, though.
14     Q.  Does Bill Herring ring a bell?
15     A.  It could have been him.
16     Q.  Okay.  Have you seen a transcript or listened
17 to a recording of that statement?
18     A.  No.
19     Q.  And do you remember where that was taken or
20 when?
21     A.  We were still in Kansas, I believe, and we
22 were working that day, and they said that I needed to
23 talk with someone, and that they would bring me out to
24 continue working with the Gang afterwards.
25     Q.  And you met with him in his vehicle?

Page 14

1  A. Yeah.
2  Q. And gave him a recorded statement, he had a
3  recording device?
4  A. He had a recording device.
5  Q. All right.
6     And did the UP ever furnish you a copy of
7  that transcript?
8  A. Not to my knowledge.
9  MR. COX: Okay. Let's -- let me ask you to
10 mark for me as Exhibit -- I think we're at 32. Let me
11 just hang on. Let me just verify that.
12    Yeah, we're at 32. Would you mark that as
13 Exhibit 32, please.
14    (Deposition Exhibit Number 32 marked for
15 identification.)
16 BY MR. COX:
17 Q. Mr. Newman, if you would take a look at what
18 we've marked as Exhibit 32, and take a look at that and
19 review it for initials and your signature.
20    And my question to you is, is that the
21 statement that you provided to Sean Dillon, provided
22 him the information, he typed it up, sent it to you,
23 you reviewed it and signed it? Is that that statement?
24 A. Yes.
25 Q. All right.

Page 15

1     And what I'd like to do, with your
2  permission, is go through some of it in some detail,
3  ask you to read me part of it, and then I'm going to
4  ask you to explain some of the things in it to me. Is
5  that okay with you?
6  A. That's fine.
7  Q. Okay. We know that the statement is made
8  regarding the personal injury of Guillermo Herrera, who
9  sustained injuries on July 26, 2015, while working for
10 Union Pacific Railroad near Onaga, Kansas, and then
11 Sean Dillon introduced himself in the statement.
12 MR. SCHMIDT: Jim, just for the record, can
13 we go off the record for a moment?
14    I haven't seen this statement before now.
15 I'd like a chance to read it, so I'm not trying to read
16 this and listen to you. So let's just go off for a
17 moment, the record for a moment.
18 MR. COX: Sure.
19 THE VIDEOGRAPHER: We're off the record at
20 10:13.
21    Thank you. We're off the record.
22    (Off the record.)
23 THE VIDEOGRAPHER: We are back on the record
24 at 10:19.
25 / / /

Page 16

1  BY MR. COX:
2  Q. I'm just going summarize some of it, because
3  certainly we'll be able to read it. You worked on
4  Division Gangs for nearly three years before bidding on
5  8501 Steel Gang, and at the time of this statement in
6  November of '15 you had been working on 8501 for about
7  a year-and-a-half. So you had been working on 8501
8  about how long in July of '15?
9  A. About a year and a couple months.
10 Q. Okay. Now, what was your bid position on
11 8501 Steel Gang?
12 A. At the time, I was a bus driver.
13 Q. And explain a little bit to the jury what
14 your responsibilities are as bus driver.
15 A. Well, my main responsibilities are shuttling
16 the people back and forth or any kind of equipment that
17 they might need. That's what my responsibilities
18 normally are as a bus driver, but I also got out and
19 helped the Gang a lot. Once I was done doing that, I'd
20 get out, worked with whatever section of the Gang they
21 would need me to work with for the day.
22 Q. We need to understand why a bus is necessary,
23 why a bus is necessary to bus other workers to and from
24 the job site. Can you explain that a little bit?
25 A. Yeah, sure. A lot of the places we go to are

Page 17

1  smaller cities, so they don't necessarily have the room
2  to either put us in hotels there or for us to have our
3  equipment in the area there. So what will happen is,
4  we'll met up in the morning at a centralized location
5  and then we'll take a bus out to wherever the
6  equipment's at or wherever we're starting work for the
7  day, and normally that's not right next to where we are
8  for the day.
9  Q. And then bring them home at night?
10 A. Correct.
11 Q. Okay. The Gang had moved from Oroville,
12 California to Onaga, Kansas?
13 A. Correct.
14 Q. Explain when that was and what it was like
15 working in Oroville, in terms of the weather and
16 climate, compared to Onaga, Kansas.
17 A. Well, when we moved from Oroville, I believe
18 we were just starting to half coming into Onaga. And,
19 Oroville, you know, that's not necessarily northern
20 California, but it is upper California. And then going
21 into Kansas, it's -- we were working on the -- in Onaga
22 it's upper Kansas, and the difference between the two,
23 I mean, heat wise, they are probably around the same,
24 but the humidity in Kansas is a lot worse, easily
25 double what it is in California, I'd say.

Page 18

1    Q.  Now, you mentioned work-and-a-half.  Explain
2  to the jury -- they may know by now.  I'm not sure what
3  order we'll put the witnesses on in the trial.  But
4  explain to the jury what -- when you say this 8501
5  Steel Gang is working halves.
6    A.  We consider half basically our work schedule.
7  You get like -- you have what's either, like, a T1 or
8  T2 schedule, and we were working the T2 schedule.  So
9  that basically means that we'll come in for eight days
10 and then we'll get seven days off.  So you think of a
11 half as -- and that your work schedule, and then you
12 get the -- another half of the schedule off.  And
13 that's a pay half, pretty much.
14   Q.  Now, what was the first day on the job in
15 Onaga, Kansas?  I understand you all -- the Gang
16 transfers from Oroville, California, and my
17 understanding is the track machines that we hear about,
18 those are transported from Oroville, California, to
19 Onaga, Kansas, on flat -- railroad flat cars.
20   A.  Yeah.  Basically what will happen is when we
21 do a major Gang move we have a train that comes in that
22 that's specially made for the equipment.  We'll load up
23 the equipment on there, any of the buses and stuff that
24 we can put on there, vehicles, we'll load up and chain
25 those down, and same thing goes for the equipment,

Page 19

1  we'll load those up and chain them down.  And then that
2  train will move its way to the next location, and then
3  when we get there, we do the reverse and take
4  everything off.
5    Q.  And it moves during the seven days that the
6  Gang is off?
7    A.  Our off cycle, that's correct.
8    Q.  Off cycle.  Thank you.  All right.
9       Tell me what you remember about -- and what
10 was the first day at Onaga?
11   A.  What do you mean by that?
12   Q.  When was the first Gang first at Onaga?  What
13 was the first workday at Onaga?
14   A.  I don't recall if it was a Monday or Tuesday.
15   Q.  No.  No.  Just the date.
16   A.  I believe it was the 24th.
17   Q.  Of July?
18   A.  Of July.
19   Q.  And I know when you all are working on those
20 Gangs days of the weeks kind of blur on you.
21   A.  Yeah.  We don't normally run Monday to
22 Friday, so the day of the week isn't as important as
23 the date of the month.
24   Q.  And what happened on July 20 -- well, let me
25 just lay this foundation too.

