Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

AT OMAHA, NEBRASKA


GUILLERMO HERRERA, III,      )
                             )
          Plaintiff,         )
                             )  Case No.
     vs.                     )  8:15-cv-426-JMG-CR
                             )
UNION PACIFIC RAILROAD       )
COMPANY, a Delaware          )
corporation,                 )
                             )
          Defendant.         )
                             )


DEPOSITION OF MICHAEL ROLOW

JUNE 10, 2016


REPORTED BY:     IMHOF AND ASSOCIATES, INC.
                 COURT REPORTERS & VIDEOGRAPHERS
JACQUELINE MARTINEZ
CSR No. 12418              20650 Adam Circle
                          Yorba Linda, Ca.
                               92886
Job No. 160610J

EXHIBIT NO. 12

Page 2

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF NEBRASKA
 3                  AT OMAHA, NEBRASKA
 4
 5   GUILLERMO HERRERA, III,    )
                                )
 6       Plaintiff,             )
                                ) Case No.
 7   vs.                        ) 8:15-cv-426-JMG-CR
                                )
 8   UNION PACIFIC RAILROAD     )
     COMPANY, a Delaware        )
 9   corporation,               )
                                )
10       Defendant.             )
                                )
11
12
13            DEPOSITION OF MICHAEL ROLOW,
14   taken on behalf of Plaintiff, at 9431 Haven
15   Avenue, in the City of Rancho Cucamonga,
16   California, commencing at 9:09 a.m. on Friday, the
17   10th day of June, 2016, before JACQUELINE MARTINEZ,
18   CSR No. 12418.
19
20
21
22
23
24
25
```

Page 3

```
 1               APPEARANCES
 2
 3   For the Plaintiff:   BRENT COON & ASSOCIATES
                          BY: JAMES L. COX, JR., ESQ.
 4                        3801 East Florida Avenue
                          Suite 905
 5                        Denver, Colorado, 80210-2500
 6
 7   For the Defendant:   LAMSON, DUGAN & MURRAY
                          BY: DAVID J. SCHMITT, ESQ.
 8                        10306 Regency Parkway Drive
                          Omaha, Nebraska 68114
 9
                               -and-
10
                          UNION PACIFIC RAILROAD COMPANY
11                        BY: TORRY N. GARLAND, ESQ.
                          1400 West 52nd Avenue
12                        Denver, Colorado 80221
13
14   Also present:    Jerry Pritchett
                      Christabel Rivero, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                 I N D E X
 2   WITNESS      EXAMINATION      PAGE
     MICHAEL ROLOW
 3
             BY MR. COX        5
 4
 5              EXHIBITS
 6   PLAINTIFF'S                   PAGE
 7   2 - Report of Personal Injury      31
         (Previously Marked)
 8   3 - Handwritten Statement          35
         (Previously Marked)
 9   4 - Job Briefing             74
         (Previously Marked)
10   8 - Production Reporting Details   72
         (Previously Marked)
11   10- E-mails                  64
         (Previously Marked)
12   12- E-mails                  41
         (Previously Marked)
13   13- Safety Meeting Package        89
         (Previously Marked)
14   15- Safety Meeting Package        74
         (Previously Marked)
15   23- Restricted Prescription Drugs     22
16   24- Photocopy of Photograph      64
     25- E-mails                 67
17   26- GCOR Rule 1.1            71
     27- GCOR Rule 1.2            71
18   28- Safety Rules, Statement of Safety Policy  71
     29- OSHA Whistleblower Policy and Directive  94
19   30- Letter from Lance Fritz      96

20         INFORMATION REQUESTED

21         Page      Line
             15        8
22
23         UNANSWERED QUESTIONS
24              (None)
25
```

Page 5

```
 1   RANCHO CUCAMONGA, CALIFORNIA, FRIDAY, JUNE 10, 2016
 2              9:09 A.M.
 3
 4        THE VIDEOGRAPHER:  This is the beginning of media
 5   number 1 for the deposition of Michael Rolow.  We are
 6   now on the record.
 7        Ms. Reporter, please administer the oath.
 8
 9              MICHAEL ROLOW,
10        called as a witness herein, being
11        first duly sworn, was examined and
12        testified as follows:
13
14              EXAMINATION
15   BY MR. COX:
16   Q   Mr. Rolow, give us your full name, please,
17   sir.
18   A   Michael Duane Rolow, II.
19   Q   And Mr. Rolow, where do you live?
20   A   Clear -- Clinton, Utah.
21   Q   How old are you?
22   A   34.
23   Q   Can you give me a little bit of background --
24   give the jury a little background on your education,
25   formal education.
```

2 (Pages 2 to 5)

1    A   My formal education?  I have a high school
2  diploma, and I have a current one -- right now, I'm
3  about one -- one year into my associate's degree.
4    Q   And the associate degree is going to be what?
5    A   Business management.
6    Q   Who do you work for now?
7    A   Union Pacific Railroad.
8    Q   What's your job with them now?
9    A   Manager of track programs.
10   Q   All right.  Now, how long have you worked for
11 the U.P.?
12   A   Just a little over 15 years now.
13   Q   So you started when you were about 19?
14   A   Correct.
15   Q   What jobs did you start out at?
16   A   I started from -- I was a track laborer.  I
17 worked the way up to equipment, machine operator, road
18 equipment operator, assistant foreman, foreman, track
19 supervisor, and now manager.
20   Q   All right.  Manager of track program, tell us
21 what your responsibilities are as that, or what your
22 area of responsibility is.
23   A   As as -- as a manager of track programs, I
24 manage a curve gang and I manage a -- the steel gang
25 and their -- their subordinate gangs, the unloading

1  gangs, that -- that kind of unload for them.
2    Q   All right.  So the steel gang, we've been
3  calling that generically 8501?
4    A   Correct.
5    Q   I know it consists of a couple of other
6  numbered gangs, but we've been referring to the whole
7  project as gang 8501.
8    A   Okay.
9    Q   Steel gang 8501.  And the curve gang, is that
10 part of 8501?
11   A   No.
12   Q   Separate gang?
13   A   Yes.
14   Q   All right.  How long have you been manager of
15 track program?
16   A   Manager of track program since March of 2015.
17   Q   What was your job just before becoming manager
18 of track program?
19   A   Track supervisor.
20   Q   On what gang?
21   A   I was a project planner.
22   Q   What is a project planner?
23   A   I plan projects for the big steel gang, the
24 9001 and the 8501.
25   Q   All right.  Now, what does a project planner

1  do?  Give me -- give me more details about it.
2    A   As a project planner, I would go out and look
3  ahead at jobs, find tie-up spots, find any -- any
4  inhibitors that they might face, build -- build the --
5  the material for them, and things like that.
6    Q   Okay.  So now inhibitors, I'm not sure what
7  that means.
8    A   You know, there's bridges out there or
9  switches, culverts, that they have to -- to go over.  I
10 would -- I would identify those crossings that they
11 would -- that they have to remove and -- and get
12 protection for.
13   Q   All right.  And that's done how far in advance
14 of the project?
15   A   Usually about a month, give or -- give or
16 take.
17   Q   And is part of the planning process figuring
18 out how much time it's going to take the gang to get
19 this section of track re-laid?
20   A   No.
21   Q   How -- how do you schedule that?
22   A   That -- that's scheduled in Omaha.
23   Q   That's above your pay grade?  What I'm -- what
24 I'm searching for is who determines how much time this
25 gang has -- the 8501 gang has to accomplish its task in

1  a certain territory on the railroad?
2    A   Generally, there's no specific times given.
3  I mean, it's -- there's a -- there's a goal that --
4  that they have and they either meet it or don't.  I
5  mean, there's no really specific time frame.  I mean,
6  there's -- there's a general time frame that if -- you
7  know, if it's -- if it's labeled at one mile a day that
8  it will take this much time, but generally, there's --
9  there's not a specific time frame to do anything.
10   Q   Is there a reward for managers or employees if
11 the goal is exceeded?
12   A   No, not that I'm aware of.
13   Q   Okay.  We heard yesterday about a backpack
14 that was awarded, I guess, in -- sometime in '85 or
15 something for -- the reference was saving the company
16 money.  What's -- what's that about?  If you know.
17   A   I have no clue about saving the company -- I
18 mean, the -- the work team gets initiatives all the
19 time.  I guess initiative's not the right word, like a
20 backpack or something like that if a project has went
21 as planned.
22   Q   Okay.
23   A   Or -- or if it was a new project and -- and
24 the gang's not familiar with, you know, that type of
25 work before and they go out and succeed.  I mean, you

3 (Pages 6 to 9)

Page 10

1  know, we always try to do barbecues and things for
2  those guys all the time, so -- and a lot of it is on
3  the business side of things, so --
4      Q   What do you mean "on the business side of
5  things"?
6      A   We want to review how we're doing with the
7  work group.
8      Q   All right.  And who does that?  Who reviews
9  how the work group is doing?
10     A   It's done between the manager and the -- and
11 the track supervisors.
12     Q   Okay.  And who monitors your work as the
13 manager of track program?
14     A   My director does.
15     Q   And that is who?
16     A   Luis Martinez.
17     Q   Did you -- when you were working your way up
18 to manager of track program, did you ever actually
19 supervise or work on the steel gang?
20     A   Yes, sir.
21     Q   What jobs did you have on the steel gang 8501?
22     A   Track supervisor.
23     Q   And that would mean -- is that when you --
24 were you in ARSA at that time?
25     A   Yes.

Page 11

1      Q   And when were you on 8501 as a track
2  supervisor --
3      A   2009.  Six months, January to about June
4  2009.
5      Q   And from '09 to March of '15 when you became
6  manager of track program, where did you work?
7      A   I -- I was the distribution supervisor, so I
8  stayed as an ARSA for the distribution side.  And
9  then --
10     Q   Tell me what that job is.
11     A   I was the -- the supervisor for the -- the
12 unloading gangs that unloaded the material for the
13 steel gang.
14     Q   Rail, pads, clips?
15     A   The O.T.M.  No -- no rail, just the O.T.M.,
16 you know, plates, pads, anchors, rip -- you know, some
17 rail, not -- you know, the shorter rails, I.J.s,
18 transition rails, things like that.
19     Q   Okay.  And I'm not sure we've defined it for
20 the jury yet, O.T.M. is what?
21     A   On track material.
22     Q   And how does the distribution side interface
23 with the production side?  Do you -- for instance -- I
24 know it's a bad question.
25         Do you go along ahead of the gang and

Page 12

1  distribute the materials, or --
2      A   Yes.
3      Q   -- how does that work?
4      A   Yes.  They go out ahead of the gang and
5  distribute the material ahead of them.  So sometimes
6  it's days, sometimes it's weeks ahead of them, so --
7  depending on what type of project it is.
8      Q   Okay.  All right.  Describe to me the -- how
9  your work is divided up between the curve gang and the
10 steel gang.  In other words, are they working in the
11 same geographical area?  Can they be spread out over
12 the system?  Do you travel back and forth?  Give me a
13 sense of that.
14     A   It -- it really all depends on the year and
15 the month.  I could tell you currently how it -- how it
16 is.
17     Q   Let's try in July of '15 when this injury
18 occurred.  Can you think back to that?
19     A   Wow, let's see.  The 8501 was on the Kansas
20 sub and the 9012, which is the curve gang, was on --
21 they were on -- on the Wyoming corridor somewhere, so
22 they were -- they were in close proximities to one
23 another, I mean, within a few -- few hundred miles.
24     Q   All right.  And how -- how do you manage them?
25 How -- how does that occur?  Are you on site?  Do you

Page 13

1  go back and forth between them?  Do you have a central
2  office?  I'm not knowledgeable about that.
3      A   All the above.  I -- I have a central office
4  in Clearfield.  That -- that's my office.
5      Q   Clearfield?
6      A   Utah.  And then I -- I divide my time up
7  between both work groups, as best as I can.  Sometimes
8  it's the whole week, sometimes it's a few days.  It's
9  just -- it's laid out on the -- on my calendar on where
10 I need to be.  So sometimes I have classes I have to be
11 at, things like that, so --
12     Q   Okay.  All right.  Let's move to the injury to
13 Guillermo Herrera.  How did you -- you understand that
14 occurred on July 26, 2015?
15     A   Correct.
16     Q   How did you learn of the injury to
17 Mr. Herrera?
18     A   I got a phone call from my -- my track
19 supervisor.
20     Q   Who?
21     A   Charlie Diaz.
22     Q   What did Mr. Diaz tell you in that phone call?
23     A   That -- that he had Guillermo with him in his
24 truck and he was en route to the hospital.
25     Q   What else did he say, if anything?

4 (Pages 10 to 13)

Page 14

1    A   Verbatim, I couldn't tell you word for word
2  what he said.  He just said that -- that -- they -- you
3  know, they had him cooling down and as they were
4  talking to him, they thought, you know, they felt that
5  he -- he needed to go to the hospital.
6        So it was -- he didn't give me the exact time
7  frames at that point on -- on how long he had been
8  sitting in the vehicle.  He just told me that he was
9  heading to the hospital.  And I -- I told him, well,
10 get him there and call me when you -- you know, if
11 there's any updates.
12   Q   Is that the first notification you had from
13 anybody about the injury to Mr. Herrera?