Page 20

1  So it has been seven days since you last work
2  in Oroville, California, before coming back to work on
3  July 24th in Onaga, Kansas?
4    A.  That's correct.
5    Q.  Okay.  Tell me what you can recall.  And feel
6  free to refer to the statement if you need to.  Tell me
7  what you can recall occurring on July 24th.
8    A.  Well, when we arrived there was already,
9  like, a skeleton crew there starting to break stuff
10 down, get things off the train, which isn't exactly
11 uncommon.  It's just -- you know, sometimes it's easier
12 to have people there to help line the train out and get
13 things ready to go.
14      We showed up about a half day because there
15 was an offset for the travel over there.  And once we
16 got there, when we first arrived, we did a little job
17 briefing and we got on one of the buses, because the
18 other bus wasn't down yet, and that took us out to the
19 job location.
20   Q.  In your statement you reference you heard
21 that Assistant Foreman Charles Turner had difficulties
22 with the heat.
23   A.  Yeah.  We heard over the radio that he was
24 having problems when -- I wasn't there, so I don't know
25 exactly what happened while he was out there.  But when

Page 21

1  we showed up I did notice them taking him out of the
2  Speed Swing, and then they sent him home for the day.
3    Q.  Okay.  When you say take him out of Speed
4  Swing --
5    A.  That's a piece of equipment pretty much
6  travels on the track or it hauls rail.  It's kind of
7  like a backhoe in a sense.  It has, like, a stinger
8  sort of at the end that will come out and pick up rail.
9    Q.  Do you know, is the cab of the Speed Swing
10 air conditioned?
11   A.  Normally.
12   Q.  Were you close enough to him, Mr. Turner,
13 when they were unloading him from the Speed Swing, were
14 you close enough to observe his condition?  Was he able
15 to climb out?  Were they helping?
16   A.  I know they helped him out.  I don't know if
17 he was coherent or anything like that.  Like I said,
18 wasn't close enough to see that.
19   Q.  Okay.  And what did you hear over the radio?
20 This is a radio that communicates --
21   A.  Throughout the Gang.
22   Q.  Throughout the Gang.
23   A.  I had heard that he had fallen out and -- but
24 I don't -- I know that he was having problems with the
25 heat is what I was understanding from the radio

6 (Pages 18 to 21)

Page 22

1  conversation.
2     Q.  And many us use the term "falling out."  When
3  you hear the term on the 8501 Steel Gang, "falling
4  out," what does that mean?
5     A.  It could mean a couple different things.  It
6  just basically -- the generalization of it would be
7  that you're having problems with the heat at the moment
8  and you can't work.
9     Q.  All right.
10        Now, as you're -- were you the bus driver on
11 the 25th?
12    A.  Yeah.
13    Q.  As you're driving the -- no.  Wait a minute.
14 Okay.  That's the 24th we were just talking about.
15    A.  Correct.
16    Q.  What did you do on the 25th?
17    A.  Probably just worked with the Gang for the
18 day.
19    Q.  Did you work part of the time as the bus
20 driver on the 25th?
21    A.  If I was running the bus for the day, then,
22 yes.
23    Q.  And in your statement you make the statement
24 that temperature and humidity were the topic of
25 everyone's conversations.  I heard so many workers on

Page 23

1  the bus complaining that the heat and humidity was
2  terrible, making it very hard to work.
3        Tell me what you base that on or why you made
4  that statement?
5     A.  Well, the thing about a being a bus driver is
6  everybody passes you as you're coming on to the bus.
7  And railroaders are normally very vocal, and it was hot
8  out there, it was definitely a transition from where we
9  were, and from -- all the guys were saying, you know,
10 they were all sweaty and everybody, like, oh, the
11 heat's just horrible and, you know, turn that A/C on,
12 let's --
13    Q.  All right.
14        Now I'm going to page two of your statement.
15 We're moving to July 26th.  Tell us what you can recall
16 doing on July 26th.  This is the day of Mr. Herrera's
17 injury.
18    A.  Well, in the morning we had our job briefing
19 like we normally do, then after the job briefing
20 happened we all loaded up on the bus.  And normally
21 they would separate laborers and equipment operators,
22 and equipment operators go to one location and laborers
23 would go to the other location and start doing some
24 work.  I had some bus duties that I needed to take care
25 of first, and then after that I got out and helped the

Page 24

1  cleanup crew because they were shorthanded.
2     Q.  Okay.  Let me explore a little bit of that
3  with you.
4        As the bus driver, will you actually drive
5  the bus along the right-of-way road along the railroad
6  track to get to the job site?
7     A.  Sometimes, if it's possible to drive there.
8  At this location I don't believe we could fit the bus
9  through there.  I know where I dropped them off
10 originally was at a crossing, then I moved it to
11 another crossing, which was in between -- we had a
12 crossing, then we did some work, there was another
13 crossing, then we did more work past that.
14    Q.  How much distance -- do you remember how much
15 distance there was between those two crossings?
16    A.  I would say maybe about a half-mile.
17    Q.  And part of the machine operators, the
18 equipment operators, you unloaded one location and the
19 laborers at another?
20    A.  That's correct.
21    Q.  Why is that?
22    A.  Because the machines don't always tie up at
23 the location that we're first starting work.  You have
24 to normally put the machines in, like, a siding or an
25 area of the track that's not being used so it doesn't

Page 25

1  disrupt train traffic.
2     Q.  So you're dropping the laborers as close to
3  the job site or work site as you can so they don't have
4  to walk to the work site?
5     A.  Correct.  Also, in the morning sometimes
6  we'll have some remaining cleanup to do, so they will
7  go back there and everyone will kind of help out a
8  little bit until the equipment comes back, and then
9  everybody mans up the equipment.
10    Q.  Okay.  All right.
11        Now, tell us a little bit about this cleanup
12 crew.  We've heard a fair amount about it and will have
13 heard about it, I'm sure, by the time you testify.  But
14 it looks like your memory was you parked my bus and
15 began helping the clean up crew at about 9:00 a.m.
16        Does that sound about right?
17    A.  Yeah.
18    Q.  Do you remember what time you would have
19 dropped them off?
20    A.  Job briefing normally takes a half-hour to 40
21 minutes, maybe 20 minutes for travel, so a full hour.
22 So if we started at 6:00, I would have dropped them off
23 by 7:00.
24    Q.  Tell me -- and we do understand this, but so
25 we'll have a context within your deposition, in general