14   A   Correct.
15   Q   Did you happen to make any notes, either
16 electronically or written, of conversations or events
17 that occurred around Mr. Herrera's injury?
18   A   I wrote down just what was told to me, you
19 know, on -- on a notepad.
20   Q   Were you asked to bring that?  Did you bring
21 that?
22   A   I think I have it with me, yes.
23   Q   Okay.  Could you dig that up for me?  Maybe
24 that will help.
25   A   Yeah.  Can I take this mike off --

Page 15

1    Q   Sure.  We'll go off the record a second and
2  dig that out.
3    A   Okay.
4    THE VIDEOGRAPHER:  We are going off the record.
5        (A break was taken.)
6    THE VIDEOGRAPHER:  We are back on the record.
7  BY MR. COX:
8    Q   Mr. Rolow, during the break, you looked in
9  your bag, you have one notebook but not the notebook
10 that has those notes in it?
11   A   Yeah, the notebook I have, those notes
12 entered is in my office.
13   Q   All right.  But that's something you can make
14 available to Mr. Schmitt to make available to me?
15   A   Yes.
16   Q   All right.  And generally, it consists of
17 what?
18   A   Generally, it consists of just the time
19 that -- that Mr. Diaz called me and then what -- what
20 Mr. Diaz has said, you know, about Guillermo,
21 Guillermo's, you know, employee ID number and things
22 like that.
23   Q   Okay.  All right.  When you received the -- or
24 after you received the phone call from Mr. Diaz that he
25 was taking Mr. Herrera to the hospital, what did you

Page 16

1  do?
2    A   I directly called my -- my superior to let
3  him know.
4    Q   And who is that?
5    A   Luis Martinez.
6    Q   And you, basically, relayed the information
7  that Mr. Diaz had given to you?
8    A   Correct.
9    Q   What happened next?
10   A   I -- I waited for, you know, any additional
11 information that had come from Mr. Diaz.
12   Q   Okay.  And when did -- when did you receive
13 that and what did you receive?
14   A   You know, the only -- he sent me a couple
15 text messages on, you know, if -- that -- that he --
16 Mr. Guillermo was resting and he got an IV and
17 basically that was about -- about it.
18   Q   Okay.  Anything else that you can recall?
19 Let's look at that first day.  I know the second day
20 you did something different, but that first day, that
21 Sunday, July 26, anything else you can think of that
22 you did or that you were told or that you told anyone?
23   A   Not that I can recollect at this time.
24   Q   Okay.  What happens the next day, Monday?
25   A   The 27th?

Page 17

1    Q   Six -- no, I'm sorry, correct.  27.  Sorry.
2    A   So on -- on the next day, the 27th, I -- I --
3  took a flight out to -- to Kansas City, I believe,
4  that was the day I took a -- I mean, I was flying on
5  the 27th, I believe.
6    Q   Okay.  You were present at
7  Mr. Guillermo Herrera's deposition in Omaha?
8    A   Correct.
9    Q   And there was some confusion initially about
10 what day was what.
11   A   There was.
12   Q   What is your memory -- what was the -- if
13 you -- the -- the heat injury occurs on Sunday, the
14 26th, you travel on the 27th, you think you fly from
15 probably Salt Lake to Kansas City?
16   A   Yeah.  That flight had already been scheduled
17 to head that way for many prior days prior to the 26th.
18   Q   Okay.  And why had it been scheduled?
19   A   That was -- that was just on my schedule to
20 go see that group that week.
21   Q   I see.
22   A   So it was going to be from the 27th till
23 the -- the 31st.
24   Q   Okay.  What else did you do Monday, the 27th,
25 about Mr. Herrera's case?  Any -- anything that you can

IMHOF AND ASSOCIATES COURT REPORTERS AND VIDEOGRAPHERS
(800) 939-DEPO (3376)  (714) 693-1213

Page 18

1  recall?
2      A   I'd have to -- I mean, I can't remember, you
3  know, verbatim anything that I had done.  Like I said,
4  I was flying.  I know I was flying that morning, so
5  there wasn't -- there was very limited things I could
6  do when I'm flying.
7      Q   Right.
8      A   Other than that, I --I can't remember
9  anything.
10     Q   Okay.  You arrive in Kansas City.  Do you rent
11 a car or does somebody pick you up?
12     A   Rent a car.
13     Q   You drive to Onaga?
14     A   Correct.
15     Q   And you arrived in Onaga, Kansas about what
16 time?
17     A   I -- I can't remember exactly what time I --
18 it had to have been right around 3:00 o'clock, if I
19 remember correctly.
20     Q   All right.
21     A   Roughly.
22     Q   And with whom do you meet when you arrive in
23 Onaga?
24     A   I can't -- I can't really remember.  I mean,
25 I know I -- I go right to the trailer, which is the

Page 19

1  timekeeper's trailer.
2      Q   There in Onaga?
3      A   Correct.
4      Q   What -- did -- was your -- was your focus
5  Mr. Herrera's injury or the general business of the
6  gang or both?
7      A   It's always about how -- how Guillermo's
8  doing, so I made sure and -- and that's the first
9  questions I asked is how is he doing.
10     Q   And who did you ask?
11     A   Mr. Diaz.
12     Q   All right.  And what did -- this is on Monday,
13 what did he tell you?
14     A   He said he -- he was resting.
15     Q   Did you conduct any investigation, talk to any
16 witnesses, do anything like that on Monday?
17     A   I talked to Mr. Diaz, and that was about the
18 extent of it.  Because the guys were just about getting
19 off, so I wanted to get, you know, some story from --
20 from Mr. Diaz on -- on how Guillermo was doing.
21     Q   Okay.
22     A   And any other information that he had.
23     Q   All right.  What did you do Monday night or
24 Monday afternoon --
25     A   Went to the hotel.

Page 20

1      Q   Did you talk at all with any of the members of
2  the gang, the people that had been working with
3  Guillermo?
4      A   Not -- not at that time, no.
5      Q   Did you any time later?
6      A   I mean, I talked to a lot of guys on the
7  gang.  I -- I don't know if I talked to any of those
8  specific ones.  I know I've reached out to many guys
9  that were, you know, like his roommate to ask how --
10 how -- how he was doing.
11     Q   Okay.
12     A   Those are the types of -- you know, how I
13 reached out to him.
14     Q   All right.  I understand your concern about
15 his health.
16     A   Yeah.
17     Q   I'm more interested in did you conduct any
18 investigation in -- into the circumstances of his
19 injury, what had happened, why it had happened, those
20 kind of things?
21     A   Not that -- not the why's or -- or -- the
22 questions I would ask would be, you know, general
23 questions of -- of, you know, you know, where was it
24 at, you know, milepost-wise, was there any specific
25 conditions or things like that.

Page 21

1      Q   Good.
2          What -- did you learn anything of
3  significance to you about what had happened or why it
4  had happened?
5      A   The only thing that -- that -- that I was
6  told about why it might have happened was that -- that
7  he, you know, Mr. Diaz had told me that Guillermo had
8  told him that he was -- that he had taken medication
9  prior that -- that evening of Tylenol and -- and, you
10 know, that could have, you know, been the cause of --
11 of, you know, heat, you know, medication's supposed to
12 be -- you know, let us know that you're on medication
13 is -- is the general consensus to -- that way, you
14 know, we know what -- what guys are on out there.
15     Q   If this were a Tylenol with codeine that had
16 been given to him by his dentist for tooth pain, do you
17 know if Tylenol with codeine is one of the medications
18 that can affect or contribute to heat stroke or heat
19 exhaustion?
20     A   I -- I would have to look it up.  You know,
21 I've heard it could be, but I'm not a -- I'm not a
22 doctor.  So -- I mean, I really don't know.  I know
23 that Tylenol with codeine is supposed to be disclosed
24 that you're -- that you're taking that type of
25 medication.

Page 22

1     Q   Okay.
2     A   Because you do have to have a prescription
3  for that type of medication.
4     Q   All right.  Just give me one minute.  Let's go
5  off the record here one second.
6     THE VIDEOGRAPHER:  We are going off the record.
7        (A break was taken.)
8     THE VIDEOGRAPHER:  We are back on the record.
9  BY MR. COX:
10    Q   Talking about this Tylenol with codeine and
11 your knowledge as to whether or not it can affect or
12 cause or contribute in any way to heat stroke or heat
13 exhaustion, I understand you're not a doctor.  Have you
14 ever been taught anything by the U.P. about the effect
15 of Tylenol with codeine?
16    A   Not specifically of Tylenol with codeine.  I
17 mean, they have a list of -- of medications that --
18 that are -- that need to be disclosed if you -- if you
19 are going to take them.
20    MR. COX:  Let me hand you what I've marked as
21 Exhibit 23.  This is a form that the U.P. has provided
22 me, restricted prescription drugs.
23       (Plaintiff's Exhibit 23 was marked by the
24       Certified Shorthand Reporter and attached
25       hereto.)

Page 23

1  BY MR. COX:
2     Q   You see that?
3     A   Yes.  That's what that says.
4     Q   And if you look down here, it says -- on the
5  top, it says, "This applies to employees in
6  safety-related positions, including operating field
7  employees, supply field, telecom train dispatchers,"
8  and then it -- see in that bottom left-hand corner, it
9  says, "Exceptions, short-acting opioids"?
10    A   That's what -- that's what it says right
11 here, yes.
12    Q   And, then, it says, "Cannot work until 12
13 hours after last dose."  And it lists Tylenol with
14 codeine number 3.
15       So the Union Pacific Railroad's instructions
16 are you cannot work until 12 hours after your last dose
17 of Tylenol with codeine number 3, correct?
18    A   That's what it says, correct.
19    Q   And were you told at all when -- and without
20 conceding that this occurred, but were you told when
21 Mr. Herrera had taken the codeine, if he had?  And I
22 understand this came from Mr. Diaz.
23    A   What -- what I was told was he took it at --
24 at 7:00 p.m. the night before.  That's -- that's
25 what -- that's what Mr. Diaz had told me.

Page 24

1     Q   So at 7:00 p.m. -- and I know you don't
2  understand the pharmaceuticals of this, and I'm not
3  sure I do, either -- but at 7:00 a.m. the next morning,
4  he would have been able to work after having taken a
5  Tylenol with codeine at 7:00 o'clock the night before,
6  according to that diagram -- that document?
7     A   That would be 12 hours after, correct.
8     Q   Okay.  Do you know -- has the U.P. conducted
9  any investigation, to your knowledge, to educate you
10 further about this event about the effect of
11 medications on workers on your gang?
12    A   The only document that I've ever seen was --
13 was this one in front of me about the medication.
14    Q   All right.  What else did you learn on that
15 Monday about what had occurred?
16    A   For the most part, that's -- that -- that
17 sums up the Monday.
18    Q   Okay.  How about Tuesday, what did you do?
19    A   Tuesday, I attended the job briefing first
20 thing in the morning, which I believe was -- was 5:00
21 a.m. or 6:00 a.m.  Right after job briefing, contacted
22 Mr. Herrera to see if I could come see him at his hotel
23 room.
24    Q   All right.  And did you go to his hotel room?
25    A   Yes.

Page 25

1     Q   Who went with you?
2     A   Myself, Mr. Diaz, and William Herring.
3     Q   And who is William Herring?
4     A   He is a risk management employee.
5     Q   Okay.  And what does a risk management office
6  do on the U.P.?
7     A   The risk management?  I'm not 100 percent
8  sure.  I couldn't give you their -- their -- their
9  exact job title.  I just know that that's his -- his
10 job title is risk management.
11    Q   Why was he there?  What's your understanding
12 of why he was there?
13    A   To investigate the -- the -- the injury or
14 the incident, the alleged incident.
15    Q   Okay.  Is this an alleged incident?  Why do
16 you use the word, "alleged"?
17    A   Right now, that's what -- I mean, it's an
18 incident, so --
19    Q   Okay.  Is there a debate, in your mind, as to
20 whether Guillermo Herrera suffered heat exhaustion on
21 July 26?
22    MR. SCHMITT:  Object to the form, foundation.
23    THE WITNESS:  In my -- in my mind, I mean, I --
24       (Mr. Pritchett enters the deposition.)
25    THE WITNESS:  -- it's not up to me to -- to decide

Page 26

1  whether he's -- he has it or not.  I mean, I don't know
2  whether he does or not.
3  BY MR. COX:
4      Q   I'm just interested in why you would use the
5  word, "alleged."
6      A   Because the -- the only report that I had was
7  that he -- he suffered from dehydration.
8      Q   And --
9      A   That was the only report that I ever got.
10      Q   All right.  Were you ever provided any
11  information from the diagnosis of the doctor at the
12  hospital?
13      A   Not until I talked to -- to -- when I was
14  there in Omaha with -- with yourself.
15      Q   And Mr. Lamson?
16      A   Correct.
17      Q   A couple weeks ago?
18      A   Yeah.
19      Q   Okay.  Explain to me why if heat prevention --
20  if a -- if a heat prevention program on the U.P. exists
21  and you have a man go down with heat exhaustion, why
22  would the U.P. not want you to know that he was
23  diagnosed with heat exhaustion rather than simply
24  dehydration?
25      MR. SCHMITT:  Object.

Page 27

1      MR. COX:  If you know.
2      MR. SCHMITT:  Form.  Argumentative.  Foundation.
3      THE WITNESS:  I -- I can't answer that.  I -- I
4  don't know.