Page 26

1   terms, what does the cleanup crew on 8501 do?
2       A.  The cleanup crew is the crew that is behind
3   all the rest of the men and equipment, and their job is
4   pretty much quality control.  They make sure that
5   everything looks nice, everything that's missed by the
6   rest of the equipment gets taken care of, which
7   includes clipping up ties, putting in spikes, you know,
8   moving ties forward or backwards, depending on where
9   the welds might fall, or pretty much doing anything
10  that the other equipment does that's left over.
11      Q.  Okay.  Now, clarify for me, and this is a
12  minor point, but when you weld two pieces of rail
13  together, does the weld have to be between the ties or
14  on top of the tie?
15      A.  As per the rules, it's supposed to be in the
16  crib between the ties.
17      Q.  All right.
18          Who was on the cleanup crew that morning at
19  9:00 o'clock, on July 26th at 9:00 o'clock when you
20  showed up?
21      A.  It was Guillermo; Scott, the Assistant
22  Foreman; and Dennis on the Camp Car.
23      Q.  Let's give them some last names, although
24  from here on you can refer to them as the first name if
25  you need to.

Page 27

1   Guillermo is Guillermo Herrera?
2       A.  Correct.
3       Q.  The Assistant Foreman is Scott, is Scott
4   Nicholson?
5       A.  That's correct.
6       Q.  And Dennis is Dennis Dickison?
7       A.  Yes.
8       Q.  All right.
9           What was Dennis Dickison's job that day?
10      A.  He always worked on the Camp Car, which is
11  the very last piece of equipment.  His job is to pretty
12  much -- it hauls all the tools that we'll need for the
13  day, and he clips up any of the clips that hold the
14  ties on to the rail.
15      Q.  We understand that Dennis Dickison was on
16  light duty on that day and preceding days and was not
17  able to do any of the physical work that was required
18  of the cleanup crew.  Is that your understanding?
19          MR. SCHMIDT:  Object to the form.
20      A.  Yes.
21  BY MR. COX:
22      Q.  When you arrived at 9:00 a.m., who had been
23  performing all of the physical labor duties on the
24  cleanup crew?
25      A.  Guillermo Herrera.

Page 28

1       Q.  Now, the cleanup crew is supposed to have --
2   tell us what a full contingent for that cleanup crew
3   consists of.
4       A.  Contingent, by that do you mean staff?
5       Q.  Yeah, when it's fully manned or personnel?
6       A.  Well, I think that a proper crew amount back
7   there should consider -- should consist of one operator
8   for each piece of equipment, so one person on the
9   P-Car, one person on the Camp Car, which is what Dennis
10  was running.  They should have at least two laborers,
11  so that way you can have one person watching each rail
12  as you're coming up, because Dennis's view, he can only
13  see what's inside the track.  He can't tell if there's
14  anything wrong on the outside of the track, so you need
15  somebody there to be able to verify.  And then we use
16  hand signals, since the equipment's loud, to let the
17  operators know, you know, where to stop, where to --
18  you know, what to do, what they need to clip things up,
19  or if they need to bring up some tools for us to use.
20      Q.  Okay.
21      A.  And, of course, more people help.  You could
22  have an additional person helping mark ties for the
23  person in front, but that's the minimum that you would
24  need.
25      Q.  And Scott Nicholson was the Assistant

Page 29

1   Foreman?
2       A.  Correct.
3       Q.  All right.  All right.
4           Now, tell us what the P-Car is supposed to do
5   on that Gang.
6       A.  So the difference between the P-Car and a
7   Camp Car is the P-Car can clip and declip clips that
8   hold the rail together.  The Camp Car can only clip
9   things up.  So the P-Car's main job is to try to get
10  some of the clips they can see to make the job a little
11  easier in the back, but also, primarily, to unclip that
12  clips that are messed up.
13      Q.  Let me see if I -- I don't know if I have a
14  photo of those clips or not.  Give me a minute here.
15          Yeah.  Let me hand you Exhibit 6 and ask you
16  to hold that up so the videographer can see it.  And
17  can you show us a little bit about that.  Show us what
18  the rail is, the ties and the clips.
19      A.  Okay.  Well, this piece right here would be
20  the rail.  These right here are concrete ties.  And all
21  this rock here is what we consider ballast.  And these
22  are the clips, which underneath the clips we use, like,
23  a plastic insert, which we call a biscuit.  So when you
24  put the biscuit on there it's like a spacer and it
25  helps hold down the rail, along with the clips that go

Page 30

1  into these grooves on the ties.
2      Q.  In the old days on -- well, on wooden ties
3  you would use tie plates and spikes to hold the rail in
4  place?
5      A.  Correct.
6      Q.  On concrete ties you use clips?
7      A.  Yeah.
8      Q.  All right.
9          And it is the P-Car that can be used to clip
10 or declip, put on or remove those clips that hold the
11 rail in place?
12     A.  That's right.
13     Q.  All right.
14         Now, to do -- to clip or declip those clips
15 by hand, would you describe that in terms of the
16 physicality of the work, the strenuousness of the work?
17     A.  So for a declipper it's a -- it kind of looks
18 like a pair of scissors, I guess is the best way to
19 describe it.  They are long handled, and you place them
20 on the clips and you have to squeeze them together,
21 because the -- you have to get the tension on them to
22 be able to pull them off.  So you put them on there,
23 it's got little grooves that go into the clip part, and
24 then once you've pulled it together and put the tension
25 on, then you pull it back to remove the clip off of it.