5      Q   BY MR. COX:
6      Okay.  Do you know Mr. Herrera -- has the
7  U.P. filled you in on Mr. Herrera's current condition
8  before Mr. Lamson may have a couple weeks ago?
9      A   That was -- that was the only of his
10  condition.  I knew he was still off work, and that's as
11  far as I knew.
12      Q   Okay.
13      A   I had reached out to him to see how he was
14  doing with -- with no -- no luck.  He -- he didn't
15  answer my phone call.  He didn't return it, either.
16      Q   Okay.  You made one phone call to him, I
17  forget when, and left him a voice message, basically,
18  "How you doing?"  Something like that?
19      A   Yeah.  Curious to how he was doing.
20      Q   Okay.  All right.  You, Mr. Herring, and
21  Mr. Diaz go to his motel room Tuesday morning.
22      A   Correct.
23      Q   About what time?
24      A   I would say right around -- right after job
25  briefing, it probably would have been about 7:00, 7:30,

Page 28

1  right around there, if I can remember right.
2      Q   All right.  And had you called ahead of time?
3      A   Yes.  I wanted to make sure he was awake.
4      Q   Okay.  Tell me about that meeting, that
5  conversation.
6      A   The phone conversation?
7      Q   No.  No.  I'm sorry, when you go to the hotel
8  or the motel.
9      A   The first -- first question I had is, "How
10  are you doing?"  That, you know, Mr. Guillermo --
11  Mr. Herrera says, you know, that he was -- he was
12  dizzy, you know, he -- he had been resting all -- all
13  day.  He's still, you know, a little lightheaded,
14  but --
15      Q   Did he -- did -- did he tell you about having
16  diarrhea?
17      A   I can't remember if he did or not.
18      Q   Did he tell you about vomiting?
19      A   I -- I can't remember.  He -- he might have,
20  I don't recollect either of one of those words, but he --
21  he could have.
22      Q   Did he tell you about his inability to hold
23  food down or eat?
24      A   No, he did not.
25      Q   What else?  What was -- what other -- what

Page 29

1  else do you recall of the conversation?
2      A   I asked him if he would like to go back to
3  the doctor.  He told me no, that he -- he just
4  liked to rest.  I asked him if he was okay to -- to
5  fill out a statement and a -- and a 52032, which was
6  our form, he said, you know, yes.
7      Q   Okay.
8      A   So --
9      Q   Why the -- why -- characterize for me why a
10  P.I. report, a Report of Personal Injury, has to be
11  filled out.
12      A   It's the U.P. protocol for any incident is
13  a -- is a 52032.
14      Q   And is there some urgency in getting that
15  filled out?
16      A   You want to do it as -- as soon as possible.
17  I mean, it obviously -- that's why you ask him if -- if
18  he wants to fill it out and if he will fill it out.
19      Q   Okay.  Do -- do you have any concerns about
20  the accuracy or validity of a report of a guy that's
21  been diagnosed with heat exhaustion filling one out a
22  day or two later, still dizzy, still having diarrhea,
23  still having problems, do you have any concerns about
24  that?
25      A   I -- I asked him if he was okay to fill it

Page 30

1  out, and he -- he -- he stated to me yes, he was.
2  He -- he would do it.  If -- if I had noticed anything,
3  you know, other than that, I wouldn't have -- I
4  wouldn't have asked him.  That's why I asked him.  I
5  didn't tell him.
6      Q    Okay.  How long was Mr. Diaz in his motel
7  room?
8      A    Maybe a minute or two, at -- at the most.
9      Q    And Mr. Herring?
10     A    Same, minute or two.
11     Q    So you remained with Mr. Herrera in his motel
12 room?
13     A    Correct.
14     Q    And you were present when he filled out the
15 injury report?
16     A    Correct.
17     Q    All right.  Now, we have previously marked a
18 copy of this as 4, Exhibit 4.  This one is a little
19 better detail.  Let me hand you what we've marked as
20 Exhibit 4.  Wait a minute.  Sorry.  Let's see.  That is
21 not Exhibit 4.  Just give me one minute.
22          What -- what did we mark this as at his
23 deposition?
24     MR. SCHMITT:  Let me look.  2.
25     MR. COX:  Forgive me.

Page 31

1          I'm handing you what we -- what was marked at
2  Mr. Herrera's deposition back in Omaha a couple weeks
3  ago as Exhibit 2.
4      (Plaintiff's Exhibit 2 was previously marked
5       and is attached hereto.)
6      THE WITNESS:  Okay.
7  BY MR. COX:
8      Q    Sorry.  I misnumbered it.  So it's Exhibit 2,
9  and can you just identify it for us, what this is?
10     A    It looks to be Mr. Herrera's 52032.
11     Q    Go ahead and look at both pages so we're sure.
12 That's his signature on the bottom of the second page?
13     A    I believe so.
14     Q    And is that yours on the right-hand corner?
15     A    Yes, it is.
16     Q    And you were present when this was filled out?
17     A    Correct.
18     Q    And do you know if Mr. Herrera had ever filled
19 out one of these before?
20     A    I'm not aware if he did or -- or hasn't, no.
21     Q    Did you provide him any guidance -- I'm not
22 suggesting that you put words in his mouth, but did you
23 provide him any guidance in how to fill this form out?
24     A    No, sir.
25     Q    On the report, it indicates that it occurred

Page 32

1  at Cook siding.  Is it Cook siding or Clark siding?
2  I've heard it referred a couple of ways.
3      A    This one says Cook, and -- and it is Cook
4  siding, yes.
5      Q    All right.  And it's -- the "weather" is
6  marked as "clear"?
7      A    Yes.
8      Q    "Daylight," "on duty," "on company property."
9  And he -- then he described, "helping in the back of
10 the gang with cleanup," and we've had a couple of
11 lengthy discussions about what cleanup consists of.
12 Then "Describe fully how the accident/injury occurred."
13 Can you read that for me?
14     A    From this document?
15     Q    Yes, sir.
16     A    Number 1, "Describe fully how the
17 accident/injury occurred."  "Working in the back of the
18 gang with cleanup, we were having to clip and de-clip
19 and dig and move ties by hand and using jacks to move
20 ties."
21     Q    Then there's a period?
22     A    Period.
23     Q    Then it's written in blue ink, "But the work
24 did not cause me to overheat.  The humidity did."
25     A    Yes.  That's what it says.

Page 33

1      Q    Why was -- obviously that was added at some
2  point in time; is that right?  Is that your memory of
3  what occurred?
4      A    Yes.
5      Q    Why was that added?
6      A    You would have to ask Mr. Guillermo.  This is
7  his document.
8      Q    Okay.  In 2, it says, "What specifically
9  caused the accident/injury?"  And what did he write in
10 there?
11     A    It says, number 2, "What specifically caused
12 the accident/injury?"  "Not using the machines to their
13 fullest all the time with the weather being so humid."
14     Q    Did you talk with him about what he meant by
15 that in 1 or 2?
16     A    I'd have to -- I mean, that's -- I can't
17 remember if I did or not.
18     Q    Okay.
19     A    I mean, when this is filled out, it's filled
20 out.  I have no judgment or protocol of -- of how or
21 what's put on here.  It's his document.
22     Q    Okay.  So you just hand him the document and
23 say, "Guillermo, fill this out."  And you don't discuss
24 with him what do you mean by that or what occurred or
25 how to narrow the language in the release or anything

IMHOF AND ASSOCIATES COURT REPORTERS AND VIDEOGRAPHERS
(800) 939-DEPO (3376)  (714) 693-1213

Page 34

1  like that?
2      A   I -- I tell him if he has any questions, to
3  please ask.
4      Q   Did he have any questions, that you can
5  recall?
6      A   Not that I can recall.
7      Q   Okay.  Number 3, "Did equipment or tools cause
8  or contribute to the cause of the accident or injury?"
9  He checked, "yes."  What did he write in there?
10     A   Number 3 says, "Did equipment or tools cause
11 to -- contribute to the cause of the accident/injury?"
12 "Yes, could be used more and have proper --" I believe
13 that says "-- machine helping or a couple more people
14 when possible."
15     Q   Number 4, "Did working conditions cause or
16 contribute to the cause of the accident or injury," he
17 checked "yes?"
18     A   He wrote on number 4, "Did working conditions
19 cause or contribute," "weather was very humid."
20     Q   Okay.  Now -- okay.
21         What did you do next after obtaining this
22 personal injury report from Mr. Herrera?
23     A   What did I do?  What did I do next?
24     Q   Yes, sir.
25     A   I believe I asked him to -- just to -- just

Page 35

1  to write a statement of -- of what had happened, you
2  know, the -- the day of, from what he could remember.
3      MR. COX:  David, did we mark that?  Do you
4  remember?
5      MR. SCHMITT:  Number 3.
6      MR. COX:  Mr. Rolow, I'm going to hand you what
7  was previously marked as Exhibit 3.
8         (Plaintiff's Exhibit 3 was previously marked
9          and attached hereto.)
10 BY MR. COX:
11     Q   Is that the statement that Mr. Herrera wrote
12 out?
13     A   It looks to be, yes.
14     Q   Have you had a chance to review that or the
15 P.I. before today, the Personal Injury Report,
16 Exhibit 2, before today?
17     A   Well, I -- I read both of these, you know,
18 after he had wrote them, yes.
19     Q   I mean, since July 27th of 2015 up to today,
20 had you been given an opportunity to review either of
21 these?
22     A   I -- no, I have not.  I have both of them,
23 but I just have -- I have not read them lately.
24     Q   Okay.  All right.  After obtaining that
25 written statement from Mr. Herrera, Exhibit 3, what did

Page 36

1  you do?
2      A   From -- from my memory, you know, I asked
3  him, you know, again, if he -- if would like to go back
4  to the doctor, and again, he told me no.
5      Q   He had just seen a doctor for four or five
6  hours on Sunday, correct?
7      A   As far as I know, yes.
8      Q   Okay.  All right.  Anything -- anything else
9  you discussed with him?
10     A   Shortly after that, I -- I -- I told him to
11 call me if he -- if he needed anything or if anything
12 changed, he had my number.  I made sure he had my
13 number.  And then I left.
14     Q   Okay.  What did you do next as it relates to
15 Guillermo Herrera's injury?
16     A   To that injury, I would -- I mean, I would
17 have called my boss to, you know, to let him know how
18 he was doing.
19     Q   Okay.  How long were you with Mr. Herrera in
20 the motel room that morning?
21     A   I would say maybe an hour, give -- give or
22 take.  I -- I can't remember the exact time frame.
23     Q   And that time was spent predominantly with him
24 filling out the Personal Injury Report and the written
25 statement?

Page 37

1      A   Yes.
2      Q   Okay.  How did he appear to you that morning?
3      A   Tired.  I mean, he had just woken up, he told
4  me.
5      Q   Anything else he talked you about, being
6  dizzy, did he describe any other symptoms to you?  I
7  know we went through them a little bit earlier, but can
8  you recall anything else now?
9      A   Just -- just the ones that you had stated.  I
10 mean, I -- I don't -- I mean, he hadn't really said
11 anything else to me.
12     Q   Okay.
13     A   He -- he told me he was going to get some
14 more sleep.
15     Q   Okay.  After that's concluded, you call
16 Mr. Martinez and kind of update him or --
17     A   Yeah, fill him in on the exact, you know --
18 you know, what was -- what was told to me.
19     Q   What happens next on that Tuesday about
20 Guillermo Herrera's injury, if anything?
21     A   I can't remember the exact, you know, step by
22 step.  I --
23     Q   What investigation, to your knowledge, was
24 conducted by the U.P. -- the gang members, the
25 supervisors on the gang -- to determine what had

10 (Pages 34 to 37)

Page 38

1   happened and why it had happened?
2       A   Can -- can you be more specific --
3       Q   Sure.
4       A   -- with that?  I mean --
5       Q   Well, for example, did you talk to Mr. Linford
6   or Mr. Bobby Steely or Scott Nicholson or any of the
7   men that were working back on the cleanup crew with
8   Mr. Herrera about what had happened or why it had
9   happened or anything like that?
10      A   I'm sure I talked to, you know, almost
11  everybody with the -- on the -- on the work team.
12      Q   Did any of them express to you or did you --
13  in the question of why did this occur, did any of them
14  express to you that the men -- that being the men that
15  were working back with him on the cleanup crew about
16  whether or not Scott Nicholson was letting them use
17  the P-car to de-clip the rail or whether they were
18  having to do it by hand?  Does that ring a bell --
19      A   Nobody had ever complained or told me that,
20  you know, any equipment was not, you know, functioning
21  or they weren't utilizing it to its fullest ability,
22  no.
23      Q   My question was:  Were they asked?
24      A   Were they asked about it?
25      Q   Yeah.

Page 39

1       A   Yes, they were.
2       Q   By you?
3       A   Yes.
4       Q   And what did they tell you?
5       A   That -- that it was utilized as much as -- as
6   they could utilize it.
7       Q   And who told you that?
8       A   The -- the gentleman back there on the -- on
9   the Q.C., the quality control team, and Mr. Nichols,
10  the assistant foreman that was back there.
11      Q   Do you remember any of their names?
12      A   I'd have to -- I'd have to read back into --
13  you know, I know Dennis was one of them -- was back
14  there.  He was running the cab car.