Page 31

1      Q.  Okay.  So the tips -- the clips, when they
2  are on the base of the rail, are under tension?
3      A.  Correct.
4      Q.  You have to take that tension off manually
5  with the declipper tool, and then once that tension is
6  off, slide them off the base of the rail?
7      A.  Not just that, but the grooves they go into,
8  once the clips are in, it spreads out so that they
9  can't pop back off.  So you're actually putting
10 pressure on the clip to pull it the together to be able
11 to pull it back out.
12     Q.  Give us some sense of how hard that work is.
13     A.  It could be easy, it could be incredibly
14 difficult.  It just depends on how much tension is on
15 the clips at the time.  You know, none of them are
16 going to be exactly the same.  And sometimes they do
17 get stuck on there and you have to, you know, really
18 yank at it to get it off, but they are not all like
19 that.  It's just hit or miss.
20     Q.  How about to put the clips back on, describe
21 that process manually.
22     A.  Manually, to put the clips back on we have
23 what's -- what we call is a banana or a reclipper.
24 It's got a hook on the bottom of it, and basically what
25 it does, is the banana will hook on to the rail, on the

Page 32

1  other side of the rail, and the hook will go into the
2  clip part, and as you're pulling this big, long handle
3  down, it pulls the clip up.
4      Q.  So the handle gives you the leverage you need
5  to pull the clip on to the base of the rail?
6      A.  Correct.
7      Q.  And how about that in terms of physicality?
8      A.  Those get kind of stuck sometimes.  So what
9  we'll have to do is we'll take a hammer, a
10 sledgehammer, and we'll kind of tap it in while we have
11 someone putting on the force to put it on.
12     Q.  And that's necessarily a two-man job when you
13 are using that sledgehammer?
14     A.  Well, yeah, when you are using a
15 sledgehammer.
16     Q.  Okay.
17     A.  It's the same thing for the other clips, that
18 when you are taking them off sometimes they go on easy
19 and sometimes not.
20     Q.  Okay.  Now, we talked about the -- what is
21 the purpose on that cleanup Gang of the P-Car?
22     A.  What do you mean by "purpose"?
23     Q.  What is it used for?  What's it supposed to
24 be used for?
25     A.  Primarily, it runs in front of the Camp Car

Page 33

1  and it reclips or unclips the clips that -- the main
2  function, I would say, is to make sure that it unclips.
3  That's the most important part, because if you unclip,
4  it makes it a lot easier, because the Camp Car is
5  behind it, and the Camp Car can only reclip.  But using
6  the machine to reclip stuff is a lot easier than doing
7  it by hand.
8      Q.  How does the use of the P-Car to declip the
9  rail affect the amount of laboring or physical laboring
10 that the laborer or laborers have to do?
11     A.  Well, the P-Car, just like with the people
12 that work in front, you know, they can't get everything
13 and they'll miss some stuff.  But the great thing about
14 it is it will cut down the labor that we have to do.  I
15 would rather put clips on than take them off.  And if
16 you have a piece of equipment in front you that takes
17 the clips off, it makes it a lot easier for the people
18 behind you.
19     Q.  And in the cleanup crew, that job would fall
20 to the P-Car?
21     A.  Correct.
22     Q.  Okay.  Now let's talk a little bit about
23 Assistant Foreman, Scott Nicholson.  You make some
24 comments in here about him in your statement.
25         You indicate that he was new and

Page 34

1  inexperienced. How did you -- do you know what was his
2  first day on that Gang where -- his job as Assistant
3  Foreman?
4     A. I think he had been an Assistant Foreman
5  before, but I don't know that for sure. But as far as
6  being -- I know that was his first half on the Gang.
7     Q. Had he ever -- in your discussions with him,
8  did you learn whether or not he had ever worked on a
9  Steel Gang before?
10    A. He -- no. That was the first time he had
11 worked on the Steel Gang, according to what he told me.
12    Q. We've been referring to this 8501 Gang. It's
13 a 8501 Steel Gang?
14    A. Correct.
15    Q. And what does Steel Gang mean?
16    A. We do a lot of rail laying and pad laying and
17 stuff like that, whereas, the tie side will do a lot of
18 tie changing and the stuff under the rail.
19    Q. Okay. What impression did you form, in
20 working with Scott Nicholson, about his level of
21 understanding of how to run the cleanup crew
22 efficiently?
23       MR. SCHMIDT: Foundation.
24    A. He was new. He -- you know, since he hadn't
25 done that before, I would imagine his level of skill

Page 35

1  back there, as far as running it, wouldn't be very
2  high. He seemed like a nice guy, but, you know, he
3  just didn't know.
4  BY MR. COX:
5     Q. Didn't know?
6     A. He just didn't know what exactly it entailed
7  being the Assistant Foreman back there.
8     Q. Okay. What instructions did Mr. Nicholson
9  give you and Mr. Herrera on July 26th about whether or
10 not to use the P-Car?
11    A. He didn't want to use it, because he thought
12 that it would work faster the way he was telling us to
13 do it.
14    Q. How was he telling you to do it?
15    A. To bump the P-Car up and to do it by hand.
16    Q. What do you mean "bump the P-Car up"?
17    A. Basically, you would just have an operator
18 move the equipment forward and then come back and help.
19    Q. To do work manually?
20    A. Correct.
21    Q. So "bump the P-Car up" means run it up the
22 track some distance and then --
23    A. Yeah. And get out and walk back.
24    Q. I got it. Okay.
25       Now, have you ever worked before on an 8501

Page 36

1  Steel Gang where a Foreman or Assistant Foreman chose
2  not to use the P-Car?
3     A. Yeah, once.
4     Q. And tell me about that.
5     A. The Assistant Foreman thought it would work
6  better without it. And we had an old operator there
7  who, after doing it for a little bit his way, decided
8  it was better to go and use the equipment and went
9  ahead and did it anyways. And once he saw what it was
10 like to actually use the equipment, he realized it was
11 quicker.
12    Q. And did you and Mr. Herrera or both of ya'll
13 talk with Scott Nicholson about using the P-Car rather
14 than doing it manually?
15    A. Guillermo had told me that he had talked with
16 him about it.
17    Q. Okay. And did that succeed? Did
18 Mr. Nicholson accede to or agree with Mr. Herrera's
19 suggestion that --
20    A. No.
21    Q. -- that you all use the P-Car?
22    A. No.
23    Q. When you don't use the P-Car, how does that
24 affect the physical work of the laborers?
25    A. It definitely makes it harder. The reason we

Page 37

1  have the equipment out there is to make it easier on
2  us. When you got to do everything by hand, it kind of
3  defeats the purpose of having the equipment.
4     Q. As a result of doing it by hand, was the
5  cleanup crew falling behind the rest of the Gang?
6     A. Yeah. It wasn't just because we were doing
7  it by hand, though. We were also -- we didn't have the
8  manpower to keep up with the Gang.
9     Q. Okay. Now, you make this statement here, it
10 was evident -- let me get you context here.
11       You say Scott's -- talking about Scott
12 Nicholson's inexperience led him to believe that
13 performing the tasks manually was more efficient than
14 using the P-Car. Guillermo attempted several times to
15 explain the need for the P-Car, but Scott would not
16 accept any of his advice, as you've already told us.
17       Then you make the statement, it was evident
18 that Scott had an attitude toward Guillermo by the way
19 he spoke to him.
20       MR. SCHMIDT: Just a moment. Finish your
21 question.
22 BY MR. COX:
23    Q. What do you mean by that?
24       MR. SCHMIDT: Objection; form, leading
25 narrative. It's not even a question. Foundation.