15      Q   And Mr. Dickison, Dennis Dickison, did you
16  know that he was on light duty?
17      A   I wasn't aware of that, no.
18      Q   Did you ever talk to a man named Mr. Marsing?
19      A   Mr. Jeremy Marsing?
20      Q   Yeah.
21      A   I don't remember talking to Mr. Jeremy.
22      Q   All right.  How about Logan Newman?
23      A   Right.  I talked to Logan.
24      Q   Okay.  And what did Mr. Newman tell you, if
25  you recall?

Page 40

1       A   I couldn't tell you verbatim, word for word
2   what he told me.
3       Q   Okay.  Did anybody else back on that cleanup
4   crew?
5       A   Tell me --
6       Q   That you -- that you talked to about what had
7   happened or why.
8       A   That was about, I mean, the gist of -- of --
9   of who I talked to back there.
10      Q   Okay.  Do you know whether or not
11  Scott Nicholson, the assistant foreman in charge of the
12  cleanup crew, was removed from that position or not?
13      A   No.  Not that I'm aware of, he was not
14  removed from the quality control as an assistant
15  foreman.
16      Q   Is that something you would learn of if it had
17  occurred?
18      A   In -- in some cases, yes, or most cases.  For
19  the most part, I mean, those -- those guys move around
20  throughout that group quite often.  They learn one --
21  one task and move on to the next.
22      Q   All right.  If the P-car is operating
23  properly, should it be used to de-clip the rail on the
24  clean-up crew?
25      A   Generally, those P-cars, if they're fully

Page 41

1   operational, they should -- they should be utilized to
2   the fullest extent that they can be, yes.
3       Q   All right.  Now, what else did you do in terms
4   of investigating or reporting to your supervisor what
5   had occurred?  Anything else you can think of?
6       A   You know, in my -- you know, I just -- I fill
7   out an incident, you know, report.  That's a -- that's
8   a Power Point that sends out to my boss, and then he
9   reviews it and sends it out to the -- to the group so
10  they can, you know, review it.
11      Q   Okay.  Let's look at Exhibit 12.
12          Dave, can you share his with -- yours --
13  MR. SCHMITT:  Sure.
14          (Plaintiff's Exhibit 12 was previously marked
15           and attached hereto.)
16  BY MR. COX:
17      Q   Exhibit 12 is something that I was furnished
18  by the Union Pacific Railroad, and it's marked as
19  Exhibit 12, and it's got U.P. e-mail number 1, and then
20  all of these documents are U.P. e-mail numbered.  And
21  it's -- it looks like it goes from Matt Hughes, the
22  first page anyway, to Carlos Diaz, "subject,"
23  "Guillermo Herrera."  It's got his employee ID, his
24  address, et cetera.  The next page, e-mail 02, is an
25  e-mail from you to Luis Martinez.

Page 42

1    A    That's what it says, yes.
2    Q    And the date is July 26 at 9:00 p.m.
3         Number 1, have you ever reviewed this
4    document?
5    A    I -- I made a document.
6    Q    Okay.  What did you send Mr. Martinez on
7    July 26, 2015?
8    A    A Power Point.
9    Q    And is the next page the Power Point you sent?
10   A    It looks to be, yes.
11   Q    Now, there's -- flip through there.  There's
12   several Power Points.  Several --
13   A    Should be four pages.
14   Q    Yeah, I see the four pages on this one, but if
15   you go through it again, there's other iterations or
16   variations or -- of this e-mail, and what I'm
17   interested in is which was the first that was sent and
18   which was the last that was sent?
19   A    They -- they look to be the exact same.  I
20   couldn't -- I couldn't tell you.
21   Q    Okay.  We'll go through them.  So it appears
22   to you, and you're the one that prepared it, that the
23   first one you sent was July 26, 2015 at 9:00 p.m.?
24   A    That's what this document says, yes.
25   Q    And you were still in Utah at that time?

Page 43

1    A    Yes.
2    Q    In fact, that was Sunday night, correct?
3    A    Yes, Sunday, 9:00 o'clock.
4    Q    And, then, here's the incident July 26, what
5    I'm looking at, and I gather you go to his personal
6    record file on-line to gain the information under
7    employee information or how -- let me -- I don't mean
8    to guess.
9         How did you gather the information that's on
10   page 2 of that incident report?
11   A    On page 2, the information that's on page 2
12   is gathered from the Human Resources on-line about
13   Mr. Guillermo.
14   Q    Okay.  And it's got his job as operator?
15   A    Yes.
16   Q    His employee ID number, his hire date.  What
17   is training compliance?
18   A    The training compliance/100 percent is that
19   he has taken all his mandatory training.
20   Q    What is his E.R.A. score?
21   A    It's -- his E.R.A. score is the -- the
22   Employee Risk Assessment.  That's what it stands for.
23   Q    Okay.  And how is it gauged?  It starts at
24   1,000, doesn't it?
25   A    It is.  Yes.  It goes by years of service.

Page 44

1    If you have under one year, it gives you such a score
2    and it goes by time at the job, training compliance is
3    in there, your injury history, your discipline history,
4    how many overall audits have been put in on you, and
5    it -- and it calculates a score.
6    Q    Okay.  So 925.  1,000 is a perfect?
7    A    Yeah.  Nobody has 1,000.
8    Q    Okay.  For a person with a hire date of
9    3-11-13, two years' service, how many points are
10   knocked off the 1,000 for two years, only having two
11   years of service?
12   A    I would have to -- it would have to -- I
13   would have to look.  I don't know exactly.
14   Q    Okay.  Would you agree with me that an E.R.A.
15   score of 925 is pretty darn good for a man with two
16   years of service?
17   A    It -- 925 is just the numbers that it gives
18   you for the -- you know, the information that it
19   calculates in there, because then I would have to look
20   at -- at, you know, two years was the cutoff of
21   where -- you know, because I know that if you have over
22   30, you know, whether some -- it docks you, but I don't
23   know exactly how many.
24   Q    Wow.  This is interesting.  How would I get to
25   that?  Who would I send a subpoena to, to get how the

Page 45

1    E.R.A. is interpreted?
2    A    That, I do not know.
3    Q    Okay.  So a man with one year service is -- or
4    less is docked some points, and a guy with 30 years
5    service is docked some points on his risk assessment?
6    A    As far as I know, when you read it, that's
7    how it reads.
8    Q    Okay.  All right.  So his last -- back to the
9    document, his last one-on-one was July 25, '15.  Do you
10   know the nature of that one-on-one?
11   A    You would have to ask the track supervisor
12   that -- that did the one-on-one.
13   Q    When a one-on-one is done, is a one-on-one
14   form supposed to be completed?
15   A    Yes.
16   Q    So somewhere on the U.P., if a one-on-one
17   meeting with Mr. Herrera occurred, there would be a
18   report of that one-on-one meeting?
19   A    Generally, there would be forms.  I mean, in
20   some cases, a one-on-one can be informal, which would
21   be no documentation, they just make -- you know, if
22   they have a talk with -- that they had a talk with them
23   on that day or a one-on-one that day.  It's a -- a
24   one-on-one means it's one-on-one.
25   Q    Did -- did the Human Resources database, to

IMHOF AND ASSOCIATES COURT REPORTERS AND VIDEOGRAPHERS
(800) 939-DEPO (3376)   (714) 693-1213

Page 46

1    which you went to get this information, document who
2    had the one-on-one with Mr. Herrera?
3        A   I don't -- I didn't dig into it that far.
4        Q   Okay.  What is an E-ramp?  E-ramp?
5        A   It's an audit.  It's a -- E-ramp is just -- I
6    don't know the exact acronym for it.  I can't remember,
7    off the top of my head.  It's just the observations
8    that we've taken on that employee.
9        Q   All right.  Now, there -- we heard yesterday
10   from Bobby Steely the T.S.C. or high team leader on the
11   gang -- that the Total Safety Culture Program is --
12   certain employees on the gang, including Mr. Herrera,
13   can come up to you, a fellow gang member, and say, "Do
14   you mind if I watch you, and critique how you're
15   working and make sure you're working safely."  Is that
16   a summary of what the T.S.C. culture is?
17       A   T.S.C. is everything.  I mean, total Safety
18   Culture is a -- it's a culture, it's everybody on the
19   group.
20       Q   But the I-team leaders, the T.S.C. I-team
21   leaders are the ones who conduct the audits?
22       A   Anybody can do it.  Don't confuse the T.S.C.
23   to the E-ramp.  Totally different -- two different
24   things.
25       Q   That's what I'm trying to clarify.

Page 47

1        A   Two different things.
2        Q   What is the E-ramp?
3        A   The E-ramp is -- is done by either myself as
4    a manager or the -- or the track supervisors of the
5    gang.  Those are the only ones that can put in E-ramp.
6    T.S.C., everybody does the Total Safety Culture.  It's
7    a culture.
8        Q   I got it.  So an E-ramp on July 8, 2015, would
9    there be a result of that audit?  We used to call them
10   field audits.  I don't know what --
11       A   You can call them the same.  That's fine.
12       Q   Okay.  Would there be documentation of that
13   field audit on July 2015 in his file somewhere?  I
14   mean, how is that recorded?
15       A   It's recorded on the -- in the E-ramp
16   database.
17       Q   Okay.  And he's had ten E-ramps in the last
18   six months and zero exceptions in the last six months.
19   What does that mean when they say "zero exceptions in
20   the last six months"?
21       A   Means every -- out of ten observations that
22   had been taken on him, they didn't find anything that
23   was done -- either he had every -- all his P.P.E. on.
24   I'd have to look to see what the E-ramps were, but
25   there was no exceptions of what he was being observed

Page 48

1    on.
2        Q   No -- no exceptions taken to any of his
3    performance?
4        A   Of -- of whatever the ten E-ramps were.
5        Q   Okay.  And is the E-ramp, is that the manager
6    of track supervisor watching him without his
7    knowledge --
8        A   No, sir.
9        Q   -- and observing him, or is -- does the -- did
10   Mr. Herrera know somebody was watching him while he was
11   doing it?
12       A   It would all -- it would all depend.  You
13   know, a track supervisor could be watching him.  He
14   could be out there observing him.  And -- and if he did
15   find an exception, a conversation would -- would be
16   had.  You know, he would coach him and talk to him and
17   let him know what he found.
18       Q   Okay.
19       A   So --
20       Q   And zero exceptions in the last six months?
21       A   That's what it says, yes.
22       Q   And "discipline history," "none"?
23       A   That's what it says, yes.
24       Q   Let's move to the next page.
25            At approximately 11:30 a.m. on July 26, 2015,

Page 49

1    milepost 92.80 on Kansas sub, "clear," that's the
2    weather?
3        A   Correct.
4        Q   And "113 degrees heat index"?
5        A   That's what it says, yes.
6        Q   Where did you learn that the heat index was
7    113?
8        A   That was what -- what was reported to me.
9        Q   By whom?
10       A   It would have to be Mr. Diaz, from my -- my
11   recollection.
12       Q   Okay.
13       A   Or it was an approximate of a heat index for
14   the day.
15       Q   Okay.  All right.  So let's go through this a
16   little bit.  And so I don't have to ask you every time,
17   is the information contained herein -- strike that.
18           Obviously, you were not present.  From whom
19   did you obtain the information that formed the basis of
20   your incident report?
21       A   The track supervisor, Mr. Charlie Diaz.
22       Q   All right.  So let's go through it.  "Employee
23   reported he felt dizzy and was immediately put in an
24   air-conditioned truck where he remained for
25   approximately two hours.  He was checked on

Page 50

1   periodically on his condition and how he was feeling.
2   After two hours, he said he was feeling much better and
3   wanted to return to work.  The assistant foreman
4   observed him and felt he was not ready to go back to
5   the track and contacted another vehicle to pick him up
6   and take him to the job briefing trailer to continue to
7   cool down.  After another hour in the 59-degree C.P.I.
8   trailer."  Is that what that means, 59 degrees?  I know
9   you don't have a little zero on your computer.  Is
10  that --
11      A   Yeah.  59 degrees, that's what the asterisk
12  stands for is the degrees.
13      Q   "After another -- another hour in the
14  59-degree C.P.I. trailer, supervisor asked him how he
15  was feeling, and employee was incoherent and not
16  finishing his sentences.  Supervisor took employee to
17  the hospital where he was given an I.V. for fluids for
18  dehydration.  Occupational nurse was called with no
19  answer due to weekend.  R.M.C.C. was notified.  No
20  medication was prescribed."
21      Since this is about 9:00 o'clock Sunday
22  night, I'm gathering that this -- like you say, this
23  information came from Mr. Diaz, who had been with
24  Mr. Herrera at the hospital --
25      A   Yes.

Page 51

1       Q   -- in terms of the I.V. fluids for
2   dehydration.  No medication was prescribed, that --
3   that may or may not be accurate.
4       Okay.  That -- did this notification that you
5   sent to Mr. Martinez or this incident report, did it
6   ever change to document the diagnosis of heat
7   exhaustion?