Page 38

1   Go ahead.
2   A.  Well, when I had got there they seemed like
3   they were not getting along well together.  And I don't
4   know if it was partially because Guillermo was
5   persistent with using the P-Car or if it was something
6   that happened prior to when I got there, but they
7   didn't seem to be seeing eye to eye, which happens
8   sometimes out there.
9   BY MR. COX:
10  Q.  Did you agree with Mr. -- or what was your
11  position about whether or not the P-Car should have
12  been used or not?
13  A.  I absolutely think it should be used.
14  Q.  Did Mr. Nicholson ever pitch in and help with
15  any of the physical laboring work?
16  A.  Not really.  I mean, he didn't understand
17  what we were doing back there, so it was kind of a
18  learning experience for him.  You can't expect somebody
19  to really help out if they don't know what they're
20  doing.
21  Q.  All right.
22      Now let's talk about the weather on
23  July 26th.  How would you describe it, or what is your
24  memory of what the weather was like on July 26th.
25  A.  It was hot, it was humid and sunny.  I don't

Page 39

1   know what else to say about it.  You know, it was a
2   very muggy kind of day.
3   Q.  Are you trained or do you know or from your
4   personal experience can you tell us how the temperature
5   on the track, when you are standing on the ties in
6   between the rails or next to the rails, compares with
7   the ambient temperature, the temperature around the
8   track?
9   A.  It's always been kind of a general knowledge.
10  It even states it in our rule book that the temperature
11  of the rail can be up to 20 degrees hotter than the
12  ambient temperature.  So when you are working around
13  that, you know, you get the temperature from the rail
14  coming up, so whatever temperature you're at in the
15  location you're at, it could up be to 20 degrees hotter
16  just because of the heat coming off the rail.
17  Q.  Tell me what you did and what you observed of
18  Guillermo Herrera on the 26th, in terms of your efforts
19  to stay hydrated.  Tell me about that.
20  A.  Well, we were drinking plenty of water.  I
21  had actually brought a big thing of juice with me that
22  day, and I was drinking that.  We tried to take breaks
23  and hydrate ourselves as much as we can.  And then I
24  eventually ran out of my juice and was drinking the
25  water with him.

Page 40

1   Q.  And where does the water come from?  Is it
2   something you all bring?
3   A.  We're provided water.  We're provided water.
4   Normally, we grab it in the morning from one of the
5   buses, will have water on it.  And we'll grab it and
6   we'll bring it out there with some ice, if we have the
7   ice with us, or sometimes we'll -- if it's really hot,
8   they'll set up, like, cooling stations and stuff like
9   that, and we can refill our ice and water and stuff
10  there.
11  Q.  Where do you store the water when you are
12  working on the cleanup crew?
13  A.  The machines have coolers on them, little
14  coolers on them, like the kind you see in, like, the
15  football games, the round ones.
16  Q.  Like an Igloo cooler?
17  A.  Yeah, an Igloo cooler.
18  Q.  Okay.
19  A.  We'll normally stock that up with bottles of
20  water and ice.
21  Q.  And is there one on the Camp Car?
22  A.  Yes.
23  Q.  And was there one on the P-Car?
24  A.  Yes.
25  Q.  Now, let's talk a little bit about the

Page 41

1   cooling station.
2       First, what is a cooling station?  How is
3   that term used to describe what was present on the 8501
4   Steel Gang?
5   A.  Cooling station is pretty much an area that
6   they will set off of the track.  It will have a big
7   cooler there that will have water.  They will have
8   another cooler that's just stocked with bags of ice,
9   and it will be shaded.  They'll set up, like, a tent.
10  Q.  Okay.  Was there a cooling station, as you've
11  described it, available to you and Mr. Herrera on the
12  morning of July 26th?
13  A.  They had a cooling station out there in front
14  of us, but they took it down.  I don't think they
15  realized that we were still back there working.
16  Q.  And do you know where it was moved to?
17  A.  No.
18  Q.  How far behind the main Steel Gang group had
19  the cleanup crew fallen that morning?
20  A.  We couldn't see them anymore.  There was a
21  bend, and they -- sometimes what will end up happening
22  is they will jump to the next location, and that's what
23  they ended up doing.  We were -- we never made it to
24  the bend where they did the jump before the day was up,
25  so it was pretty far behind.

Page 42

1  Q. Okay. Let's talk a little bit about breaks
2  from your work to rest, cool off, hydrate.
3      What was Mr. Nicholson's practice on
4  July 26th?
5  A. What do you mean by that?
6  Q. What would he tell ya'll to do, what would he
7  let ya'll do in terms of breaks?
8  A. Well, we tried to take breaks. In the
9  beginning of the day, I think it was more like we were
10 trying to take breaks when he was allowing it. And
11 then towards the end of the day we were just taking
12 breaks whenever we could, regardless of what he said.
13 Q. When you say "regardless of what he said,"
14 what would he say? What memory do you have of what
15 Mr. Nicholson would say to you and Mr. Herrera when you
16 would try to take a break?
17 A. Well, I know that he wanted us to get back to
18 work. You know, he is the Assistant Foreman, it's part
19 of his job to make sure we're continuing our
20 production, so that's pretty much what he would tell
21 us.
22 Q. Okay. You described the heat as devastating
23 in your statement, and the only shade we could get was
24 from the canopy at the Camp Car.
25      First, why would you use the word

Page 43

1  "devastating" to describe the heat on July 26th?
2  A. So being from Arizona, you know, I have --
3  I'm used to hot weather. The hot weather, though, with
4  humidity is just insane. I'm not -- you know, I would
5  rather have the dry heat over the humidity heat any
6  day. I think that it just really doesn't let you know
7  when you stop sweating or anything like that, because
8  you're constantly feeling soaked.
9  Q. Soaked with sweat?
10 A. Yes.
11 Q. Okay. Now, the Camp Car had a canopy on it.
12 What does that mean?
13 A. It's -- so pretty much the Camp Car has a
14 metal top on it that provides shade for the operator.
15 Q. Now, if ya'll were to sit on that Camp Car
16 for shade under the canopy of the Camp Car, is the Camp
17 Car running while ya'll are on there?
18 A. Yes.
19 Q. And what kind of engine does it have?
20 A. Like I said before, we use hand signals
21 because it's a big engine, it's loud. It's not exactly
22 easy to hear each other when you are around it. It's a
23 diesel engine.
24 Q. Does it generate heat?
25 A. Yeah.