8       A   This document?
9       Q   Or any subsequent.  See, the reason I'm
10  asking, it looks like the first one on July 26, 9:00
11  p.m. and then here's another one, if you look on e-mail
12  007, here's another one from you to Martinez sent
13  July 26 at 9:27, seven minutes later -- no, 27 minutes
14  later.  And that's why I was asking you about whether
15  subsequent additions or anything like that --
16      A   Okay.
17      Q   The next one here on -- that goes at 9:27, if
18  we look at e-mail 0010, it's changed to say that a
19  prescription for potassium to take for 10 days.
20      A   I see that here.
21      Q   All right.  Now, what's the significance?  Why
22  would you mention the fact of the prescription, the
23  fact of the I.V. fluids being given for dehydration?
24      A   Can you --
25      Q   Sure.  Let me rephrase the question.

Page 52

1       Are you familiar with the FRA criteria on
2   what makes an incident reportable to the FRA?
3       A   Generally, yes.
4       Q   All right.  And is an I.V. for fluids, is that
5   a medical treatment that renders an injury reportable
6   to the FRA?  Do you know?
7       A   Not that I -- I'm not too sure if it does or
8   not.
9       Q   How about a prescription?
10      A   I know prescriptions are an FRA reportable,
11  yeah.
12      Q   They convert -- an FRA -- they report -- they
13  convert -- strike all that.
14      A prescription will convert an incident to a
15  reportable injury, according to the FRA guidelines?
16      A   Okay.
17      Q   Do you agree with that?
18      A   As far as I know, I believe that's the -- the
19  case.
20      Q   All right.  Now, let's go back to the next --
21  let's look at -- I think it's the remedial action is
22  the same.  Let's look at the U.P. e-mail 0011, remedial
23  action.
24      What is meant by "remedial action" in your
25  incident report to Mr. Martinez?

Page 53

1       A   Remedial action's, if -- you know, what needs
2   to either -- either happen or -- or change to -- to,
3   you know, not have an incident like that occur again.
4       Q   Okay.  And the -- what was the remedial action
5   that you stated in your incident report?
6       A   The document says supervisors will be -- will
7   have standdown and cover heat stress prevention again,
8   stressing how important it is to hydrate before you get
9   thirsty.
10      Q   Did you conduct an investigation to determine
11  what water, what squinchers, what Gatorade, what fruit,
12  what materials were available to that gang on July 25th
13  and July 26?
14      A   I -- I had asked on the -- on July 25th of --
15  of what -- what they were doing to mitigate the heat.
16      Q   Okay.
17      A   And --
18      Q   Did it sound to you like there was plenty of
19  water and plenty of Gatorade and plenty of that on the
20  gang?
21      A   It did, yes.
22      Q   And does anyone have any -- to your knowledge,
23  does anyone have any information that Guillermo Herrera
24  had not tried to adequately hydrate himself that -- the
25  morning of the 26th?

14 (Pages 50 to 53)

Page 54

1    MR. SCHMITT: Foundation.
2    THE WITNESS: I don't -- I couldn't answer that.
3  I don't know what he -- what he did or what he didn't
4  do for himself.
5    Q  BY MR. COX:
6    All right.  Now, let's move to 0012.  This is
7  an e-mail from Mr. Martinez who you've told is the
8  director, your boss; is that right?
9    A  Correct, he is my boss.
10    Q  And it's to -- who -- who are all these
11  people?  I mean, where are they -- like, on a chain of
12  command?  Or who -- who -- there's 15 or 20 people
13  there.  You're the second one, Arthur Williams and then
14  Michael Rolow, and then if we go down the list, we see
15  that it goes to Joe Linford, and it goes to -- I
16  thought I saw Carlos Diaz.
17    Who -- who are all these people to whom
18  Mr. Martinez has sent this e-mail?
19    A  The rail northwest team, which -- which would
20  be the track supervisors and the managers.
21    Q  Okay.  Of -- of what gangs?
22    A  The -- the rail northwest team, the entire
23  rail northwest group.
24    Q  Okay.  I see.  Okay.  You've got a curve gang
25  and steel gang.  There's other managers out there with

Page 55

1  other gangs?
2    A  Correct.
3    Q  I got it.
4    And this -- is there -- I've -- I've heard
5  reference to a conference call after an injury, after
6  an injury occurs to an employee, there's a conference
7  call among the managers and directors to find out what
8  happened and why.  Was there a conference call about
9  Mr. Guillermo's injury?
10    A  No, sir.
11    Q  Mr. Guillermo Herrera.  Okay.
12    A  Okay.  There's conference calls every Friday.
13    Q  Okay.  Has Mr. Herrera's injury, the reasons
14  for it or what can be done to prevent it from occurring
15  again been a subject of a conference call, to your
16  knowledge?
17    A  Heat mitigation process is a subject the
18  entire summer spike month.
19    Q  Okay.  And what is a summer spike month?
20    A  It's -- summer spike is the summer spike
21  months, you know, where -- where, you know, the hottest
22  part of the year.
23    Q  Okay.  Where there's a spike in heat?
24    A  Correct.
25    Q  I mean, what does spike refer to?

Page 56

1    A  Yeah, there's a spike in heat.
2    Q  Got it.  Okay.
3    Let's go through some of Mr. --
4  Mr. Martinez's e-mail.  Attached is an incident
5  write-up on team 8501 working on the Kansas sub.  That
6  would be the incident write-up that you prepared and
7  that we just talked about?
8    A  I believe that's what he's referring to.
9    Q  Today -- that's on Sunday because this e-mail
10  goes out July 26 at 10:25 p.m.  So today, the team --
11  and he's talking about team rail northwest, correct?
12    A  I can't tell you what he was referring to.
13    Q  Okay.  "Had an employee who experienced heat
14  stress symptoms and was taken to the hospital, given an
15  I.V. with fluids, and prescribed potassium.  Team got
16  track time at 7:00, incident occurred approximately
17  11:00.  Employee was a P-car operator working behind
18  the team doing cleanup."  He makes a statement,
19  "Therefore, over-exertion is not the cause of this
20  incident."
21    Do you have any information, from your
22  experience on the railroad or your relationship with
23  Mr. Martinez, as to why he would mention that
24  over-exertion is not the cause of this incident?
25    MR. SCHMITT:  Foundation.

Page 57

1    Go ahead.
2    Q  BY MR. COX:
3    If you know.  That's what I'm asking.
4    A  I can't -- I can't put words in -- I don't
5  know what he would mean by -- what he meant by that,
6  putting that in there.  I mean that --
7    Q  He does go on to say that, "The cause was
8  employee was not acclimated to the humidity and
9  possibly not fit for the conditions."
10    Do you have any -- any idea where
11  Mr. Martinez formed the opinion that the employee was
12  not acclimated to the humidity and possibly not fit for
13  the conditions?
14    A  Again, it's -- it's -- it's his words.  I
15  don't know what he meant by his words.
16    Q  Did you know Guillermo Herrera before this
17  incident?
18    A  Not personally, no.
19    Q  Okay.  Then Mr. Martinez says, "This is not
20  the way we wanted to start our work half," with an
21  exclamation point.  "This is the third heat incident we
22  have had in the last four weeks, which indicates we are
23  doing a poor job with our heat prevention plans and
24  just going through the motions."
25    Do you have any knowledge of any other heat

IMHOF AND ASSOCIATES COURT REPORTERS AND VIDEOGRAPHERS
(800) 939-DEPO (3376)  (714) 693-1213

Page 58

1  incident occurring on rail north in the last four
2  weeks?  That would have been from June 26 to July 26.
3      A   Not -- not specific.  Nothing in -- in my
4  work group but nothing specific that I could, you know,
5  relay verbatim on who it was or the exact time or -- I
6  mean, there -- there was nothing reported.
7      Q   Okay.
8      A   So I -- I mean, you know --
9      Q   Was there anything discussed in the conference
10 calls, the Friday conference calls about the three
11 previous incidents?  I'm sorry, two previous incidents.
12     A   Not that I can remember.  I know, you know,
13 if somebody -- somebody gets hot, I mean, they -- they
14 get -- they take breaks in an air-conditioned vehicle.
15 But other than that, I mean, I don't -- I can't
16 remember or recollect anything from -- that was
17 specifically said on the conference call about any
18 previous.
19     Q   Well, an employee getting hot and sitting in a
20 vehicle to cool off, that wouldn't rise to the level of
21 the heat incident that would be reported to
22 Mr. Martinez, would it?
23     A   I couldn't tell you who reports what to him.
24 I can only tell you what I report to him.
25     Q   Okay.  He continues, "Therefore, I want each

Page 59

1  of you to send to -- to send your summer spike plan to
2  your manager with a copy to me.  Each manager will
3  develop one plan for his teams to ensure heat
4  mitigation action is being done consistently on a daily
5  basis."
6          Did you ever prepare a heat mitigate -- a
7  plan to ensure heat mitigation action is being done
8  consistently on a daily basis on your team?
9      A   We had already had that plan in place
10 already, so there was no -- there was no extra that
11 we -- we needed to do.
12     Q   Did you send him the same plan that you had in
13 place?  Is that what you did?
14     A   Not via e-mail.  I mean, we already had the
15 plan in place.  We were already doing everything that
16 we -- that -- to mitigate the heat as best we could.
17     Q   Okay.  It says, "Thereafter, managers and all
18 supervisors are to follow up daily to ensure plan is
19 being executed."
20         Did you instruct your supervisors to follow
21 up daily to ensure this plan was being executed?
22     A   I was already following up daily with --
23 prior to -- to the 26th.
24     Q   Well, did you do anything different in
25 response to Mr. Martinez's e-mail or to reenforce it or

Page 60

1  to restate it or anything like that?
2      A   In the standdown, it was discussed again in
3  the safety standdown with the whole group to -- to make
4  sure that -- you know, how important it is to follow
5  the -- the Q.S.M. 97, the heat mitigation, to make sure
6  you take care of yourself, whether -- you know, before
7  it gets hot.  So drinking plenty of water, watching out
8  for each other.
9      Q   Okay.  And the -- you're talking about the
10 standdown that Monday morning after Mr. Herrera's
11 injury?
12     A   Yes.
13     Q   Okay.  Did -- to your knowledge -- I see -- if
14 you'll go to e-mail 0045, it's an e-mail to you from
15 William Herring.  Here are the documents you requested
16 which are Mr. Herrera's written statement and his
17 52032, the P.I. report.  Do you know or -- oh, on
18 July 29, it looks like you forwarded that information,
19 those statements, to Mr. Martinez.
20     A   On what?  I'm sorry, what --
21     Q   I'm sorry, I'm on 0050.
22     A   Oh, okay.  I'm still on 45.
23     Q   Sorry.  0050.
24     A   That's what it says, yes.
25     Q   Do you know -- I'm looking at 0055, U.P.

Page 61

1  e-mail 0055.  On July 29 at 9:55, Phil Danner e-mails
2  you.  Who is Phil Danner?
3      A   Phil Danner is the A.V.P. of engineering.
4      Q   Who -- he's farther on up the chain than
5  Martinez -- Mr. Martinez, right?
6      A   He's the assistant vice-president of
7  engineering.
8      Q   Why is he involved, if you know?
9      A   He's the -- he's involved in engineering
10 department.  He's the assistant vice-president of
11 engineering.
12     Q   Okay.  He says, "Mike, what is the first
13 document?  It's a statement but not part of the 52032
14 or is it some add-on or was it taken later, et cetera?
15 Was that taken before or after?  By the way, there are
16 different color inks on 52032.  Why is that?  A key
17 part is saying the work did not cause the issue, but
18 that's in blue ink.  Did that get in added later or the
19 pen stop working or what?"
20         So he's pointed out a key part saying the
21 work did not cause the issue, but that's in blue ink,
22 and what did you respond to him?
23     A   Do you have that e-mail here?
24     Q   Keep going.  I think it's the --
25     A   Okay.

16 (Pages 58 to 61)

Page 62

1      Q    -- next page.
2      A    Number 56, that's what I have in front of me,
3  U.P. e-mail 0056.
4      Q    Yes, sir.  You e-mail Mr. Danner back, and
5  what -- what do you say to him?
6      A    This -- this document says on 056, "The
7  statement was taken at the same time as the 52032 and
8  was just a statement.  The different pen inks was his
9  pen ran out and he used a different one.  We had him
10 take a picture of the 50 -- 52032 with his phone when
11 it was complete for his records."
12     Q    Okay.  Whether it was because his pen ran out
13 of ink or not, why was it added, that statement, to the
14 P.I. report?  Do you see the -- the -- the -- if you
15 read "details of accident injury or occupational," to
16 my reading, it make it -- makes it sound like the --
17 that they were having to clip and de-clip by hand using
18 jacks.  Then he says, "Not using the machines to their
19 fullest all the time with the weather being so humid,
20 could be did equipment tools cause -- could be used
21 more and have proper machines helping or a couple more
22 people when possible."  But then -- and see, there's a
23 period after the "ties" on paragraph 1.  But then it's
24 added, "But the work did not cause me to overheat, the
25 humidity did."

Page 63

1         Do you have any understanding from your
2  conversation with him or anything that you said that
3  caused Mr. Herrera to add that to his P.I. report?
4      MR. SCHMITT:  Object to the form.  You're reading
5  from different parts.
6         But go ahead.
7      THE WITNESS:  You would -- you would have to ask
8  Mr. -- Mr. Herrera.  I mean, it's his document.  He --
9  he filled it out.  I mean --
10     Q    BY MR. COX:
11        And would you accept his explanation as to
12 why he did that?