Page 44

1  Q. So when you are on the Camp Car trying to get
2  in the shade under the canopy, are you exposed to the
3  heat of the engine?
4  A. Yes.
5  Q. All right.
6      Tell us about your memory of Mr. Herrera,
7  Guillermo Herrera, walking down to the mechanic's truck
8  where he can sit in the air-conditioned cab. What do
9  you remember about that?
10 A. I know Guillermo was feeling hot and that he
11 went and took a little break in the mechanic's truck,
12 because it is a -- he does have A/C in the mechanic's
13 truck. And, you know, they are there to help us out
14 too, so he went and took a little break there and came
15 back to work.
16 Q. Do you have any memory of how long he was
17 gone, how long he was in that mechanic's truck?
18 A. I wouldn't say no more than 30 minutes.
19 Q. Did Mr. Nicholson -- did you observe Mr.
20 Nicholson go down to the mechanic's truck to talk to
21 Mr. Guillermo Herrera?
22 A. Yeah. I know that he came back after that.
23 Q. Scott -- or Guillermo did?
24 A. Yes.
25 Q. Did Guillermo tell you what Scott Nicholson

Page 45

1  had said to him?
2  A. Yes.
3  Q. What did he say?
4  A. Guillermo told me that Scott said that he
5  needed to get back to work or he would be sent home for
6  the day without pay.
7  Q. Do you know who the mechanic was that was in
8  charge of that truck?
9  A. Yeah. It was Brad Bradley.
10 Q. All right.
11     What did Guillermo do after Scott Nicholson
12 went down to the truck and talked to him?
13 A. He went back to work.
14 Q. How long was he able to work?
15 A. Well, we worked for -- until he ended up
16 falling out.
17 Q. Tell me what you and he are doing during that
18 period of time when he returns to work at
19 Mr. Nicholson's instructions from the mechanic's truck.
20 A. We're moving down the track, each of us on a
21 rail, which is the way it should be run, a guy on each
22 rail, and moving up the P-Car in front, and we're just
23 standing in front of the Camp Car just doing what we
24 needed to do to clean up the track.
25 Q. And what type of work were you engaged in at

Page 46

```
 1   that time?
 2        A.  Reclipping, declipping, moving ties and just
 3   the normal work that would be required back there for
 4   the day.
 5        Q.  Okay.  Again, you're doing this manually?
 6        A.  Yes.
 7        Q.  How would you describe how you were feeling?
 8        A.  I was hot.  I was hot and feeling -- when you
 9   get really hot you don't really get hungry.  You just
10   get to this point to where you just want to either
11   drink water or kind of relax a little bit.  Toward the
12   end of the day we were both feeling kind of dizzy,
13   which we know that wasn't a good thing, but we were
14   trying to finish out the day and just be done with it.
15        Q.  What did Mr. Guillermo do or Mr. Guillermo
16   Herrera do?
17        A.  What do you mean?
18        Q.  Later in the day or as ya'll are working that
19   period of time.
20        A.  We started taking more breaks trying to --
21   because as the day got -- moved on, it got hotter in
22   the day, so we were trying to take more breaks
23   frequently.  And he was doing the same thing I was,
24   which was the manual labor, plus moving up the P-Car.
25        Q.  And what were ya'll doing in terms of trying
```

Page 47

```
 1   to hydrate yourself, remain hydrated?
 2        A.  Drinking water.  We were drinking water out
 3   of our cooler and just doing anything we could to stay
 4   hydrated.
 5        Q.  Okay.  Did there come a time when
 6   Mr. Herrera, Guillermo Herrera, sat down again or took
 7   a break again in the shade of the canopy of the --
 8        A.  Yeah.  We actually -- we were getting towards
 9   where the crew had made the jump to the next location,
10   and we took a break to get some water, and Guillermo
11   sat down on the canopy area.  And after a little while
12   I had told him I was -- I was, like, hey, you know, we
13   should get back to work.  And he's, like, I'll see you
14   in a minute, you know, and told me he couldn't get up.
15   And I asked him, I was, like, you know, you can't get
16   up, are you okay?  And he was, like, I can't get up.
17   So then I had told Scott Nicholson we needed to get him
18   help.
19        Q.  What happened next?
20        A.  Scott got on the radio and contacted
21   somebody, and the Surfacing Gang Foreman came and
22   picked him up in his vehicle.
23        Q.  We know that to be Bobby or Robert Herrera?
24        A.  Yes.
25        Q.  Describe Mr. Herrera, Mr. Guillermo Herrera,
```

Page 48

```
 1   how he's doing at that time.  What did you observe
 2   about his physical or mental condition?
 3        A.  He seemed a little out of it.  You know, when
 4   he told me that he couldn't get up, I knew that it was
 5   serious.  You know, where -- I don't think either one
 6   of us, you know, wanted anything bad to happen out
 7   there, and I don't think either one of us would have
 8   left each other just hanging like that.  And when he
 9   told me he couldn't get up, I knew it was a big deal,
10   so I tried to get him to drink more water and stuff,
11   and it just wasn't really working too well.
12        Q.  And is that the reason that you called Scott
13   Nicholson?
14        A.  I called Scott as soon as he told me he
15   couldn't get up.
16        Q.  And is that on the radio or did you do
17   that --
18        A.  He was within earshot of me.
19        Q.  Okay.  You state that his head was hanging
20   down and his eyes were closed and he said, I can't get
21   up.  It's pretty self-explanatory, but I need you to
22   describe head hanging down and eyes closed.
23             What was his condition in that regard?
24             MR. SCHMIDT:  Objection; form, leading,
25   narrative, foundation, he's testifying.
```