13     A    I don't know what his -- I don't know what
14 his -- I can't answer that.  I don't know what it is.
15     Q    Do you remember hearing that discussed with
16 Mr. Lamson at his deposition?
17     A    I -- I can't remember.  There was a lot of
18 things discussed at that --
19     Q    Okay.  All right.
20     MR. SCHMITT:  Is this a good time for a break?
21     MR. COX:  Yeah.  You want to take a little break?
22 Sure.
23     THE VIDEOGRAPHER:  This is the end of media number
24 1.  We are going off the record.
25        (A break was taken.)

Page 64

1      THE VIDEOGRAPHER:  This is the beginning of media
2  number 2.  We are back on the record.
3      MR. COX:  Mr. Rolow, let me hand you Exhibit 10
4  that we talked about with some witnesses yesterday.
5  And these are e-mail texts that were provided to me by
6  the Union Pacific Railroad between Joe Linford and
7  somebody.
8         (Plaintiff's Exhibit 10 was previously marked
9          and attached hereto.)
10 BY MR. COX:
11     Q    And can you tell me, is -- is your phone
12 number on there?  Did you ever receive these texts?
13     A    My phone number is on here.
14     Q    Okay.  Let me look first --
15     A    You need it back or --
16     Q    No, no, I could do it like this.  Yesterday,
17 we talked about the little picture on the text.
18     A    Okay.
19     Q    Is that -- is that text to you from somebody
20 with that photograph?
21     A    It is, yes.
22     Q    All right.  And yesterday, I tried to find it
23 and couldn't.  Today I found it.  I'm going to mark as
24 24 a blowup of the picture that's on the text.
25     A    Okay.

Page 65

1         (Plaintiff's Exhibit 24 was marked by the
2          Certified Shorthand Reporter and attached
3          hereto.)
4  BY MR. COX:
5      Q    Now, can you document for me, is that a blowup
6  of the photograph that's on 10 on that text?
7      A    Can I borrow your glasses?  No, I'm just
8  kidding.
9      Q    You're only what, 30-something and you need
10 these glasses?  Come on.
11     A    It appears to be a blowup of this picture,
12 yes.
13     Q    Okay.  What is this a picture of?
14     A    This is a picture of a canopy, a shade canopy
15 around an O.S. or a crossing, it looks like, with
16 water, a cooling fan, a cooler -- two coolers,
17 actually, one small, one -- one large.
18     Q    And in the text, it says there was an
19 attachment and then a response, "Perfect.  How hot
20 today?"  And "not bad yet."  But what I'm concerned
21 about is the times on those texts.
22     A    On -- on that piece of paper?
23     Q    Yeah.  On --
24     A    I'm not too sure if they're correct or not.
25     Q    Okay.

17 (Pages 62 to 65)

Page 66

1    A   I'd have to look into my phone to see if they
2 were.
3    Q   Okay.
4    A   So I --
5    Q   What I'm interested in is on 10, the fourth
6 text says -- well, the second one says, "perfect." And
7 then it says, "get more if you need them."
8        Is that -- is that "get more if you need
9 them," is that from you?
10   A   Yeah.  From my phone number right there, yes.
11   Q   All right.  And what are you referencing, "get
12 more," what are you referencing, "perfect, and get more
13 if you need them"?
14   A   The canopies.
15   Q   Do you know how many of these canopies were on
16 8501 on July 25th, 2015?
17   A   I'd have to ask the -- the work group.  I
18 know that they have -- they -- they have a handful.  I
19 don't know how many per se.
20   Q   Okay.  I don't want you to guess.
21   A   I'd have to ask.
22   Q   Okay.  Okay.  All right.  Let me see if that's
23 all I need to talk about about those texts.  See, the
24 reason I'm concerned about the times of these texts on
25 Exhibit 10, here's one July 26, '15 at 10:30 at night,

Page 67

1 "Where I'm standing, my phone says it feels like 103."
2    A   I don't know -- that's what I mean, those
3 times, I don't think they're -- they're accurate on
4 that paper.
5    Q   Okay.
6    A   That was the one thing I noticed, as well.
7    Q   Okay.  Now, let's talk about some other texts
8 that were provided to me by the U.P.  I'm going to mark
9 this one as 25, Exhibit 25.
10       (Plaintiff's Exhibit 25 was marked by the
11       Certified Shorthand Reporter and attached
12       hereto.)
13 BY MR. COX:
14   Q   Is your phone number on any of these?  It
15 looks like they're from Carlos Diaz.  Is this to you?
16   A   My phone number's on here again, yes.
17   Q   Now, here again, these dates and times are
18 messed up, too, it looks like.
19   A   Yeah, I mean, they don't.  They're -- they're
20 a little bit -- I couldn't tell you if they're --
21   Q   See --
22   A   -- correct or not.
23   Q   July 26, 2015, 10:13 p.m., you're asking for
24 Guillermo's name and E.I.D., employee identification,
25 but you already had that.  Well, wait a minute.  On the

Page 68

1 26th at 10:00 p.m. -- well, let's look at the next one,
2 July 26.  "What was the heat index today?"  That's when
3 Carlos tells you the heat index was 113, the following
4 e-mail.  And on July 26 at 10:24 p.m., says -- you
5 e-mail him, "What was the heat index?"  He responds,
6 "Sorry, talking to doctor.  Lab work is good.  No
7 problems.  Just needed fluid.  Heat index 113."
8        Now, that's -- I doubt if that occurred at
9 10:24.  I don't think he was still talking to the
10 doctor at 10:24.  He's out of the hospital at like 8:30
11 or 9:30, something like that.  Although it might --
12 might be 10:30.  I'll check.  But is this what you
13 based your incident report on, "lab work is good, no --
14 no problems, just need fluids, heat index 113"?  Or do
15 you know?
16   A   I based the -- the report off of the
17 information that was given to me.
18   Q   Okay.  I mean, did you -- is this off a text
19 from Diaz or a phone call with Mr. Diaz?
20   A   I know the heat index was -- was from here.
21   Q   Then Mr. Diaz asked, "If a tester
22 should come," you say, "may not have any liquid to
23 give," you're talking about urine, I assume?  Then it
24 says, "sleeping good now.  Call in a U.A. test for him,
25 please."

Page 69

1        Why -- why did you call in for a urinalysis
2 test?
3    A   Urinalysis test is -- is protocol for -- for
4 every incident.
5    Q   Okay.  Then you ask about, "Is he on any meds,
6 blood pressure, anything?"  This is where you learn
7 about the Tylenol number 3.  "Took one last night at
8 7:30."  You learned that from Carlos Diaz?
9    A   That's what it says, yes.
10   Q   Why would -- why would or -- strike that.
11       What authority would Carlos Diaz have to
12 discuss medical treatment or the taking of prescription
13 medications with Mr. Herrera?
14   A   Can you -- I'm sorry?
15   Q   Sure.
16   A   Can you rephrase it?
17   Q   What authority does Carlos Diaz have to
18 discuss medications with Mr. Herrera or whether or not
19 he had taken any medication?  Isn't that privileged
20 medical information?
21   MR. SCHMITT:  Form.
22       Go ahead.
23   THE WITNESS:  If -- if Guillermo tells him -- I
24 mean, if a question's asked and he tells him, then --
25 ///

18 (Pages 66 to 69)

Page 70

1    Q   BY MR. COX:
2        I'm more interested in the question.  What
3    authority does he have to ask Mr. Herrera about
4    privileged medical information?  For example, "What
5    prescription medication are you taking?"
6        MR. SCHMITT:  Form.
7    Q   BY MR. COX:
8        Do you know whether he has any legal
9    authority to do that?
10   A   Not from Union Pacific, no.
11   Q   Okay.  Okay.  All right.  Let's move just to
12   some general rules to begin with on the U.P.
13       Can you tell us what the GCOR is, General
14   Code of Operating Rules?
15   A   The GCOR is General Code of Operating Rules.
16   Q   And what is it authority -- well, it says
17   right on the document, could you read that?  These are
18   the 7th edition, effective April 1, 2015.  Could you
19   read what these rules are.  It begins, "These rules."
20   A   The document says, "These rules hereon govern
21   the operations of the railroads listed and must be
22   compiled with all" -- I'm sorry, with -- with -- "by
23   all employees, regardless of gender whose duties are in
24   any way affected thereby.  They supercede all previous
25   rules and instructions and consent there - therewith."

Page 71

1    Q   All right.  And 1.0, general responsibilities
2    1.1, the first safety rule in GCOR says what?
3    A   "1.1 safety."  "Safety is the most important
4    element in performing duties.  Obey the rules is
5    essential to job safety and continued employment."
6    Q   And 1.1.1 says what?
7    A   1.1.1, "Maintain a safe course.  In case of
8    doubt or uncertainty, take the safe course."
9    Q   Exhibit 27 is another rule from GCOR.  It is
10   1.2, the second rule in the safety portion.  What does
11   1.2.1 -- what does 1.2 say?
12   A   1.2?  1.2?
13   Q   Yes, sir.
14   A   "Personal injuries and accidents."
15   Q   And 1.1 -- 1.2.1 says?
16   A   The document says 1.2.1, "care for injured.
17   When passengers or employees are injured, do
18   everything -- everything responsible to care for them."
19   Q   Reasonable?
20   A   I'm sorry.
21   Q   Do everything reasonable.
22   A   Oh, sorry.  "Do everything reasonable to care
23   for them."
24   Q   Okay.  28 is a portion of the Union Pacific
25   Railroad Safety Rules, and it contains the Statement Of

Page 72

1    Safety Policy of the Union Pacific Railroad.
2        (Plaintiff's Exhibits 26, 27, and 28 were
3         marked by the Certified Shorthand Reporter
4         and attached hereto.)
5    BY MR. COX:
6    Q   And could you update or could you read that
7    for us, please.
8    A   The document says, "statement, statement of
9    safety policy."  "In this policy of the Union Pacific
10   Railroad, that operations be conducted in a safe
11   manner.  The management of Union Pacific Railroad
12   believes all injuries can be prevented.  All management
13   and employees at all levels are responsible for
14   maintaining safe working conditions and preventing
15   personal injuries.  Carrying out work functions in a
16   safe manner is more important than meeting deadlines,
17   production schedules, and other safe --" oh, sorry, "--
18   nonsafety criteria."
19   Q   Thank you.
20   A   Updated July 2nd, 2013.
21   Q   Thank you.
22       We went over these exhibits a little bit
23   yesterday with some of the witnesses, but I needed you
24   to clarify one for me.  On Exhibit 8, these are
25   Production Reporting Details for July 26, 2015.

Page 73

1        (Plaintiff's Exhibit 8 was previously
2         marked and attached hereto.)
3    BY MR. COX:
4    Q   And I'm just going to ask you to look here on
5    the third page.  It says, "rail details milepost from
6    milepost 2," and it looks like on that day, they worked
7    from milepost 92.22 to 92.90, both rails, left and
8    right, then from 9942 to 9950, both rails.  And then
9    from, 9950 to 9997, both rails.
10       Does it appear to you that the gang is spread
11   out or working on sections of track over approximately
12   seven miles?
13   A   It -- it would all depend on the specifics
14   of -- of the project.  I mean, the milepost range is
15   from 92 to 99.
16   Q   Then on Exhibit 4, which we talked about
17   yesterday, I just needed to clarify on this job
18   briefing form that we talked about.  This form will
19   tell the employees when they show up to the job
20   briefing, yesterday's the days before, actual number of
21   track feet laid, that's 12,240?
22   A   That's what the document says.
23       (Plaintiff's Exhibit 4 was previously marked
24        and attached hereto.)
25   ///

IMHOF AND ASSOCIATES COURT REPORTERS AND VIDEOGRAPHERS
(800) 939-DEPO (3376)  (714) 693-1213

Page 74

BY MR. COX:
1
2     Q    And then "today's goal, relay mile -- relay
3  mail mile," gosh, "relay rail milepost 92.22 to
4  milepost 92.90, and relay rail milepost 39.42 to
5  milepost," I think it's "100." I can't quite see that.
6  "Today's goal is 13,304 feet of laid rail to be laid";
7  is that right?
8     A    That's what that document says.
9     Q    And on the 26th, you all were hoping to lay
10  over 1,000 feet more rail from the previous day?
11    A    That was the goal is what that document says.
12    Q    Okay. What knowledge do you have, Mr. Rolow,
13  about how the heat index is calculated on the U.P.?
14    A    They calculate the heat index by -- we -- we
15  use a bar graph, I mean, not a bar graph, but a graph
16  on -- out of the Q.S.M. 97.
17    Q    Let me find that. Here's Exhibit 15, so we'll
18  know what we're talking about. Can you hold that up?
19  And tell the -- hold that up so the camera can look at
20  it.
21        (Plaintiff's Exhibit 15 was previously
22         marked and attached hereto.)
23  BY MR. COX:
24    Q    Is that the Q.S.M. you're talking about?
25    A    I would have to read through it.

Page 75

1     Q    Sure. I'm sorry. Go ahead.
2     A    This appears to be the -- the Q.S.M. for heat
3  stress prevention.
4     Q    I understand that that chart that you talked
5  about, which is on page 10 of the document -- could you
6  hold that up to the camera so the jury can get a sense
7  for what we're talking about. I don't expect them to
8  be able to read it, but --
9     A    Yeah.
10    Q    Okay. They'll have this in front of them at
11  the trial.