Page 49

```
 1             Go ahead.
 2        A.  Like I said, he was out of it.  He seemed
 3   like he needed help.
 4   BY MR. COX:
 5        Q.  What impression did you make about whether or
 6   not he was about to pass out or not?
 7        A.  When it became real for me that he was going
 8   to pass out is when we were actually trying to get him
 9   to the vehicle.  He couldn't -- like, we had to help
10   him get to the vehicle.  Me and Scott Nicholson both
11   pretty much took one of his arms and put him on our
12   shoulder, like, shoulder on my arm and a shoulder on
13   Scott's arm, and we kind of walked him over to the
14   vehicle, but Guillermo wasn't really walking.  He was
15   just kind of -- like, he wanted to help, but he
16   couldn't really do anything other than just sort of
17   shuffle his legs along, but they were more dragging
18   than they were helping us.
19        Q.  When Mr. Herrera arrived in his van and you
20   and Mr. Nicholson helped Mr. Herrera, Guillermo
21   Herrera, to the van, where did you think Mr. Bobby
22   Herrera was taking Guillermo Herrera?
23        A.  I assumed --
24             MR. SCHMIDT:  Form, foundation.
25        A.  I assumed that he was going to take him to
```

Page 50

1  the hospital or, you know, some kind of medical center.
2  BY MR. COX:
3  Q. In your opinion, did he need medical -- from
4  your observations, did it appear to you that he needed
5  medical attention?
6     MR. SCHMIDT: Form, foundation.
7  A. Yes. And that's always been the way that we
8  had talked about it. If somebody goes out, the first
9  thing we would do is take them to a hospital or
10 something like that.
11 BY MR. COX:
12 Q. On the job briefing form ya'll fill out each
13 day to document weather conditions, tracking time, all
14 these things we've seen on the job briefing form, it
15 actually has the nearest hospital location, address and
16 phone number?
17 A. Correct.
18 Q. Tell me what knowledge you have of any
19 investigation into Mr. Herrera's injury that was
20 conducted by any supervisor on the Gang.
21    MR. SCHMIDT: Foundation, form.
22 A. What do you mean?
23 BY MR. COX:
24 Q. Were you ever contacted? Did any supervisor
25 on the Gang ever come up to you and talk to you about

Page 51

1  what had happened or what the conditions were like that
2  day or why Guillermo fell out or anything like that?
3  A. Not that I remember.
4  Q. Is the only person you talked about what had
5  occurred -- the only person you talked with about what
6  had occurred, Bill Herring, the claim agent that took
7  your statement?
8     MR. SCHMIDT: Object, form. And your runner.
9  Go ahead.
10    MR. COX: I'm going to move to strike.
11    MR. SCHMIDT: Well --
12    MR. COX: Go ahead.
13    MR. SCHMIDT: Object to form,
14 mischaracterizes his testimony.
15    MR. COX: In what way?
16    MR. SCHMIDT: In that he's already testified
17 that he talked to your investigator and gave this --
18    MR. COX: I'm talking about -- let me
19 clarify.
20 BY MR. COX:
21 Q. Did you talk to any UP employees, other than
22 Bill Herring, about what had happened that day?
23 A. Scott had come up to me that day and -- at
24 the end of it and asked me what happened. And I told
25 him -- I was, like, he got hot, you know, it's horrible

Page 52

1  out here, and he got hot, and he couldn't just hydrate
2  enough. That's all that I recall, though.
3  Q. Why would Scott Nicholson have to ask you
4  that?
5     MR. SCHMIDT: Foundation, form.
6  A. He -- like I said, he was within earshot of
7  us, but he wasn't right next to us when it happened.
8  BY MR. COX:
9  Q. Do you have any knowledge of what Scott
10 Nicholson -- what job he was assigned to or what his
11 responsibilities were after this happened?
12    MR. SCHMIDT: Foundation.
13 A. When I was working on the Gang afterwards he
14 wasn't really put in charge of any other people, any
15 other crew members. He wasn't exactly -- he was still
16 an Assistant Foreman. He just either worked alongside
17 other Assistant Foremans, but he wasn't necessarily in
18 charge of anybody himself.
19 BY MR. COX:
20 Q. Okay. Anything else you can remember,
21 Mr. Newman, about what happened on July 24th, 25th or
22 26th that we haven't talked about?
23 A. Not that I can think of.
24 Q. Okay. Thank you, sir. Thanks for your time
25 today.

Page 53

1     MR. SCHMIDT: Let's take a break, go off.
2     THE VIDEOGRAPHER: Okay. We're off the
3  record at 11:05.
4     Thank you. We're off the record.
5     (Off the record.)
6     THE VIDEOGRAPHER: We are back on the record
7  11:15.
8
9            EXAMINATION
10 BY MR. SCHMIDT:
11 Q. Mr. Newman, I have just a few brief
12 questions.
13    I wanted to ask you couple of more background
14 questions in regards to this narrative summary of your
15 conversation with Mr. Herrera's attorney's office at
16 Dillon Snowden.
17    Was that conversation recorded that you had
18 with --
19    MR. COX: Sean Dillon.
20 BY MR. SCHMIDT:
21 Q. -- Sean Dillon?
22 A. Yeah. It was an over-the-phone recording.
23 Q. Okay. Did Mr. Dillon or his attorney's
24 office provide you with that recording?
25 A. They provided me with the statement, the one

Page 54

1  in front of you, but that's it.
2      Q.  All right.
3          And it was a lawyer's office that typed up
4  this statement?
5      A.  I don't know.
6      Q.  Okay.  You didn't type it up?
7      A.  I did not.
8      Q.  All right.
9          But here's my question.  As far as this
10 conversation that you had with the attorney
11 representative, that conversation you understand was
12 recorded?
13     A.  Yes.
14     Q.  All right.
15         And my question is, were you provided with a
16 copy of that recording?
17     A.  No.
18     Q.  Were you provided with any of the notes that
19 the lawyer's representative took during your
20 conversation with him?
21     A.  No.
22     Q.  Did you create notes from your conversation
23 with the attorney representative?
24     A.  No.
25     Q.  Okay.  And I'm assuming -- I'm just going to

Page 55

1  make the assumption, once you were provided with this
2  narrative, you signed it, you didn't make any changes
3  to it?
4      A.  I did actually make a change on it.  I don't
5  remember what it was, but I remember that I did have to
6  send it back once, because there was some stuff on
7  there that I didn't -- that wasn't correct.
8      Q.  Did you keep those changes that were made?
9      A.  No.
10     Q.  Keep a copy?
11     A.  I did not.
12     Q.  Okay.
13     A.  That should be the current updated version.
14     Q.  All right.
15         The -- I don't -- you were asked some prior
16 background questions.  I want to make sure that I
17 understand.
18         Did you know Mr. Herrera before this time
19 that you are working together in Kansas in July of '15?
20     A.  I didn't know him until he started coming to
21 the Gang, but we did carpool a few times going out with
22 each other.
23     Q.  So how long had you known Mr. Herrera before
24 this incident?
25     A.  I had known him, I would probably say, maybe