12        I understand that this chart has three color
13  categories, general heat stress prevention measures,
14  high heat procedures to be implemented, and extreme
15  heat procedures to be implemented.
16        How does -- how did, on July 26, 2015, gang
17  8501 learn what the heat index was going to be for
18  July 26?
19    A    The heat index is -- it's forecasted first
20  thing in the morning from the weather service what it's
21  going to be in that area. And then when they get to
22  the job, they -- they forecast it on the track.
23    Q    Okay.
24    A    So it's taken by, you know, an anemometer,
25  which would take the wind speed, it will give the --

Page 76

1  the temperature and the humidity.
2     Q    Okay.
3     A    And then they can calculate from there what
4  the heat index for the day would be.
5     Q    Hold on a second here.
6        Okay. Is it your experience that the
7  temperature on the track on a sunny day is hotter than
8  the ambient temperature?
9     A    That -- that the temperature on the track --
10    Q    Is hotter than the ambient temperature away
11  from the track.
12    A    Temperature on the track can be -- can be
13  hotter than -- than off the track.
14    Q    Has the U.P. ever provided you any guidance as
15  to how to determine that or an estimate of what it
16  would be?
17    A    There's no -- I mean, the only way to
18  determine that would be take the -- as we do is take
19  the measurement from the track.
20    Q    And would you agree with me that a heat index
21  of 113 is in the extreme heat procedures to be
22  implemented portion?
23    A    This document, 113 is in the extreme heat
24  procedures to be implemented, yes.
25    Q    Let's look at appendix B in that document.

Page 77

1  It's on page 11. Got it?
2     A    Yes, sir.
3     Q    This is the general heat stress prevention.
4  This is the steps that are be -- to be taken if the
5  heat index is on the yellow portion of the chart; is
6  that your understanding?
7     A    General heat stress prevention, that's what
8  it says, yes.
9     Q    One of the bullets says, "Observe employees
10  for alertness and signs or symptoms of heat illness."
11  Is that right?
12    A    That's what it says. Fourth -- fifth line
13  down -- fourth line down.
14    Q    Couple of bullets down, it says, "Reenforce
15  U.P.R.R. procedures for responding to symptoms of
16  possible -- possible heat illness, including how
17  emergency medical services will be provided should they
18  become necessary."
19        Does the document say that?
20    A    That's what the document says.
21    Q    And what's your understanding of what are the
22  symptoms of possible heat illness?
23    A    I have to read through the -- the symptoms
24  list on the -- in the Q.S.M. 97. I don't -- I can't
25  remember them verbatim.

20 (Pages 74 to 77)

1    Q    Okay.  In -- on high heat procedures, I'm
2    in -- I'm in appendix C, page 12, under those
3    circumstances, you ensure that all employees -- high
4    heat is orange on the chart.  That is the heat -- high
5    heat procedures, ensure that all employees exposed to
6    the high heat take a rest break for at least five
7    minutes every hour.  And this is interesting to me.  It
8    says, "Note, in California, these breaks must be
9    permitted in the shade or air-conditioned vehicles or
10   equipment.  Supervisors must provide enough shade or as
11   many air-conditioned vehicles and equipment to
12   accommodate 25 percent of the employees at any one
13   time.  The shade or air-conditioned vehicles or
14   equipment must be accessible within five minutes of the
15   work site."
16       Now, this gang has worked in California
17   before.  In fact, you all had your last stop before
18   Onaga was in California; is that right?
19   A    Yes, we did work in California prior to -- to
20   Onaga.
21   Q    Does -- what does the gang do in terms of high
22   heat procedures when it leaves California?
23   A    They -- they follow this.
24   Q    Do they follow the California rule or --
25   A    They follow the Q.S.M. 97.

1    Q    Okay.  The -- one of the bullets says, "On
2    larger gangs or where the work is spread over an
3    extended distance, the designation of a buddy for each
4    employee must be discussed in the job briefing."
5        What does that mean?
6    A    So in the morning in the job briefing, every
7    employee's designated a buddy, and -- and within our
8    work group, everybody's everyone's buddy, so whoever
9    they're working next to is their buddy.  And that's how
10   it's explained to them.
11   Q    See, that's confusing.  If everyone is
12   everyone's buddy, I thought a buddy system was, I was
13   your buddy and you were my buddy and we'd look out for
14   each other.  Is it -- does the U.P. mean it differently
15   than that?
16   A    A buddy is whoever you're -- you're working
17   next to is your buddy.  So in the railroad, in -- in
18   the work group, you can be moved from the front of the
19   gang to the back of the gang, away from that particular
20   person.  And when you get to the back, you might have a
21   different buddy.  It might not be the same person
22   every -- throughout the whole day.
23   Q    So --
24   A    We can't give you two people because they
25   might be doing two different separate jobs, so wherever

1    you're at in the gang, that's your buddy right next to
2    you.
3    Q    Okay.  So when I move from the front of the
4    gang to the back of the game -- gang, do I walk up to
5    you and say, "Mike, I'm your new buddy, you're my new
6    buddy"?
7    A    Well, they check into the form B or -- or the
8    track and time with A.F. and everybody's watching for
9    everybody.  That's how it's designated in the job
10   briefing.  Because if -- if somebody comes and helps
11   and has to be drawn off to another task, he has -- he
12   can't take two people with him, three people with him.
13   I mean, it's -- that's why it's designated, you know,
14   the -- as the -- as the buddy system, so --
15   Q    Everybody is everybody's buddy?
16   A    Correct.  Wherever -- wherever you're working
17   within that gang, the guy right next to you is your
18   buddy.
19   Q    Okay.  See, the reason I'm confused is the
20   Q.S.M. says the designation of a buddy for each
21   employee must be discussed in the job briefing.  To
22   me -- and I don't want to really argue with you, but to
23   me, that reads like each employee has a buddy?
24   A    And -- and that's how it discussed.  Each
25   employee does have a buddy.  If I'm working next to

1    you, whether you're in the front of the gang or in the
2    back of the gang, I'm your buddy.
3    Q    Okay.
4    A    It's everybody watching out for everybody, so
5    the guy next to you is watching out for you and in
6    turn, you're watching out for him.
7    Q    Is there a -- is -- okay.  Never mind.
8        The next bullet says, "When practicable,
9    schedule work in hot areas for cooler months or --
10   and/or cooler parts of the day.  When practicable,
11   schedule work for cooler parts of the day."
12       Was any consideration given on 8501, to your
13   knowledge, on July 25th or 26th, particularly on the
14   26th when the heat index was at least 113 to doing the
15   work during the cooler part of the day?
16   A    Can you rephrase -- I mean --
17   Q    Sure.
18   A    Rephrase that question.  I have it right
19   here.  It's under -- on page 12?
20   Q    Yeah.  My question, to your knowledge, was any
21   consideration given to doing the work on July 26 when
22   the heat index was at least 113 degrees to doing the
23   work during the cooler part of the day?
24   A    What -- what would be the cooler part of the
25   day?

IMHOF AND ASSOCIATES COURT REPORTERS AND VIDEOGRAPHERS
(800) 939-DEPO (3376)   (714) 693-1213

Page 82

1    Q   I would assume the morning or late evening.
2  If we look at the temperature scale for the day, I know
3  it's hot and humid in Onaga all the time, but --
4    A   Uh-huh.
5    Q   -- it is cooler in the morning and it's cooler
6  later in the evening.  Does -- was any consideration
7  given to doing or scheduling the work for the cooler
8  part of the day?
9    A   In -- in the Kansas area, it's scheduled
10  to -- to try to get most of the work done in the cooler
11  part of the morning.  So the curfew which is the times
12  that you could be on the track to -- in between the
13  trains is -- is from, you know, 6:00 o'clock or 6:30
14  until 1400 before it gets hot.  So -- so you try to get
15  your work done in the cooler parts of the day.  We
16  don't want to work from 2:00 o'clock to 6:00 o'clock,
17  which is the hottest part of the day.
18    Q   Well, let's look, then, at -- and see if
19  that's what this gang did.  And let's look at just
20  July 26.  Hang on a second.  Just give me one second to
21  find it.  You know, let's go -- let's go off the
22  record, let's not hold everybody up and let me find it.
23  Stay on -- I found it.
24       I'm going to hand you Exhibit 8, which is a
25  Production Reporting Detail for July 26, 2015.  And it

Page 83

1  shows that the gang, if I'm reading this right, started
2  the -- on page 2, it's got a start time 7:00 a.m. --
3  wait a minute, I'm -- I'm looking at their 6:20
4  was when the job briefing was, then they traveled to
5  the -- the gang traveled to the job site, started
6  working, let's say, at 6:50.  That's when the travel
7  ended.  And they worked until -- where would this be,
8  1900?  Till 7:00?  Am I reading that right?
9    MR. SCHMITT:  No, it's 1630.
10    Q   BY MR. COX:
11       Well, you read it for me.  When -- according
12  to that document, when did the gang start working and
13  when did that gang come off the track?
14    A   Start time was 0600 -- well, you're looking
15  under delayed times, 0600 --
16    Q   Is when they --
17    A   -- when they started work.
18    Q   Then they had a job briefing?
19    A   Till 1600.  I'm sorry, let me -- let me
20  correct that.  0600 until 1830 is their -- is their
21  scheduled time.
22    Q   They left the track at 1830?
23    A   No.  No.  No.  No.  That's not what I said.
24    Q   Okay.
25    A   I said their scheduled time to work was 0600

Page 84

1  until 1830.  Now what time did they leave the track?
2    Q   That was their window then?  Their track and
3  time --
4    A   No.  No.  No.  No.
5    Q   Go ahead.
6    A   Their start time was 0600 until 1830.  That's
7  what -- that's the hours they get paid for the day.
8    Q   Okay.
9    A   Okay?  Their production was from -- quit at
10  1630.
11    Q   4:30?
12    A   Correct.
13    Q   And then what do they do at 4:30?
14    A   They get on the bus.
15    Q   And what on here, on this production
16  milestone -- see, this is what's confusing.  Production
17  milestone and on track log, what -- what -- what's the
18  difference between -- between those two?
19    A   I don't fill these out, so I can't give you
20  exactly the definitions of them.
21    Q   Okay.
22    A   But I mean, they're -- per the times,
23  they're -- they're almost exactly the same --
24    Q   Okay.
25    A   -- if you read it correctly.

Page 85

1    Q   That's what I'm trying to do --
2    A   Okay.
3    Q   -- is learn how to read it correctly.  On
4  track log, is that when they're on the track?
5    A   No.
6    Q   What is the production milestone?  I think
7  they told us yesterday that --
8    A   It's -- it's like a C.P.I. data.  It's
9  just -- it -- it kind -- the production report tells
10  you every -- what times you're doing what, so if you
11  could read that, so -- I can't quite see that.  So the
12  category, obviously, pre -- precurfew activities, the
13  curfew being what time you get the track, okay?
14  Precurfew, that's before you get the track.
15    Q   Okay.
16    A   Okay?  So start of shift and then it has
17  end-of-job briefing.
18    Q   At what time?
19    A   6:20.
20    Q   Okay.
21    A   Okay?  Arrive at machine 6:50, equipment
22  check.  These are targets, so these are actuals.
23    Q   Give me the actual.  What actually happened on
24  the 26th.  Am I looking at the 26th?
25    A   Yeah.

22 (Pages 82 to 85)

Page 86

1    Q   Okay.
2    A   So permit, okay, time, that's what time you
3  get the track, 7:00; first spike driven, 9:10; gang
4  clear -- I'm sorry, last spike driven 1630, and then
5  gang clear at 1900.
6    Q   What does gang clear mean?
7    A   That's when they gave back the track, not
8  when they're done with production, but when they gave
9  the track back.  So that's when the signal clears, when
10  everybody else clears the track.
11    Q   So we learned yesterday instead of last spike
12  driven, since this was a steel gang --
13    A   Well --
14    Q   -- clip?
15    A   Correct.
16    Q   We learned that the last clip installed was at
17  1630, 4:30 in the afternoon, and then they had to
18  travel to the siding to put the machines in the siding,
19  and the gang cleared the track at 7:00 in the
20  afternoon, 1900, because the track didn't clear until
21  the machines are off it?
22    A   It all depends.  I mean, that's not --
23  generally that is, but I mean, you got a lot of
24  other -- you got the signal gang that's out there that
25  you can't -- you can't give the track back when the

Page 87

1  signal gang's out there.  So that gang could have been
2  in the clear at 1630 or at 15.
3    Q   Do you -- do you know if there was a signal --
4  signal gang out there?
5    A   Yeah, there was a signal gang out there and
6  they gave the track back at 1900, so that's when the
7  track was safe to give it back.
8    Q   Who -- who gave it back?
9    A   The E.I.C., the employee in charge.
10    Q   Okay.  So are you -- you know whether or
11  not or do you know when this gang cleared the track?
12    A   The gang?
13    Q   Yeah.
14    A   They gave back the time at 1900 is what that
15  document says.
16    Q   7:00 o'clock in the evening?
17      So essentially on this day, they were on the
18  track from first -- spike pulled first, clip installed
19  7:40, last spike driven, last clip installed 1630,
20  4:30, and the gang was clear of the track at 1900, 7:00
21  o'clock at night; is that right?