Page 56

1  six months.  I think that was his time on the Gang.
2      Q.  On the 8501 Gang?
3      A.  That's correct.  Once he came out there -- it
4  wasn't immediately, but I'd say within the month he was
5  out there, to the month-and-a-half after he had gotten
6  out there, we started carpooling, because we were
7  coming from -- the route that we would take up was
8  about the same, so it actually was cheaper in the long
9  run for us to carpool.  Me, him and couple of other
10 guys.
11     Q.  So when you say "carpool," what's your -- how
12 long are you together?  I mean, in other words, what's
13 your origination, what's your destination?
14     A.  When we were working in Oroville we would
15 carpool back from Oroville down to Tucson, and that's
16 where they would drop me off at, and then they would
17 proceed on to wherever they were going.  And then
18 coming back, they would pick me up in Tucson and we
19 would travel up to Oroville.
20     Q.  In what state is Oroville?
21     A.  Oroville is in California.
22     Q.  Okay.  And Mr. Herrera, he lives in El Paso?
23     A.  Correct.
24     Q.  So it's kind of right on the way to go from
25 El Paso, through Tucson, out to California?

Page 57

1      A.  Yeah.
2      Q.  All right.
3          So when we talk about carpooling, I just want
4  to make sure we understand.  Some people listening to
5  this on a jury may say, well, carpool, you're together
6  with somebody for 20 minutes driving to the job down
7  the street.
8      A.  Oh, yeah.  No.  It was anywhere from, like, a
9  six-hour ride to, you know, eight or nine, depending
10 how far we would be going.
11     Q.  Okay.  About six months or so that you had
12 done with this Mr. Herrera then before?
13     A.  Sometimes I would fly, just because it was
14 easier.  It would depend on the location we were
15 working.  I carpooled with him when they were coming
16 through Tucson, but if we were up in, like -- like,
17 when we went to Kansas, we weren't carpooling together
18 because it was actually out of their way to come get me
19 and it was easier for me to fly in.
20     Q.  With Mr. Herrera, did you then share other
21 expenses, this sharing food or things like you talked
22 about earlier?
23     A.  We were actually staying at different hotels.
24     Q.  Okay.  So you didn't share the food?
25     A.  No.

Page 58

1   Q.  All right.
2       And do you still keep in contact with
3   Mr. Herrera up to today from time to time?
4   A.  I have messaged him, like, you know, Merry
5   Christmas, stuff like that.  Not anything in depth,
6   though.
7   Q.  All right.
8       I think that's all I have.  Thank you very
9   much.
10      MR. COX:  Thank you, sir.
11      Let me -- we can take the video off.  I need
12  to him advise him about signature.
13      THE VIDEOGRAPHER:  Please stand by.
14      This ends media number one in the deposition
15  of Logan Newman.
16      We are off the record at 11:20.
17      MR. COX:  You have the right to read this
18  when it's transcribed.  It will come out in a
19  transcribed deposition.  You have the right to read
20  that and make any changes that you want to make, or you
21  can waive reading and signing.  The choice is yours.
22      THE WITNESS:  Okay.
23      MR. COX:  Whichever you want to do, but he
24  needs to know what you want.
25      THE WITNESS:  I don't mind.  I'll sign, you

Page 59

1   know.
2       MR. COX:  Can he mail it to your address?
3       THE WITNESS:  Yeah, that's fine.
4       MR. COX:  Will you do that for me?  Thank
5   you.
6       (Off the record.)
7       MR. COX:  Let's make this record.
8       For the record, I'm going to retain the
9   original of 32.  Is that all right with ya'll?  Or do
10  you want to attach it to the original depo?
11      MR. GARLAND:  You can attach a copy of the
12  statement to the depo if you want to keep the original
13  document, but I still want an attachment of Exhibit 32
14  on the record.
15      MR. COX:  Give me yours.  I'll hand you --
16      MR. GARLAND:  Wait a second.  If you have
17  given it to him, then we don't need it attached, or do
18  you want it on --
19      MR. SCHMIDT:  I think we should have a copy
20  attached to the transcript.  But, certainly, for the
21  record, you can maintain the original in your
22  possession, Jim.
23      MR. COX:  Would you ask someone to make us a
24  copy so they can keep his and I can give you a copy.
25  Would you do that for me?  Put it on the bill.

Page 60

1   We are now off the record.
2
3   (Record closed at 11:30 a.m.)
4
5       *    *    *    *

Page 61

2           SIGNATURE PAGE
3
4       I, the undersigned, affirm that I have read
5   the foregoing transcript of testimony taken September
6   7, 2016, and I declare under penalty of perjury that
7   the foregoing is a true and correct transcript of my
8   testimony contained therein.
9
10      EXECUTED this _____ day of _____ 2016.
11
12
13
                              _____
14                                LOGAN NEWMAN

Page 62

1    CERTIFIED REPORTER'S CERTIFICATE
2
3    STATE OF ARIZONA  )
                       ) ss.
4    COUNTY OF PIMA    )
5
6         BE IT KNOWN that I took the foregoing
7    deposition pursuant to Notice; that I was then and
8    there a Certified Reporter, CR No. 50218, in
9    the State of Arizona; that the witness was duly sworn
10   by me to tell the truth; that said witness's
11   testimony was reduced to writing by me.
12        I DO FURTHER CERTIFY the ethical obligations
13   set forth in ACJA 7-206 (J)(1)(g)(1) and (2) are in
14   compliance; that I am not a relative or attorney of
15   either party, or financially or otherwise interested
16   in the action.
17        (X) Pursuant to request, notification was
18   provided that the deposition is available for review
19   and signature.
20        ( ) Deposition review and signature was not
21   requested.
22        WITNESS MY HAND this 8th day of September
23   2016.
24             _____
               ANTHONY C. GARCIA, RDR, CR
25             Certified Reporter No. 50218

Page 63

1    REPORTING FIRM CERTIFICATE
2
3         THIS FIRM CERTIFIES the ethical obligations
4    set forth in ACJA 7-206 (J)(1)(g)(1) through (6)
5    are in compliance and have been met.
6         WITNESS MY HAND this 8th day of September
7    2016.
8
               _____
9              KATHY FINK & ASSOCIATES, INC.
               No. R1003
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

17 (Pages 62 to 63)