22    A   No.  The -- the track was given back at 1900.
23  The gang could have been cleared up for two hours
24  before that.  The track was given back at 1900.
25    Q   So it could have been, you just don't know?

Page 88

1  You weren't there?
2    A   No, I wasn't there.
3    Q   Okay.  And if that -- well, all right.  Let's
4  go back to the Q.S.M. for a second.  I'm still on page
5  12.  Here it says, "Extreme heat procedures," "In
6  addition to those procedures in appendix B and C,
7  supervisors will ensure that all employees exposed to
8  the extreme heat take a rest break for at least 15
9  minutes every hour.  Employees should also take
10  advantage of shade, forced-air or air-conditioned
11  vehicles or equipment, if they are available."
12      Explain to me how supervisors ensure that all
13  employees exposed to the extreme heat take a rest break
14  for at least 15 minutes.  How -- how do they ensure
15  that?
16    A   The -- in the job briefing, everyone's
17  instructed to take their 15 minute every hour along
18  with the assistant foreman.  So the foreman of the gang
19  will ensure that he gets that message out, hey, take
20  your 15-minute break.  Now, those are minimum.  That's
21  a minimum at least.  So that's the minimum that they
22  need to be given.  I mean, they're -- they're
23  instructed to take as many breaks as they need to.
24    Q   If --
25    A   So they're -- that means to take advantage of

Page 89

1  every chance they have if they're feeling, you know --
2  if they need to get to the shade, to take advantage of
3  every chance they can get.
4    Q   Now, would this apply to machine operators
5  that are in air-conditioned cab?
6    A   This is applied to everybody.  This is given
7  to everybody.
8    Q   Everybody?  So everybody on that gang has to
9  stand down and stop working in extreme heat procedures
10  for 15 minutes every hour?
11    A   That's what it says, yes.
12    Q   Okay.  In the Q.S.M. or Q.S. 97 or quality
13  safety meeting process, Exhibit 13, does it address
14  what is addressed here in Exhibit 20, the heat index
15  that's provided by the National Weather Service in
16  Exhibit 20, is this guidance contained in the Q.S.M.,
17  that if the heat index is 105 to 130 -- I'm reading
18  here off the document -- if you can see it -- sun
19  stroke, heat cramps, or heat exhaustion likely, and
20  heat stroke possible with prolonged exposure and/or
21  physical activity, does this Q.S.M. contain any of that
22  guidance?
23      (Plaintiff's Exhibit 13 was previously
24      marked and attached hereto.)
25    MR. SCHMITT:  Objection.  Form, foundation, not a

23 (Pages 86 to 89)

Page 90

1  Union Pacific document.
2      Go ahead.
3      Q    BY MR. COX:
4      Just does it -- does that document, the
5  Q.S.M. advise you that with a heat index between 105
6  and 130, sun stroke, heat cramps, or heat exhaustion
7  likely and heat stroke possible with prolonged exposure
8  and/or physical activity?
9      MR. SCHMITT: Same objections.
10     THE WITNESS: The -- the Q.S.M. 97 provides a lot
11 of information. I don't know if it has that particular
12 information in it. That's not a -- that's not a
13 document I've seen before.
14     Q    BY MR. COX:
15     That's what I'm asking you. Does this
16 training document that you said you relied on for
17 guidance about heat injury prevention -- what do they
18 call it? Heat stress prevention? Does that contain
19 these guidelines for the supervisors or employees?
20     MR. SCHMITT: Objection. Asked and answered.
21     THE WITNESS: If it provides everything that's in
22 here, I've never seen that document, I don't know.
23     Q    BY MR. COX:
24     Okay. Does the Q.S.M., Exhibit 15 or 13,
25 there's two of them marked, it's -- does it provide

Page 91

1  advice that the heat index values were devised for
2  shady light-wind conditions, and exposure to full
3  sunshine can increase heat index values by up to 15
4  degrees fahrenheit. This is contained in an OSHA
5  document that is referenced in the Q.S.M.
6      Does the Q.S.M. provide guidance to
7  supervisors and -- or instruct employees that exposure
8  to full sunshine can increase heat index values by up
9  to 15 degrees fahrenheit?
10     MR. SCHMITT: Object to form, foundation,
11 inappropriately reading other documents not Union
12 Pacific documents.
13     THE WITNESS: Yeah, I never seen that document
14 before. The one that we go by is the one that's
15 provided to us by Union Pacific.
16     MR. COX: So the answer is this advice that's
17 contained in this OSHA document, that exposure to full
18 sunshine can increase heat index values by up to 15
19 degrees fahrenheit is not included in that Q.S.M.?
20     MR. SCHMITT: Object to form.
21     THE WITNESS: I don't know if it is or not. I've
22 never seen that document, so I don't know.
23     Q    BY MR. COX:
24     I'm not asking about the document. I'm
25 asking about that advice. Is this advice, what's

Page 92

1  called an important note in this OSHA document,
2  contained in the Q.S.M.?
3      MR. SCHMITT: Objection.
4      THE WITNESS: I don't know.
5      MR. SCHMITT: Just -- just a minute. You need to
6  pause for a moment and let me at least make my
7  objections for the record. And we've got a court
8  reporter here that's trying to type everything down.
9      Objection. Asked and answered. You're,
10 again, presenting a document from whatever source you
11 obtained it from. It's not a Union Pacific document.
12 It's inappropriately reading it into the record. The
13 witness has already answered the question.
14     Q    BY MR. COX:
15     All right. Take a minute, look through the
16 Q.S.M., see if you find that advice in there anywhere.
17 In here, I'm going to mark a little square around the
18 advice I'm asking you to look for.
19     Is that advice -- is that important note
20 contained in the Q.S.M.?
21     MR. SCHMITT: Same objections.
22     THE WITNESS: There's a lot of important
23 notifications in this Q.S.M. 97 that is provided to us.
24 I don't know -- I -- like I said, I've never seen that
25 before, so I don't know if it is or isn't. It could be

Page 93

1  in here in different terminology.
2      Q    BY MR. COX:
3      Well, look -- look through it and see. Just
4  take a minute. We got all the time you need to go
5  through that Q.S.M., and tell me whether that
6  information, that instruction is included in there or
7  not.
8      MR. SCHMITT: Object to the form. It's not an
9  instruction.
10     MR. COX: An important note.
11     MR. SCHMITT: Well, again, object to the form,
12 foundation. It's some document that you obtained from
13 whatever source. It's inappropriate.
14     THE WITNESS: In the Union Pacific document that's
15 provided to us, there's no important note in here or
16 anything that references an important note.
17     Q    BY MR. COX:
18     Or references that --
19     A   There's nothing in here that references an
20 important note.
21     Q   No. It's not the important note, it's the --
22 is there anything in there that according to
23 supervisors or employees on the Union Pacific Railroad,
24 that when calculating the heat index, exposure to full
25 sunshine can increase heat index by up to 15 degrees

24 (Pages 90 to 93)

Page 94

1   fahrenheit?
2       MR. SCHMITT:  Objection.  Asked and answered.
3       THE WITNESS:  I don't see it in here.  I've never
4   see it before, so I don't -- I can't -- I can't answer
5   a document I've never seen before.
6       Q   BY MR. COX:
7       All I'm asking you is do you see that in
8   there?  You said you didn't see it in there.
9       A   I didn't see anywhere that said an important
10  note in here.
11      Q   Okay.  Now, let's move to another topic.  Tell
12  me what you know about Federal Railroad Safety Act
13  20109, what's called OSHA Whistleblower Policy.  What
14  training have you received from the U.P. about that?
15      A   For -- for the OSHA Whistleblower?
16      Q   Yes, sir.
17      A   The only -- the only training that I have
18  on -- on whistleblower is the actual -- I mean, the
19  whistleblower that's provided by Union Pacific is the
20  training.  I don't know if it's OSHA or not.  I
21  couldn't answer that.
22      MR. COX:  Okay.  Let me hand you what I've marked
23  as Exhibit 29.  This is the U.P. OSHA Whistleblower
24  Policy and Directive.  Whistleblower -- do you see on
25  the bottom left-hand corner, it said Whistleblower

Page 95

1   Policy, final May 18, 2015.
2       (Plaintiff's Exhibit 29 was marked by the
3       Certified Shorthand Reporter and attached
4       hereto.)
5   BY MR. COX:
6       Q   Do you see that?
7       A   That's what the document says, yes.
8       Q   Okay.  And do you see on the second page, the
9   fourth paragraph begins, "When an employee reports a
10  work-related personal injury or illness, Union
11  Pacific's expectations include, but are not limited to,
12  the following."  And what does that -- what does
13  number 1 say?
14      A   This document says, "When an employee reports
15  a work-related personal injury or illness, Union
16  Pacific's expectations include, but are not limited to,
17  the following:  Number 1, ensure the employee receives
18  necessary medical attention without delay.  If
19  transport to the hospital is requested, the manager
20  shall arrange transportation to the nearest hospital
21  where the employee can receive safe and appropriate
22  medical care."
23      Q   Have you ever seen this document before?
24      A   I believe I have, yes.  I mean, it's --
25      Q   All right.  Let's move down to paragraph 5 of

Page 96

1   Exhibit 29.  The Union Pacific Railroad OSHA
2   Whistleblower Policy and Directive.
3       What does paragraph 5 say?
4       A   Okay.  On Number 5, "Do not enter the
5   examination treatment room unless specifically invited
6   to do so by the employee."
7       MR. COX:  Let's look at Exhibit 30.
8       (Plaintiff's Exhibit 30 was marked by the
9       Certified Shorthand Reporter and attached
10      hereto.)
11  BY MR. COX:
12      Q   This is a memo from Lance Fritz, February 28,
13  2013.  In 2013, Lance Fritz was -- what was his job on
14  the U.P.?
15      A   I don't know.
16      Q   Okay.
17      A   I can't remember.  He's got many jobs, so I
18  couldn't tell you.
19      Q   All right.  It's addressed to all operating
20  department management employees.  Have you ever seen
21  this document?
22      A   If it was -- if it was directed to all
23  operating department management employees, I was not
24  management in 2013.  So no, I wouldn't have seen this
25  document.

Page 97

1       Q   All right.  So management employees in 2013
2   would have.  Okay.  If you -- if you hadn't seen it, we
3   will talk to others that had.
4       Mr. Rolow, you were present at
5   Guillermo Herrera's deposition in Omaha and sat through
6   his deposition; is that right?
7       A   That's correct.
8       Q   Have you talked to any of the witnesses that
9   testified here in the last two days, Mr. Bobby Steely,
10  Bobby Herrera, Carlos Diaz -- I'm sorry, my mind's
11  going blank.  I can't think of the other person.
12      Have you talked to any of those people about
13  anything that occurred at that deposition or that was
14  said by Mr. Herrera at his deposition?
15      A   No, sir.
16      MR. COX:  That's all the questions I have.
17      Thank you for your time today.
18      THE WITNESS:  Okay.
19      MR. SCHMITT:  I will wait with all of my questions
20  until the time of trial.
21      MR. COX:  All right.
22      THE VIDEOGRAPHER:  This is the end of media
23  number 2 and marks the conclusion of today's deposition
24  of Mr. Michael Rolow.  We are off the record.
25      MR. SCHMITT:  And he'd like to read and sign, so

Page 98

1  you can just send that to me and then we'll forward
2  that on.
3      THE REPORTER:  And did you want a copy?
4      MR. SCHMITT:  Yes.
5      (Deposition concluded at 11:39 a.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 99

1
2
3
4
5      I, MICHAEL ROLOW, declare
6  under penalty of perjury under the laws of the
7  State of California that the foregoing is
8  true and correct.
9
10      Executed at _____,
11  California, this _____ day of _____,
12  2016.
13
14
15      _____
    MICHAEL ROLOW
16
17
18
19
20
21
22
23
24
25

Page 100

1          REPORTER'S CERTIFICATE
2
3
4      I, JACQUELINE MARTINEZ, CSR No. 12418,
5  Certified Shorthand Reporter, certify:
6      That the foregoing proceedings were
7  taken before me at the time and place therein set
8  forth, at which time the witness was put under oath by
9  me;
10      That the testimony of the witness and
11  all objections made at the time of the examination
12  were recorded stenographically by me and were
13  thereafter transcribed;
14      That the foregoing is a true and correct
15  transcript of my shorthand notes so taken.
16      I further certify that I am not a
17  relative or employee of any attorney or of any of the
18  parties, nor financially interested in the action.
19      Dated this 22nd day of June, 2016.
20
21      _____
    JACQUELINE MARTINEZ, CSR No. 12418
22
23
24
25

Page 101

1      REPORTER CERTIFICATION OF CERTIFIED COPY
2
3
4
5      I, JACQUELINE MARTINEZ, CSR No. 12418, a
6  Certified Shorthand Reporter in the State
7  of California, certify that the foregoing
8  pages 1 through 100 constitute a true and
9  correct copy of the original deposition of
10  MICHAEL ROLOW, taken on June 10, 2016.
11      I declare under penalty of perjury
12  under the laws of the State of California
13  that the foregoing is true and correct.
14      Dated this 22nd day of June, 2016.
15
16
17
18      _____
    JACQUELINE MARTINEZ, CSR No. 12418
19
20
21
22
23
24
25

26 (Pages 98 to 101)